James E. Magleby (7247)
 magleby@mgpclaw.com
Eric K. Schnibbe (8463)
 schnibbe@mgpclaw.com
Jennifer Fraser Parrish (11207)
 parrish@mgpclaw.com
**MAGLEBY & GREENWOOD, P.C.**
170 South Main Street, Suite 850
Salt Lake City, Utah 84101
Telephone: 801.359.9000
Facsimile: 801.359.9011

Eugene Rome (*pro hac vice*)
 erome@romeandassociates.com
**ROME & ASSOCIATES, A.P.C.**
2029 Century Park East, Suite 1040
Los Angeles, California 90067
Telephone: 310.282.0690
Facsimile:  310.282.0691

Attorneys for Defendant Namecheap, Inc.

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **GLOBAL MARKETING STRATEGIES, LLC, a Utah limited liability company,**<br><br>    **Plaintiff,**<br><br>**vs.**<br><br>**NAMECHEAP, INC., a Delaware corporation/ d/b/a WHOISGUARD; DAN GOLDSTEIN; and DOES 1 through 5,**<br><br>    **Defendants.** | **MEMORANDUM IN SUPPORT OF NAMECHEAP'S MOTION TO DISMISS**<br><br><br><br><br><br>**Case No. 1:11-CV-00065-DN**<br><br>**Judge David Nuffer** |

Defendant Namecheap, Inc. ("Defendant" or "Namecheap"), through counsel of

record hereby submits this Memorandum in Support of Namecheap's Motion to Dismiss.

## TABLE OF CONTENTS

Page

INTRODUCTION.............................................................................................ix

FACTUAL ALLEGATIONS OF THE AMENDED COMPLAINT RELATING
    TO NAMECHEAP.................................................................................xi

    GMS's Alleged Facts ......................................................................xi

    GMS's Actual Cease and Desist Letters.......................................xiv

    Material Facts Omitted by GMS From its Complaint.........................xvi

ARGUMENT.................................................................................................. 1

    I.     PLAINTIFF'S COMPLAINT DOES NOT STATE A VALID CLAIM
          AND SHOULD BE DISMISSED AGAINST NAMECHEAP UNDER
          THE GOVERNING RULE 12(b)(6) STANDARD ........................................ 1

          A.     Legal Standard of Ruling on a Rule 12(b)(6) Motion ...................... 1

          B.     The Two Letters Identified by GMS in Its Complaint and The
                 Public Information With the USPTO Are Properly Considered
                 in Ruling on This Motion to Dismiss ................................................. 2

    II.    THE COPYRIGHT INFRINGEMENT CLAIM FAILS AS A MATTER
          OF LAW BECAUSE IT IS BARRED BY THE IMMUNITY AND
          SAFE HARBORS OF THE DIGITAL MELLENNIUM COPYRIGHT
          ACT.............................................................................................. 4

          A.     GMS's February Letter and March Letter are Inadequate as
                 Notice Under the DMCA................................................................. 7

    III.    THE COURT SHOULD DISMISS THE SECOND AND FIFTH
          CLAIMS FOR RELIEF BECAUSE NAMECHEAP CANNOT BE
          HELD LIABLE UNDER THE LANHAM ACT OR THE UTAH
          UNFAIR COMPETITION ACT BASED ON THE ALLEGATIONS IN
          THE COMPLAINT ..................................................................... 11

          A.     Namecheap is a Domain Name Registrar and Cannot be
                 Held Liable on This Second Claim for Relief Under the
                 Lanham Act .............................................................................. 11

i

      B.      GMS's Lanham Act Claim Fails Because GMS Does Not Allege Any Trademark Use By Namecheap in Connection with Goods or Services ................................................................ 12

      C.      GMS Has no Claim Based on Use of the Mark "Trust Guard" Because That Mark is Not Owned by GMS................................... 15

      D.      Because GMS Can State No Lanham Act Claim Against Namecheap, Its Claim Under the Utah Unfair Competition Act Also Fails ................................................................................ 16

IV.    ALL OF GMS'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW BECAUSE THEY ARE PREEMPTED ................................................ 17

      A.      The Communications Decency Act Preempts All of GMS's State Law  Claims ........................................................................ 17

      B.      The CDA's Exception to Immunity for "Intellectual Property" Claims Extends Only to Federal Claims not GMS's State Law Claims ............................................................................. 21

      C.      The State Law Claims are Preempted Under the Copyright Act......................................................................................... 23

V.     REGARDLESS OF PREEMPTION, MANY OF THE STATE LAW CLAIMS MUST BE DISMISSED BASED UPON GMS'S OWN ALLEGATIONS ......................................................................................... 25

      A.      GMS's Third Claim for Relief Must be Dismissed as to Namecheap Based on GMS's Allegations ..................................... 25

      B.      The Court Should Dismiss the Unfair Practices Act Claim Because GMS Does Not Allege Any Anticompetitive Conduct by Namecheap ................................................................ 26

      C.      GMS's Unjust Enrichment Claim Must Be Dismissed Because There is No Allegation it Conferred Any Benefit on Namecheap.......................................................................... 29

      D.      GMS's Civil Conspiracy Claim Must be Dismissed Because GMS has not Alleged Any Agreement by Namecheap Relative to the Purported Infringement........................................... 29

E.      Namecheap Cannot Be Liable On the Ninth Claim For Relief
        Because It Does Not State A Cause Of Action and is a Legal
        Theory Refuted by the Alleged Facts ............................................ 31

CONCLUSION ............................................................................................................ 33

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## Cases

*Academy of Motion Picture Arts & Sciences v. Network Solutions*, 989 F. Supp. 1276 (C.D. Cal. 1997) ................................................................................................ 13, 14

*Almeida v. Amazon.com, Inc.*, 456 F.3d 1316 (11th Cir. 2006) ...................................... 18

*Alta Indus. v. Hurst*, 846 P.2d 1282 (Utah 1993) ........................................................... 30

*Anderson v. Suiters*, 499 F.3d 1228 (10th Cir. 2007) ...................................................... 1

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ............................................................. 22

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955 (2007) .......... 1, 2, 25

*Ben Ezra Weinstein, & Co v. America Online, Inc.*, 206 F.3d 980 (10th Cir. 2000) .. 18, 19

*Beyond Systems, Inc. v. Keynetics, Inc.*, 422 F. Supp. 2d 523 (D. Md. 2006) .............. 19

*Bosley Med. Inst., Inc. v. Kremer,* 403 F.3d 672 (9th Cir.2005) .................................... 13

*Briarpatch Ltd. v. Phoenix Pictures, Inc.,* 373 F.3d 296 (2nd Cir. 2004) ........................ 24

*Burt v. Woolsulate, Inc.*, 106 Utah 156, 146 P.2d 203 (Utah 1944) ............................... 27

*Campbell v. Castlestone Homes, Inc.*, 2011 U.S. Dist LEXIS 27266 (Case No. 2:09-CV-250 TS March 15, 2011) ........................................................................................... 31

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) ............................... 18

*Cargill, Inc. v. Stafford*, 553 F.2d 1222 (10th Cir. 1977) ................................................ 29

*Carlie v. Morgan*, 922 P.2d 1 (Utah 1996) ..................................................................... 31

*Chalfant v. Tubb*, 453 F.Supp.2d 1308 (N.D. Okla. 2006) ............................................ 24

*Corbis Corp. v. Amazon.com, Inc.,* 351 F. Supp. 2d 1090 (W.D. Wash. 2004) ........... 5, 9

*CoStar Group, Inc. v. LoopNet, Inc.,* 373 F.3d 544 (4th Cir. 2004) ................................. 6

*Customs & Classics v. Bonneville Street Rods, LLC,* 2007 WL 1601483
  (D. Utah June 4, 2007).............................................................................. 23

*Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956 (10th Cir.2001) .......................... 3

*Desert Miriah, Inc. v. B&L Auto, Inc.*, 12 P.3d 580 (Utah 2000) .................................... 29

*Does 1-30 v. Franco Productions*, 2000 WL 816779 (N.D. Ill.)...................................... 21

*Duluth News-Tribune v. Mesabi Publ. Co.*, 84 F.3d 1093 (8th Cir. 1996)........................ 3

*Dummar v. Lummis*, 543 F.3d 614 (10th Cir. 2008) ......................................................... 29

*Ehat v. Tanner,* 780 F.2d 876 (10th Cir. 1985)................................................................. 23

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) .................................................... 5, 6

*Erikson v. Farmers Group, Inc.*, 151 Fed. Appx. 672 (10th Cir. 2005) ............................. 3

*FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 ...................................................... 27, 28

*Garrard v. Gateway Financial Services, Inc.*, 207 P.3d 1227 (2009)............................... 28

*Gates Rubber Co. v. Bando Chemical Indus., Ltd.,* 9 F.3d 823, 847 (10th Cir. 1993).... 23

*GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381 (10th Cir.1997) ........ 3

*Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276 (10th Cir. 2004) ...................... 3

*Huthwaite, Inc. v. Sunrise Assisted Living, Inc.,* 261 F.Supp.2d 502
  (E.D. Va. 2003) ......................................................................................... 14

*Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687
  (6th Cir. 2003) .......................................................................................... 13

*Island Software & Computer Serv. v. Microsoft Corp.*, 413 F.3d 257 (2nd Cir. 2005)....... 3

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949
  (C.D. Cal. 1997) ................................................................................... 11, 12

*Lockheed Martin Corp. v. Network Solutions,* 141 F. Supp. 2d 648 (N.D. Tex. 2001)... 15

*MacArthur v. San Juan County*, 416 F. Supp. 2d 1098 (D. Utah 2005)................... 26, 27

*Marvullo v. Gruner + Jahr AG & Co.,* No. 98 Civ. 5000, 2001 WL 40772, at *7
  (S.D.N.Y. Jan.17, 2001) ........................................................................... 24

*Mattel, Inc. v. MCA Records, Inc.,* 296 F.3d 894 (9th Cir. 2002) ..................................... 14

*McGregor v. Gibson*, 248 F.3d 946 (10th Cir.2001) .......................................................... 3

*Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532 (E.D. Va. 2003) ........................ 20

*Northstar Funding Group v. Federal Deposit Ins. Corp.* 2010 WL 2802438, 10 (D. Utah 2010) .......................................................................................................... 33

*Novak v. Overture Services, Inc.*, 309 F. Supp. 2d 446 (E.D.N.Y. 2004) ...................... 20

*Pace v. Swerdlow*, 519 F.3d 1067 (10th Cir. 2008) ............................................................ 3

*Papasan v. Allain,* 478 U.S. 265 (1986) ......................................................................... 1

*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007) ..................... 5, 9,10,19, 22

*Perfect 10, Inc. v. Cybernet Ventures, Inc.,* 213 F. Supp. 2d 1146 (C.D. Cal. 2002)....... 5

*Peterson v. Coca-Cola United States*, 48 P.3d 941 (Utah 2002)................................... 32

*Pirone v. MacMillan, Inc.*, 894 F.2d 579 (2d Cir. 1990) ................................................. 13

*Pohl, Inc. of Am. v. Webelhuth*, 201 P.3d 944 (Utah 2008) ........................................... 30

*Prestonettes, Inc. v. Coty*, 264 U.S. 359 (1924) ............................................................ 13

*R.W. Beck, Inc. v. E3 Consulting, LLC*, 577 F.3d 1113 (10th Cir. 2009) ................. 23, 24

*Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.,* 351 F.3d 1229 (D.C.Cir.2003)............................................................................................................. 10

*Rookard v. Mexicoach*, 680 F.2d 1257 (9th Cir.1982) ................................................... 32

*Schneider v. Amazon.com, Inc.*, 108 Wash. App. 454 (Wash. Ct. App. 2001) ............. 20

*Schneider v. Amazon.com, Inc.*, 31 P.3d 37 (Wisc. Ct. App. 2001) ............................. 21

*Trade Comm. v. Skaggs Drug Centers, Inc.*, 21 Utah 2d 431P.2d 958 (Utah 1968) ..... 26

*Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763 (1992)......................................... 13

*U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723 (E.D. Va. 2003)................ 14

*Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249 (10th Cir.2005)................ 3

*Utah Lighthouse Ministry v. Foundation for Apologetic Information & Research*, 527 F.3d 1045 (10th Cir. 2008) .................................................................................. 13

*Utah Lighthouse Ministry, Inc. v. Discovery Computing, Inc.*, 506 F. Supp. 2d 889 (D. Utah 2007) ........................................................................................................ 17

*Van Woudenberg v. Gibson*, 211 F.3d 560 (10th Cir.2000) ............................................ 3

*Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054 (Utah 2002) ............................ 30

*Watermark Publishers v. High Tech. Sys.,* No. 95-3839-IEG, 1997 U.S. Dist. LEXIS 22512, at *15 (S.D. Cal. 1997) ........................................................................... 24

*Zeran v. America Online, Inc.,* 129 F.3d 327 (4th Cir. 1997) .............................. 18,19, 20

*Zito v. Steeplechase Films, Inc.,* 267 F.Supp.2d 1022 (N.D. Cal. 2003) ...................... 24

**Statutes**

15 U.S.C. § 1125(a)(1) .......................................................................................... 12,13

17 U.S.C. § 301(a) ................................................................................................. 23,24

17 U.S.C. § 512 (2003) ................................................................... 5, 6, 7, 8, 9,10,11

47 U.S.C. § 230(c)(1) ................................................................... 18, 19, 20, 21, 22

Utah Code Ann. § 13-40-101 ...................................................................................... 18

Utah Code Ann. § 13-40-201(1) ................................................................................. 25

Utah Code Ann. § 13-5-1 ............................................................................................ 18

Utah Code Ann. § 13-5-2.5(1) .................................................................................... 26

Utah Code Ann. § 13-5a-103(1)(a) ............................................................................ 16

Utah Code Ann. § 40-13-101 ...................................................................................... 18

**Other Authorities**

3 Am. Jur. 2d Agency § 302 (1986) ............................................................................ 31

3 Am. Jur. 2d Agency §§ 313-315 .............................................................................. 31

H.R. Rep. 105-551(II), at 49-50 (1998) ........................................................................ 5

H.R. Rep. 105-551(II), at 54 .................................................................................... 6

H.R. Rep. No. 105-551, at 64 (1998) ........................................................................ 7

Restatement (Third) of Agency § 7.03 (2006) ........................................................ 33

S. Rep. 105-190, 19 (1998) ...................................................................................... 6

S. Rep. 105-190, at 20 (1998) .................................................................................. 5

S. Rep. 105-190, at 20 (1998); H.R. Rep. 105-551(II), at 49 (1998) ........................ 5

S. Rep. 105-190, at 45 .............................................................................................. 6

S. Rep. No. 105-190, at 1-2 (1998) .......................................................................... 4

Wright & Miller, Federal Practice & Procedure § 62:520 (2003) .............................. 3

**Rules**

Fed.R.Civ.P. 12(b)(6) ........................................................................................... 3, 4

Fed.R.Civ.P. 8(a)(2) ................................................................................................. 1

# INTRODUCTION

The Court should dismiss this action, with prejudice, as against Namecheap because, even viewing all the allegations in Plaintiffs' favor, Plaintiff does not state a claim on which relief can be granted against Namecheap -- all Plaintiff's claims fail as a matter of law.

In this action, Plaintiff Global Marketing Strategies, LLC ("GMS") is attempting to hold liable two named parties for the alleged infringement of the copyright and trademark it claims in a two-dimensional graphic, the Trust Guard seal.

The first named defendant is Dan Goldstein ("Goldstein"), the individual who registered the domain name "homerevenuestreamsystem.com" (the "Domain") and, through this domain name, operated a website at which the allegedly offending content appeared that included the "Trust Guard" seal.

The second named defendant is Namecheap, Inc. ("Namecheap").  As admitted in GMS's allegations, Namecheap did not operate any website with any content that GMS alleges was objectionable.  Rather, Namecheap is merely a domain name registrar through which Goldstein registered the Domain that he used for the website that Goldstein, not Namecheap, created.

The instant action against Namecheap must be dismissed on a multitude of legal grounds.  The claims against Namecheap are foreclosed in full by the safe harbors afforded to internet service providers, *i.e.* registrars, by the provisions of the Digital Millennium Copyright Act ("DMCA"), and otherwise.  For example, no claim for copyright infringement may be stated against a service provider such as Namecheap unless

certain notice requirements were first met by GMS, in accordance with DMCA proscriptions.  In this instance, GMS has failed to provide such notice and no claim for copyright infringement has been stated.

Next, the Lanham Act claim is foreclosed under clear principles of statutory and case law insulating domain name registrars from liability arising out of third party activity, such as the alleged misuse of the Trust Guard seal by Goldstein.

Further, all state law claims asserted by GMS against Namecheap in this action are preempted by the provisions of the Communications Decency Act ("CDA"), legislation specifically designed to insulate publishers from claims such as the ones asserted in this action.

Finally, the state law claims fail as a matter of law based upon GMS's own allegations that refute the existence of essential elements of those claims.

In sum, no proper claims have been stated against Namecheap in this action and Namecheap respectfully requests that its Motion to Dismiss be granted and that it be dismissed from this lawsuit with prejudice for the reasons set out below.

## FACTUAL ALLEGATIONS OF THE
## AMENDED COMPLAINT RELATING TO NAMECHEAP

### GMS's Alleged Facts

Plaintiff GMS filed this action on April 26, 2011, naming only Namecheap as a defendant.  [*See* 4/26/11 Compl. (Document No. 2), on file with the Court].  On May 11, 2011, GMS filed its Amended Complaint, adding the individual Dan Goldstein ("Goldstein") as a party defendant.  [See 5/11/11 Amended Complaint (Document No. 5) ("Complaint" or "Compl."), on file with the Court].  GMS's new Amended Complaint recognized and alleged that "Goldstein is the licensee of the . . . or actual registrant of the website" on which this case is based [5/11/11 Compl. ¶ 29], and that "Goldstein placed the "allegedly infringing information on the subject website.  [5/11/11 Compl. ¶ 30].  Despite recognizing and alleging that Defendant Goldstein, rather than Namecheap, engaged in the actual conduct giving rise to GMS's claims, GMS has refused to relent is seeking to also impose liability on Namecheap.

The purported basis of the Complaint is the appearance of a two-dimensional graphic, referred to as the "Trust Guard seal," which was allegedly used by Goldstein, but not Namecheap, on the offending website.  [5/11/11 Compl. ¶¶ 29-30].

Defendant Namecheap is a registrar of domain names used on the Internet.  [*See* 5/11/11 Compl. ¶ 7.  Namecheap provides a service to domain name registrants called "WhoisGuard" which substitutes WhoisGuard's contact information in the place of the registrant's true information in order to shield the registrant's information from the public.  [*See* 5/11/11 Compl. ¶¶ 10-11].  GMS alleges that the policies of the Internet Corporation of Assigned Names and Numbers ("ICANN") require the registrant's current

contact information to be provided for each registered domain.  [*See* 5/11/11 Compl. ¶ 13].  GMS does not, however, state to whom such information is to be provided.

GMS alleges that it is a company specializing in compliance credentials and verification for commercial websites.  [*See* 5/11/11 Compl. ¶ 14].  Apparently, as part of its services, it evaluates the safeguards employed by commercial websites and, where it finds that they meet GMS's standards, it provides the compliant website with a "trust seal" bearing a "Trust Guard" designation.  [*See* 5/11/11 Compl. ¶ 16].  This designation indicates to the public that the website was verified by GMS.  [*See* 5/11/11 Compl. ¶ 16].

In February of 2011, GMS alleges that it learned that a website with the internet Domain name "homerevenuestreamsystem.com" was using the Trust Guard seals without GMS's authorization in connection with sale of services showing people how to earn large incomes from their homes.  [*See* 5/11/11 Compl. ¶¶ 22-23].  WhoisGuard information was provided in the whois records for this Domain.  [*See* 5/11/11 Compl. ¶ 28].  As noted above, GMS further alleges that it is was Goldstein who was the actual registrant of the offending website and that it was Goldstein who placed the Trust Guard seals on the web pages appearing at the Domain.  [*See* 5/11/11 Compl. ¶¶ 29-30].  GMS alleges that the Trust Guard seals appearing at the website hosted at the Domain were not legitimate seals.  [*See* 5/11/11 Compl. ¶ 26].

GMS states that on February 25, 2011, it sent a cease and desist letter to WhoisGuard by certified mail and facsimile, that this letter was received via facsimile but that the certified mail was returned as undeliverable ("February Letter").  [*See* 5/11/11

Compl. ¶ 32].  GMS alleges that WhoisGuard failed to respond to the February Letter.
[*See* 5/11/11 Compl. ¶¶ 32-33].  GMS further alleges that it sent a second cease and
desist letter on March 21, 2011 via certified mail to WhoisGuard, which was also
returned as undeliverable ("March Letter").  [*See* 5/11/11 Compl. ¶ 34].  GMS does not
allege that the March Letter was sent by facsimile or that it received a "return receipt"
showing that the March Letter was actually received by facsimile.  [*See* 5/11/11 Compl.
¶ 34].  Neither the February Letter nor the March Letter is attached to Complaint.  [*See
generally* 5/11/11 Compl.].

Based on this alleged factual background, GMS alleges the following claims
against Namecheap:

1.      The First Claim for Relief against all Defendants, Copyright Infringement,
due to alleged use of copied "TRUST GUARD seals" [5/11/11 Compl. ¶¶ 36-46];

2.      The Second Claim for Relief against all Defendants, Unfair Competition
under the Lanham Act, due to alleged representation that "TRUST GUARD seals" used
created confusion with GMS's seals [5/11/11 Compl. ¶¶ 47-59];

3.      The Third Claim for Relief against all Defendants, for "pharming" under the
Utah E-commerce Integrity Act, due to allegedly using a trademark owned by GMS to
induce users to provide identifying information or property [5/11/11 Compl. ¶¶ 60-67];

4.      The Fourth Claim for Relief against all Defendants, for unfair competition
pursuant to the Utah Unfair Practices Act, based on the alleged infringement of the
"TRUST GUARD seals" and the "TRUST GUARD" trademark [5/11/11 Compl. ¶¶ 68-
76];

5.      The Fifth Claim for Relief against all Defendants, again, for unfair competition pursuant to the Utah Unfair Practices Act, by allegedly causing a "material diminution in value of GMS'[s] intellectual property" based on copyright and trademark infringement [5/11/11 Compl. ¶¶ 77-81];

6.      The Sixth Claim for Relief against all Defendants, for unjust enrichment due to allegedly using "the TRUST GUARD trademark and the TRUST GUARD seals" [5/11/11 Compl. ¶¶ 82-86];

7.      The Seventh Claim for Relief against all Defendants, for civil conspiracy based on the alleged agreement and "concerted action" based on alleged infringement of GMS's copyrights and trademarks [5/11/11 Compl. ¶¶ 87-90];

8.      The Eighth Claim for Relief against Namecheap only, but not Goldstein, for negligence based on receiving notice as to alleged copyright and trademark infringement in February 2011, but not taking steps to ensure such infringement did not continue [5/11/11 Compl. ¶¶ 91-101]; and

9.      The Ninth Claim for Relief against Namecheap only, but not Goldstein, seeking to hold Namecheap vicariously liable for Goldstein's conduct who, by GMS's allegations, registered and controlled the content of the website using the Domain name homerevenuestreamsystem.com [5/11/11 Compl. ¶¶ 102-105].

## GMS's Actual Cease and Desist Letters

Counsel for Namecheap subsequently contacted counsel for GMS, Randall Bateman, and requested copies of the February Letter and March Letter.  The February Letter so received is attached as Exhibit "1" and the March Letter is attached as Exhibit

"2."  The May 3, 2011 email sent by Mr. Bateman that provided copies of these letters is attached as Exhibit "3."

Although the allegedly offending website that is the basis of GMS's claims used the Domain name "homerevenuestreamsystem.com," the February Letter states as follows:

> It has come to our attention that you are using these copyrighted designs without Trust Guard's authorization on the following website:
>
> http://www.revenuestreamsystem.com

[2/25/11 February Letter (emphasis added), Ex. 1].

In the March Letter, GMS identified "homerevenuestreamsystem.com" as an offending website.  [3/21/11 March Letter, Ex. 2].  The March Letter, however, failed to make a certification under penalty of perjury as to anything.  That is, the March Letter does not certify that the information contained in it is accurate and does not state, under penalty of perjury that the signer of the letter was actually authorized to act on behalf of the purported copyright holder.  [3/21/11 March Letter at 1-2, Ex. 2].  Rather, the March Letter begins, but fails to complete, any such statements.  Page 1 of the March Letter ends by stating:

> We are providing this notice in good faith and with the reasonable belief that rights our client owns are being infringed. Under penalty of perjury I certify

[3/21/11 March Letter at 1 (emphasis added), Ex. 2].  Page 2 of the March Letter then continues:

xv



Should you wish to discuss this with me please contact me directly.

[3/21/11 March Letter at 2 (emphasis added), Ex. 2].

## **Material Facts Omitted by GMS From its Complaint**

The Complaint contains an allegation that might be construed as asserting trademark infringement by use of the mark "TRUST GUARD."  [5/11/11 Compl. ¶ 50 (alleging GMS "markets its services under the trademark TRUST GUARD," that the "TRUST GUARD trademark . . . have developed considerable goodwill among commercial internet websites and their customers.")].

The Complaint, however, fails to inform the Court of material facts pertaining to that mark which are subject to judicial notice.  In particular, according to the official records of the United States Patent and Trademark Office ("USPTO"), the mark "TRUST GUARD" is registered to Markmonitor, Inc. as Registration Number 3633315 that was published for opposition on May 1, 2007 and bears a registration date of June 2, 2009. [5/26/11 USPTO TESS results for "TRUST GUARD," attached as Exhibit "4"].  The use in commerce by Markmonitor, Inc. is as follows:

| Word Mark | TRUST GUARD |
|---|---|
| Goods and Services | IC 042. US 100 101. G & S: Application service provider (ASP) featuring software in the field of data theft and identity theft. FIRST USE: 20060927. FIRST USE IN COMMERCE: 20060927 |
| | IC 045. US 100 101. G & S: Consultation in the field of data theft and identity theft. FIRST USE: 20060927. FIRST USE IN COMMERCE: 20060927 |

[6/9/11 USPTO TESS results for "TRUST GUARD," Ex. "4"].  In addition, the mark

"TRUSTGUARD" (without the space) is also, according to official USPTO records,

registered to Markmonitor, Inc. as Registration Number 3412223 that was published for

opposition on May 1, 2007 and bears a registration date of April 15, 2008.  [6/2/11

USPTO TESS results for "TRUSTGUARD," attached as Exhibit "5"].  The use in

commerce by Markmonitor, Inc. of "TRUSTGUARD" is, similarly, as follows:

| Word Mark | TRUSTGUARD |
|---|---|
| Goods and Services | IC 009. US 021 023 026 036 038. G & S: Computer software for impeding attempts at data theft and identity theft that may be downloaded from a global computer network. FIRST USE: 20061201. FIRST USE IN COMMERCE: 20061201 |
| | IC 042. US 100 101. G & S: Application service provider (ASP) featuring software in the field of data theft and identity theft. FIRST USE: 20061201. FIRST USE IN COMMERCE: 20061201 |
| | IC 045. US 100 101. G & S: Consultation in the field of data theft and identity theft. FIRST USE: 20061201. FIRST USE IN COMMERCE: 20061201 |

[6/2/11 USPTO TESS results for "TRUSTGUARD," Ex. 5].

In addition, GMS's application with the PTO for "TRUST GUARD" was

suspended on July 30, 2010.  [7/30/10 Notice of Suspension, attached as Exhibit "6"].

GMS filed a Petition with the Trademark Trial and Appeal Board ("TTAB"), seeking to

cancel Markmonitor, Inc.'s registered marks "TRUST GUARD" and "TRUSTGUARD."

[*See* 1/16/10 Petition for Cancellation with TTAB, attached as Exhibit "7"].  However,

GMS filed a withdrawal of its petition and, on May 10, 2011 -- after this lawsuit was filed

-- "the petition to cancel is dismissed with prejudice" by TTAB.  [5/10/11 Dismissal with

Prejudice by TTAB, attached as Exhibit "8"].

**ARGUMENT**

I.    **PLAINTIFF'S COMPLAINT DOES NOT STATE A VALID CLAIM AND SHOULD BE DISMISSED AGAINST NAMECHEAP UNDER THE GOVERNING RULE 12(b)(6) STANDARD**

A.    LEGAL STANDARD OF RULING ON A RULE 12(B)(6) MOTION

As the Supreme Court recently held in *Bell Atlantic Corp. v. Twombly,* "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need *detailed* factual allegations," it still must plead facts, and must do so sufficiently "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007) (emphasis added). Thus, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Id.*; *see also Papasan v. Allain,* 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S. Ct. at 1965. Further, as the Tenth Circuit has reiterated:

> [Pursuant to] this new standard for reviewing a motion to dismiss, "the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."

*Anderson v. Suiters*, 499 F.3d 1228, 1232 (10th Cir. 2007) (citation omitted) (emphasis in original).

Stated positively, the "threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'show that the pleader is entitled to relief'" requires

that the Complaint contain "allegations plausibly suggesting (not merely consistent

with)" liability under the claims asserted.  *Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966.

And in order for allegations to rise to "enter the realm of plausible liability," they must

cross the lines "between the conclusory and the factual," and "between the facially

neutral and the factually suggestive."  *Id.* at 557 n.5, 127 S. Ct. at 1966 n.5.

B.   THE TWO LETTERS IDENTIFIED BY GMS IN ITS COMPLAINT AND THE PUBLIC
INFORMATION WITH THE USPTO ARE PROPERLY CONSIDERED IN RULING ON
THIS MOTION TO DISMISS

It is wholly proper for this Court to consider the two letters described in GMS's

Complaint, as well as the matters of public record with the USPTO, in ruling upon this

Motion to Dismiss.

First, the February Letter and the March Letter purport to give notice to

Namecheap of the claimed infringement occurring at the Domain and are specifically

alleged within the Complaint itself.  [5/11/11 Compl. ¶¶ 32, 34].  Although not appended

to the original Complaint or to the Amended Complaint, Utah district courts have

repeatedly held that where a document is referenced in a complaint but not appended

as an exhibit, the Court may take judicial notice of such a document in evaluating a

motion to dismiss, provided that the authenticity of the document is not in dispute, and

doing so does not convert the motion to one for summary judgment.  As the Tenth

Circuit has repeatedly reiterated:  "It is accepted practice that, 'if a plaintiff does not

incorporate by reference or attach a document to its complaint, but the document is

referred to in the complaint and is central to the plaintiff's claim, a defendant may submit

an indisputably authentic copy to the court to be considered on a motion to dismiss.'"

*Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir.2001) ((quoting

*GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th

Cir.1997)), *rev'd on other grounds*, 537 U.S. 79 (2002).[1]  In accordance with these

established principles, the February Letter and the March Letter are attached as

Exhibits "1" and "2" respectively.  These copies of the letters are indisputably authentic

because they were provided by GMS's own counsel.  [*See* 5/3/11 Email R. Bateman to

E. Rome, Ex. 3].

      Second, the Court may take judicial notice of the public records of the USPTO.

The Tenth Circuit has specifically held that courts may "take judicial notice of [their] own

files and records, as well as facts which are a matter of public record," *Van Woudenberg*

*v. Gibson*, 211 F.3d 560, 568 (10th Cir.2000), *abrogated on other grounds by McGregor*

*v. Gibson*, 248 F.3d 946, 955 (10th Cir.2001), and doing so does not convert a Rule

12(b)(6) motion into a Rule 56 motion.  *Grynberg v. Koch Gateway Pipeline Co.*, 390

F.3d 1276, 1278 n.1 (10th Cir. 2004) (quoting Wright & Miller, Federal Practice &

Procedure § 62:520 (2003)); *accord Erikson v. Farmers Group, Inc.*, 151 Fed. Appx.

672, 675 (10th Cir. 2005).  Filings with the USPTO, in particular, are subject to judicial

notice.  *See Duluth News-Tribune v. Mesabi Publ. Co.*, 84 F.3d 1093, 1096 n.2 (8th Cir.

1996) (judicial notice of trademark filings); *cf Island Software & Computer Serv. v.*

*Microsoft Corp.*, 413 F.3d 257, 261 (2nd Cir. 2005) ("The district court was entitled to

---

[1] *See also Pace v. Swerdlow*, 519 F.3d 1067, 1072-1973 (10th Cir. 2008) ("The district court was correct in considering these materials on a motion to dismiss under Fed.R.Civ.P. 12(b)(6)."); *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253-54 (10th Cir. 2005) ("We have recognized however, that a document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute.").

take judicial notice of Microsoft's federal copyright registrations, as published in the copyright Office's registry.").

A formal Motion for Judicial Notice of the February Letter, March Letter, and adjudicative facts of public record with the USPTO is filed herewith.  Pursuant to that motion, these facts are properly considered in ruling upon this Motion to Dismiss pursuant to Rule 12(b)(6).

## II.     THE COPYRIGHT INFRINGMENT CLAIM FAILS AS A MATTER OF LAW BECAUSE IT IS BARRED BY THE IMMUNITY AND SAFE HARBORS OF THE DIGITAL MELLENNIUM COPYRIGHT ACT

The Court should grant this Motion and dismiss Plaintiff's First Claim for Relief, for copyright infringement, as alleged against Namecheap, because the claim is barred pursuant to the Digital Millennium Copyright Act ("DMCA").  As admitted by GMS's own allegations in its Complaint, Namecheap is a domain name registrar.  [5/11/11 Compl. ¶ 7].  Both case law and statutory law afford Namecheap various forms of immunity and safe harbors from liability arising out of general activities, which include the matters giving rise to the claims alleged by GMS in its Complaint.

By way of background, the DMCA's purposes can only be furthered by applying its safeguards to Namecheap and dismissing the First Claim for Relief as against Namecheap.  Enacted in 1998, the DMCA was "designed to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age."  S. Rep. No. 105-190, at 1-2 (1998).  "Difficult and controversial questions of copyright liability in the online world prompted Congress to enact Title II of the DMCA, the Online Copyright Infringement

Liability Limitation Act (OCILLA)." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (citing 17 U.S.C. § 512 (2003)).  In order to strike a balance between their respective interests, Title II of the DMCA seeks to "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment."  S. Rep. 105-190, at 20 (1998); H.R. Rep. 105-551(II), at 49 (1998).  "Congress hoped to provide 'greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.'"  *Ellison,* 357 F.3d at 1076 (quoting S. Rep. 105-190, at 20 (1998); H.R. Rep. 105-551(II), at 49-50 (1998)).

In furtherance of these goals, the DMCA enables qualifying service providers to limit their liability for claimed copyright infringement under four "safe harbors."  *See* 17 U.S.C. § 512(a)-(d).  "These safe harbors provide protection from liability for:  (1) transitory digital network communications; (2) system caching; (3) information residing on systems or networks at the direction of users; and (4) information location tools." *Ellison,* 357 F.3d at 1076-77.  "These safe harbors limit liability but 'do not affect the question of ultimate liability under the various doctrines of direct, vicarious, and contributory liability.'"  *Perfect 10, Inc. v. CCBill LLC,* 488 F.3d 1102, 1109 (9th Cir. 2007) (quoting *Perfect 10, Inc. v. Cybernet Ventures, Inc.,* 213 F. Supp. 2d 1146, 1174 (C.D. Cal. 2002)).  That is, they protect qualifying service providers from liability for all monetary relief for direct, vicarious, and contributory infringement, leaving copyright owners with limited injunctive relief.  *Corbis Corp.,* 351 F. Supp. 2d at 1098-99.  Further, the safe harbor provisions are not exclusive of any other defense an accused infringer

might have.  *CCBill LLC,* 488 F.3d at 1109 ("'[N]othing in the language of § 512 indicates that the limitation on liability described therein is exclusive.'") (*quoting CoStar Group, Inc. v. LoopNet, Inc.,* 373 F.3d 544, 552 (4th Cir. 2004)).  "Far short of adopting enhanced or wholly new standards to evaluate claims of copyright infringement against online service providers, Congress provided that OCILLA's 'limitations of liability apply if the provider is found to be liable *under existing principles of law.*'"  *Ellison,* 357 F.3d at 1077 (*quoting* S. Rep. 105-190, 19 (1998)).

The primary mechanism Congress established for cooperation in Title II, and in § 512(c) in particular, is the "notice and take-down" procedure.  "This 'notice and take-down' procedure is a formalization and refinement of a cooperative process that has been employed to deal efficiently with network-based copyright infringement."  S. Rep. 105-190, at 45; H.R. Rep. 105-551(II), at 54.

As a principal item, Namecheap categorically qualifies as a service provider under the DMCA's definitions.  Under § 512(k)(1)(A), a service provider is "an entity offering the transmission, routing, or providing of connections for digital online communication, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received."  Namecheap, as a domain name registrar, is "a provider of online services or network access, or the operator of facilities therefor."  17 U.S.C. § 512(k)(1)(A) (1998).  Under Section 512(k)(1)(B), the code further states, "the term 'service provider' means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A)."  Moreover, the legislative history

reports that the DMCA's definition of "service provider" was intended to include those "providing Internet access, e-mail, chat room and <u>web page hosting services</u>."  H.R. Rep. No. 105-551, at 64 (1998) (emphasis added).

Next, the claimed infringed copyright content, the Trust Guard seals, fall into the first DMCA safe harbor – a transitory digital network communication – one that originated with Goldstein and passed through Namecheap; or the third DMCA safe harbor – information residing on systems or networks at the direction of users, i.e., Defendant Goldstein.

Because the DMCA applies to Namecheap, in order for GMS to pursue the copyright infringement claim against Namecheap notwithstanding the DMCA safe-harbor, GMS must have served a DMCA-compliant "take down" letter upon Namecheap which Namecheap ignored.  GMS cannot make this showing in this action.

A.    GMS's February Letter and March Letter are Inadequate as Notice Under the DMCA

In order to have an allegedly infringing website removed from a service provider's network, or have access to an allegedly infringing website disabled, the copyright owner must provide notice to the service provider consistent with the following requirements set forth under the DMCA:

1.    The name, address, and physical or electronic signature of the complaining party [512(c)(3)(A)(i)].

2.    Identification of the infringing materials and their Internet location [512(c)(3)(A)(ii-iii)], or if the service provider is an "information location tool" such as a search engine, the reference or link to the infringing materials [512(d)(3)].

3.    Sufficient information to identify the copyrighted works [512(c)(3)(A)(iv)].

4.      A statement by the copyright holder of a good faith belief that there is no legal basis for the use complained of [512(c)(3)(A)(v)].

5.      A statement of the accuracy of the notice and, under penalty of perjury, that the complaining party is authorized to act on the behalf of the copyright holder [512(c)(3)(A)(vi)].

17 U.S.C. § 512.  The DMCA is clear that notices which fail to comply substantially with 512(c)(3)(A) "shall not be considered . . . in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent."  17 U.S.C. § 512(c)(3)(B).  GMS's notices are deficient under the DMCA and provided no notice to Namecheap requiring take-down action.

Specifically, the February Letter purportedly sent on GMS's behalf refers, and affirmatively states that the website containing material that allegedly infringes copyrights was "http://www.revenuestreamsystem.com."  [February Letter at 1, Ex. 1]. This domain name and the corresponding website, however, are not the same that is now alleged in the Complaint as the basis for GMS's actual copyright infringement claim.  Rather, the Domain described in the Complaint where the allegedly infringing content appeared is <**home**revenuestreamsystem.com>.  [Complaint ¶ 23 (emphasis added)].  Because the letter referred to, and affirmatively stated that it was the non-existent domain name, and because the expressly described domain was not even registered with Namecheap, the February Letter could not impart any notice to Namecheap of any allegedly infringing activity; it could only impart notice of such activity appearing at a different website that was not registered with Namecheap.

8

Likewise, the second, March Letter, is also defective under the DMCA.  Aside from GMS failing to allege that the March Letter was actually received by GMS, although it identifies the Domain that is also alleged in the Complaint, the balance of the March Letter fails to comply with the requirements of Section 512(c)(3)(A)(vi). Specifically, this March Letter (1) fails to give a statement of the accuracy of the notice; and (2) does not state, under penalty of perjury, that GMS's counsel is authorized to act on behalf of the copyright holder.  [March Letter, Ex. 2].  Indeed, considering that Markmonitor, Inc. has an existing registered trademark in "TRUST GUARD," which mark was incorporated in the seals that purportedly infringed GMS's copyrights, the absence of a statement under perjury that the author of the letter was acting with actual authority is especially critical.

The sufficiency of notice under the DMCA must substantially comply with these strict, clearly set forth, and easily understandable requirements.  For example, the notice provisions were considered and set out by the court in *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007).  The *Perfect 10* court stated that "[p]ermitting a copyright holder to cobble together adequate notice from separately defective notices [would] unduly burden service providers."  *Id.* at 1113.  Accordingly, "[t]he DMCA notification procedures place the burden of policing copyright infringement -- identifying the potentially infringing material and ***adequately documenting infringement -- squarely on the owners of the copyright***.  We decline to shift a substantial burden from the copyright owner to the provider."  *Id.* at 1113 (emphasis added); *see also Corbis Corp. v. Amazon.com, Inc.,* 351 F. Supp. 2d 1090, 1107 (W.D. Wash. 2004)

9

(plaintiff's "decision to forego the DMCA notice provisions . . .  stripped it of the most

powerful evidence of a service provider's knowledge -- actual notice of infringement

from the copyright holder").

The *Perfect 10* court reasoned:

> Compliance is not "substantial" if the notice provided complies with only some of the requirements of § 512(c)(3)(A).  Section 512(c)(3)(B)(ii) explains that a service provider will not be deemed to have notice of infringement when "the notification that is provided to the service provider's designated agent fails to comply substantially with all the provisions of subparagraph (A) but substantially complies with clauses (ii), (iii), and (iv) of subparagraph (A)" so long as the service provider responds to the inadequate notice and explains the requirements for substantial compliance.  The statute thus signals that substantial compliance means substantial compliance with *all* of § 512(c)(3)'s clauses, not just some of them.  *See* H.R. Rep., at 56 (A communication substantially complies even if it contains technical errors such as misspellings or outdated information.).  *See also Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.,* 351 F.3d 1229, 1236 (D.C.Cir.2003) (citing H.R. Rep., at 56).

*Perfect 10, Inc.,* 488 F.3d at 1112.

In *Perfect 10*, as is the case here, the notice was without the requisite declaration

under penalty of perjury and provided **no notice** to the recipient:

> The October 16, 2002 production did not contain a statement under penalty of perjury that the complaining party was authorized to act, as required by § 512(c)(3)(A)(vi). . . .The DMCA requires a complainant to declare, under penalty of perjury, that he is authorized to represent the copyright holder, and that he has a good-faith belief that the use is infringing.  **This requirement is not superfluous**. . . ."

*Perfect 10, Inc.*, 488 F.3d at 1112 (emphasis added).  The *Perfect 10* court concluded

that "***Notice that fails to substantially comply with § 512(c)(3), however, cannot be***

***deemed to impart such awareness.  §§ 512(c)(3)(B)(i) & (ii).***"  *Perfect 10, Inc.*, 488

F.3d at 1114 (emphasis added).

In sum, the purported DMCA notices provided to Namecheap by GMS were defective in both instances.  Because Namecheap did not receive an appropriate DMCA notice, it was never on proper notice of copyright infringement within the meaning of Section 512.  Consequently, it was not required to act and remains immune to claims of copyright infringement as a result of the DMCA safe harbors.

**III.  THE COURT SHOULD DISMISS THE SECOND AND FIFTH CLAIMS FOR RELIEF BECAUSE NAMECHEAP CANNOT BE HELD LIABLE UNDER THE LANHAM ACT OR THE UTAH UNFAIR COMPETITION ACT BASED ON THE ALLEGATIONS IN THE COMPLAINT**

      **A.  NAMECHEAP IS A DOMAIN NAME REGISTRAR AND CANNOT BE HELD LIABLE ON THIS SECOND CLAIM FOR RELIEF UNDER THE LANHAM ACT**

The Court should dismiss the Second Claim for Relief, as against Namecheap, because Namecheap is merely a domain name registrar and its alleged conduct is limited to registering the domain at issue.  As clearly stated by the court in *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 959  (C.D. Cal. 1997), acceptance of registrations for domain names by a registrar of internet domain names does not constitute use of the mark in connection with goods or services, as required to support Lanham Act unfair competition claim.  The court reasoned:

> Where domain names are used to infringe, the infringement does not result from NSI's publication of the domain name list, but from the registrant's use of the name on a Web site or other Internet form of communication in connection with goods or services.  NSI is not a "printer or publisher" of Web sites, or any other form of Internet "publication."  As discussed below in the section on contributory infringement, NSI's involvement with the use of domain names does not extend beyond registration.  NSI's liability cannot be premised on an argument that it prints or publishes the list of domain names, because the list is not the instrument or forum for infringement.  NSI's liability, if it exists at all, would stem from registrants' use of domain names in connection with other services not provided by NSI.

*Id.* (emphasis added).

In a similar case to the instant one, the *Lockheed Martin* court reasoned that

> registration of a trademark as a domain name does not constitute use of the trademark on the Internet in connection with goods or services, and therefore was not prohibited by section 43(a).   This reasoning applies more strongly to NSI, which has not registered domain names resembling SKUNK WORKS <u>for its own use</u>, but has <u>merely accepted domain name registrations from others</u>.

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F.Supp. at 959 (emphasis added) (citation omitted).  The Lanham Act claim was therefore dismissed.

In its Complaint here, GMS acknowledges that "Dan Goldstein is the licensee of the homerevenuestreamsystem.com website or is the actual registrant of the website." [Complaint ¶ 29].  "Dan Goldstein placed the infringing TRUST GUARD seals on the website."  [Complaint ¶ 30].  GMS, therefore, admits that it is Goldstein -- not Namecheap -- who engaged in the offending activity and GMS has no basis to hold Namecheap liable on this claim.

### B.   GMS'S LANHAM ACT CLAIM FAILS BECAUSE GMS DOES NOT ALLEGE ANY TRADEMARK USE BY NAMECHEAP IN CONNECTION WITH GOODS OR SERVICES

GMS's Second Claim for Relief must be dismissed on the separate and independent grounds that GMS's makes no allegation that Namecheap used any Trademark in connection with goods or services.

To invoke the protections of the Lanham Act, a plaintiff must show that the alleged infringer used the plaintiff's marks "in connection with any goods or services." 15 U.S.C. § 1125(a)(1).  Courts have long recognized that "[a] trade-mark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of

another's product as his." *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924)

(Holmes, J. for the Court).  Simply put, "[i]f defendants are only using [plaintiff's]

trademark in a 'non-trademark' way -- that is, in a way that does not identify the source

of a product -- then trademark infringement and false designation of origin laws do not

apply." *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695

(6th Cir. 2003).[2]

The 10th Circuit addressed the limitations of a Lanham Act claim in *Utah*

*Lighthouse Ministry v. Foundation for Apologetic Information & Research*, 527 F.3d

1045 (10th Cir. 2008) ("*Utah Lighthouse*").  There, the court held that "[t]o invoke the

protections of the Lanham Act, a plaintiff must show that the alleged infringer used the

plaintiff's mark 'in connection with any goods or services,'" which is "commonly

described as the commercial use requirement."  *Id.* at 1052 (citing 15 U.S.C. §

1125(a)(1)) *cf. Bosley Med. Inst., Inc. v. Kremer,* 403 F.3d 672, 677 (9th Cir.2005).  The

*Utah Lighthouse* court elaborated, that the "Lanham Act is intended 'to protect the ability

of consumers to distinguish among competing producers,' not to prevent all

unauthorized uses."  *Utah Lighthouse*, 527 F.3d at 1053 (quoting *Two Pesos, Inc. v.*

*Taco Cabana, Inc.,* 505 U.S. 763, 774 (1992)) (emphasis added).[3]

---

[2] *See also Academy of Motion Picture Arts & Sciences v. Network Solutions*, 989 F.
Supp. 1276, 1279 (C.D. Cal. 1997) ("commercial use" under Lanham Act requires that
defendant attach marks to goods or services that it sells); *Pirone v. MacMillan, Inc.*, 894
F.2d 579, 583 (2d Cir. 1990) (a defendant "can infringe [a trademark owner's] rights only
if [the defendant's] use was a 'trademark use,' that is, one indicating source or origin").

[3] The *Utah Lighthouse* court looked favorably to *Bosley Medical Institute, Inc. v. Kremer*,
which similarly instructs that "[w]hile the meaning of the term 'commercial use in
commerce' is not entirely clear, we have interpreted the language to be roughly

Another district court recently decided a case with facts nearly identical to those presented here and, not surprisingly, it held that when a defendant uses trademarks encountered on the Internet to trigger advertisements, but does not use the trademark to identify the source of its goods, the defendant does not use the trademark in a way that runs afoul of trademark laws.  *See U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723 (E.D. Va. 2003). In *U-Haul*, the defendant WhenU's computer software SaveNow monitored software licensees' Internet use, searching for designated terms, including trademarks.  *Id.* at 725-26.  When the licensee encountered the trademark "U-Haul," the SaveNow software triggered and displayed "pop-up advertisements" that obscured the other windows on the licensees' computer screens.  *Id.* at 726-27. The court held that this practice "does not constitute 'use' under the Lanham Act," because "U-Haul fails to adduce any evidence that WhenU uses U-Haul's trademarks <u>to identify the source of its goods or services</u>."  *Id.* at 728 (emphasis added).[4]

---

analogous to the 'in connection with' sale of goods and services requirement of the infringement statute."  403 F.3d 672, 676 (9th Cir. 2005); *see Mattel, Inc. v. MCA Records, Inc.,* 296 F.3d 894, 903 (9th Cir. 2002) ("Although this statutory language is ungainly, its meaning seems clear:  It refers to a use of a famous and distinctive mark to sell goods other than those produced or authorized by the mark's owner.")); *see also Huthwaite, Inc. v. Sunrise Assisted Living, Inc.,* 261 F.Supp.2d 502, 517 (E.D. Va. 2003) (holding that the commercial use requirement of the FTDA is "virtually synonymous with the 'in connection with the sale, offering for sale, distribution, or advertising of goods and services' requirement" of the Lanham Act).

[4] Similarly, courts have rejected trademark claims against Internet domain name registrars even for selling <u>trademarks as domain names</u> to cybersquatters when the cybersquatters make an infringing use of the mark.  These courts reason that the registrar cannot be held liable because it is not using the protected term to identify <u>the registrar's</u> services or products.  *See Academy of Motion Picture Arts and Sciences*, 989 F. Supp. at 1279-80 ("There has been no allegation that Network Solutions markets its registration service or the quality of its service by displaying or otherwise exploiting

Namecheap's limited activities do not amount to a use of GMS's alleged mark in connection with sale of goods or services.  Notwithstanding the broad allegations mounted against all defendants named in this action, it is Goldstein who GMS alleges to have actually misused of the purported trademark.  Namecheap merely accepted the application to register the presented Domain name and provided an indisputably legal anonymous registration service.  By GMS's own allegations, it was Goldstein, not Namecheap, who -- after the registration -- created a website that published GMS's purported trademark.  By GMS's allegations, Namecheap did nothing with regard to the purported trademark and its mere acts of permitting a registration of a non-infringing domain simply do not constitute a "use in commerce in connection with goods or services."  Consequently, GMS does not have a claim against Namecheap under the Lanham Act and its Second Claim for Relief must be dismissed.

C.   **GMS HAS NO CLAIM BASED ON USE OF THE MARK "TRUST GUARD" BECAUSE THAT MARK IS NOT OWNED BY GMS**

Plaintiff GMS claims it "markets its services under the trademark TRUST GUARD," that the "TRUST GUARD trademark . . . have developed considerable goodwill among commercial internet websites and their customers."  [Complaint ¶ 50].

GMS failed to inform the Court that this mark, in fact, belongs to a non-party, Markmonitor, Inc.  As indicated by the trademark prosecution history, and other public information with the USPTO for which the Court properly takes judicial notice, GMS had

---

the Academy's marks"); *Lockheed Martin Corp. v. Network Solutions*, 985 F. Supp. 949, 967-68 (C.D. Cal. 1997), *aff'd on other grounds,* 194 F.3d 980, 983-85 (9th Cir. 1999); *Lockheed Martin Corp. v. Network Solutions,* 141 F. Supp. 2d 648, 654-55 (N.D. Tex. 2001).

filed its application for the "TRUST GUARD" mark with the USPTO on June 22, 2007.

GMS's application.  Then, on January 16, 2010, GMS petitioned for cancellation of

marks owned by Markmonitor, Inc. who had already received a registered mark for

"TRUST GUARD" in May 1, 2007, in connection with goods & services of software

related to data and identity theft.  In July 2010, GMS's Registration was suspended by

the USPTO.  After a period, GMS abandoned its efforts with the USPTO to effect a

cancellation of MarkMonitor, Inc.'s TRUST GUARD trademark, GMS withdrew its

petition for cancellation **following the initiation of this action**, and the TTAB granted

the withdrawal <u>with prejudice</u>.  GMS does not own the trademark or attendant rights

which were purportedly injured in the term TRUST GUARD notwithstanding its

allegations to that effect made in the Complaint.

    **D.**    **BECAUSE GMS CAN STATE NO LANHAM ACT CLAIM AGAINST NAMECHEAP, ITS CLAIM UNDER THE UTAH UNFAIR COMPETITION ACT ALSO FAILS**

For the same reasons that GMS has no claim against Namecheap for trademark

infringement under the Lanham Act, its Fifth Claim for Relief under the Utah Unfair

Competition Act ("UCA"), must also be dismissed.[5]

The UCA gives a private right of action only for "a person injured by unfair

competition . . . against a person who engages in unfair competition."  Utah Code Ann.

§ 13-5a-103(1)(a).  The UCA, in turn, defines that actionable "unfair competition" is only

"an intentional business act or practice" that satisfies the <u>three</u> following elements:

[1] is unlawful, unfair, or fraudulent; <u>and</u> [2] leads to a material diminution
in value of intellectual property; <u>and</u> [3] is one of the following:   (A)

---

[5] The Utah Unfair Competition Act consists of only three sections in the Utah Code.
*See* Utah Code Ann. §§ 13-5a-101 to -103.

malicious cyber activity; (B) infringement of a patent, trademark, or tradename; (C) a software license violation; or (D) predatory hiring practices.

Utah Code Ann. § 13-5a-102(4)(a) (emphasis added).

In this case, there is no allegation that Namecheap, or even any other defendant engaged in malicious cyber activity, a software license violation, or predatory hiring. [*See generally* 5/11/11 Compl.].  Further, as established above, there has been no trademark infringement by Namecheap.  Indeed, the District of Utah has previously expressly held that when a plaintiff's Lanham Act claim fails due to a failure to meet the "'commercial use' requirement," the state law UCA claim is "deficient in making the same showing."  *Utah Lighthouse Ministry, Inc. v. Discovery Computing, Inc.*, 506 F. Supp. 2d 889, 902 (D. Utah 2007), *aff'd* 572 F.3d 1045 (10th Cir. 2008).

Here, because GMS's allegations do not and cannot establish the third essential element of a UCA claim,[6] the claim fails as a matter of law and must be dismissed.

## IV.   ALL OF GMS'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW BECAUSE THEY ARE PREEMPTED

### A.   THE COMMUNICATIONS DECENCY ACT PREEMPTS ALL OF GMS'S STATE LAW CLAIMS

The Court should dismiss all GMS's state law claims because they are preempted by the federal Communications Decency Act ("CDA").[7]  In particular, each

---

[6] Although Namecheap focuses on the third element, importantly, GMS has not alleged facts that would support the first element as well.  Indeed, Namecheap has done no intentional act that could be considered "unlawful, unfair, or fraudulent" and, therefore, the UCA claim would also be properly dismissed on this ground.

[7] The series of preempted state law claims are as follows: Third Claim for Relief -- Pharming in violation of the Utah E-Commerce Integrity Act, Utah Code Ann. § 13-40-

state law claim, even if adequately pled, is foreclosed as a matter of law by the broad provisions of the CDA that insulates internet services providers ("ISPs"), such as Namecheap, from liability.

The CDA states, in relevant part that "[no] provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  The CDA further expressly preempts any state law to the contrary of the CDA:  "State law. . . . No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3) (emphasis added).  As the Tenth Circuit has stated, "47 U.S.C. § 230 creates federal immunity **to any state law cause of action** that would hold computer service providers liable for information originating with a third party."  *Ben Ezra Weinstein, & Co v. America Online, Inc.*, 206 F.3d 980, 984-85 (10th Cir. 2000) (emphasis added).  Indeed, "[t]he majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'"  *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) (quoting *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997)); *see also Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003).

---

101, *et seq.* (inaccurately cited in the Complaint as Utah Code Ann. § 40-13-101, *et seq.*); Fourth Claim under the Utah Unfair Practices Act, Utah Code Ann. § 13-5-1, *et seq.*; Fifth Claim under the Utah Unfair Competition Act, Utah Code Ann. § 13-5(a)-101, *et seq.*; Sixth Claim for Unjust Enrichment; Seventh Claim for Civil Conspiracy; Eighth Claim for Negligence; and Ninth Claim for Agent for Undisclosed Principle [sic].

In other words, where one party serves merely as a conduit [Namecheap] for the speech of another [Defendant Goldstein], then the conduit has no liability.  A service provider may only be found "responsible" for the development of offensive content, so as to preclude provider from immunity under the CDA, where it specifically encourages the development of the offensive content.  *See generally* 47 U.S.C. § 230(a), (b) (stating, respectively, Congressional findings and the policy of the United States). Otherwise, "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions -- such as deciding whether to publish, withdraw, postpone, or alter content -- are barred."  *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997); *see Ben Ezra, Weinstein & Co.*, 206 F.3d at 986 (Tenth Circuit stating "[i]n this regard, we agree with the Fourth Circuit's decision in *Zeran*" and district court "correctly concluded Defendant is immune from suit pursuant to § 230").

Further, while the CDA was originally targeted towards defamation liability, the scope of immunity is quite broad.  In the case of *Beyond Systems, Inc. v. Keynetics, Inc.*, 422 F. Supp. 2d 523 (D. Md. 2006), the court found the CDA immunity afforded service providers in the civil context extends to negligence, state law unfair competition, tortious interference with prospective economic advantage, claims under Title II of the Civil Rights Act of 1964, and breach of contract claims.  In that case, the court noted the reach of the CDA to immunize ISPs from liability in a variety of circumstances in addition to defamation claims and cited to broad supporting case law.[8]

---

[8] *Beyond Systems, Inc.* 422 F. Supp. 2d at 536 (citing *Ben Ezra, Weinstein & Co. v. America Online, Inc.*, 206 F.3d 980, 986 (10th Cir. 2000), as "quoting *Zeran* and applying § 230 to a negligence claim against AOL"; *Perfect 10, Inc. v. CCBill, LLC*, 340 F. Supp.

*Zeran* succinctly explains that "by its plain language, <u>§ 230 creates a federal immunity to **any** cause of action</u> that would make service providers liable for information originating with the third party user of the service."  129 F.3d at 330 (emphasis added). The court noted, among other things, that "notice-based liability for interactive computer service providers would provide third parties with a no-cost means to create the basis for future lawsuits."  *Id.* at 333.  To impose liability on ISPs would place an "impossible burden" upon them, confronting them with a specter of tort liability with every complaint they received.  *Id.*  To require ISPs to make legal determinations about customers' activity might well lead to the termination of service, severely impact internet speech and commerce, a result Congress sought to avoid by enacting Section 230.  *Id.*

As acknowledged by GMS's own allegations, Namecheap is a domain name registrar.  While it does provide private registration services, which have time and time again been held to have legitimate applications,[9] it simply does not and did not serve as

---

2d 1077 (C.D. Cal. 2004), as "applying § 230 to claim of unfair competition based on state law"; *Novak v. Overture Services, Inc.*, 309 F. Supp. 2d 446 (E.D.N.Y. 2004), as "applying § 230 to claim of tortious interference with prospective economic advantage"; *Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 538 (E.D. Va. 2003), as "applying § 230(c) to a claim based on Title II of the Civil Rights Act of 1964 and dismissing claims for intentional infliction of emotional distress, unjust enrichment, negligence and fraud"; and *Schneider v. Amazon.com, Inc.*, 108 Wash. App. 454, 464-65 (Wash. Ct. App. 2001), as "noting that many courts have applied § 230(c) to breach of contract claims.").

[9] This service has a number of important and legitimate functions, as repeatedly acknowledged by the courts and numerous publications.  These include promoting anonymous speech, which is a constitutionally protected right, as well as avoidance of SPAM and information harvesting.  *See* Matthew Bierlin & Gregory Smith, *Privacy Year in Review: Growing Problems with Spyware and Phishing, Judicial and Legislative Developments in Internet Governance, and the Impacts on Privacy,* 1 I/S: J.L. & POL'Y FOR INFO. SOC'YY 279, 313-14 (2005).

the originator of the content alleged here to have caused damage to GMS.  As admitted

by GMS in its Complaint, the party who created the offending content appearing at the

Domain was Goldstein.  GMS may and is pursuing Goldstein on the subject claims.

Namecheap's limited activity is precisely what Congress envisioned when enacting the

CDA.  Because of its passive status and role as a pure provider of services, it is

covered by the CDA and immune from the state claims alleged by GMS, which should

be directed exclusively to Goldstein.  *Schneider v. Amazon.com, Inc.*, 31 P.3d 37 (Wisc.

Ct. App. 2001); *Does 1-30 v. Franco Productions*, 2000 WL 816779, *1 (N.D. Ill.).

**B.      THE CDA'S EXCEPTION TO IMMUNITY FOR "INTELLECTUAL PROPERTY" CLAIMS EXTENDS ONLY TO FEDERAL CLAIMS NOT GMS'S STATE LAW CLAIMS**

GMS's "intellectual property" claims based on state law must also be dismissed

because they are not within the exception to immunity provided by the CDA.  That is,

the CDA contains an exception that provides the CDA shall not "be construed to limit or

expand any law pertaining to intellectual property."  47 U.S.C. § 230(e)(2).  This

limitation on immunity, however, must be interpreted in light of the broad and wholesale

---

As explained by another commentator:

Because of the important role anonymous speech serves within expressive forums -- which in turn are integral to democratic governments --ICANN should, in reevaluating its policies to accord meaningful protection for freedom of expression, revise its policy requiring domain name holders publicly to disclose their names and addresses.  While protecting anonymous Internet speech is clearly an important component of free speech within the United States, it is even more important for ICANN to protect the identity of speakers from countries that are more inclined to retaliate against speakers based on the ideas they express.

Dawn C. Nunziato, *Freedom of Expression, Democratic Norms, and Internet Governance,* 52 EMORY L.J. 187, 256 (Winter 2003).

preemption of all state law claims in § 230(e)(3), because the CDA does not explicitly

define "intellectual property" for purposes of § 230(e)(2).

The cases that have made this interpretation have squarely held that the term

describing claims that may be maintained as pertaining to "intellectual property" are

limited to only "federal intellectual property" claims.  For example, *Perfect 10, Inc. v.*

*CCBill LLC,* 488 F.3d 1102, 1118-19 (9th Cir. 2007), specifically examined the scope of

this exclusion.  As the *Perfect 10* court reasoned:

> [T]he CDA does not contain an express definition of "intellectual property,"
> and there are many types of claims in both state and federal law which
> may -- or may not -- be characterized as "intellectual property" claims.
> While the scope of federal intellectual property law is relatively well-
> established, state laws protecting "intellectual property," however defined,
> are by no means uniform.  Such laws may bear various names, provide for
> varying causes of action and remedies, and have varying purposes and
> policy goals.  Because material on a website may be viewed across the
> Internet, and thus in more than one state at a time, <u>permitting the reach of
> any particular state's definition of intellectual property to dictate the
> contours of this federal immunity would be contrary to Congress's
> expressed goal of insulating the development of the Internet from the
> various state-law regimes</u>.  In the absence of a definition from Congress,
> <u>**we construe the term "intellectual property" to mean "federal
> intellectual property**</u>."

*Perfect 10, Inc.*, 488 F.3d at 1118 -19 (emphases added) (citing 47 U.S.C. § 230(a) &

(b)) (citing *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003) as noting that "courts

construing § 230 have recognized as critical in applying the statute the concern that

lawsuits could threaten the 'freedom of speech in the new and burgeoning Internet

medium'" (other citation omitted)).

Consequently, insofar as GMS intends to argue that its state law claims are really

claims for trademark infringement or copyright infringement couched in state tort

language, then that argument, too, is unavailing because only the **federal** intellectual property laws are outside the scope of the CDA immunity.  The CDA preempts all state law claims, even state law claims involving intellectual property matters andNamecheap is, therefore, immune from each of GMS's state claims and they should be dismissed.

### C.    THE STATE LAW CLAIMS ARE PREEMPTED UNDER THE COPYRIGHT ACT

The Court should dismiss GMS's state law claims because they are further preempted under the federal Copyright Act.  To the extent the state law claims are based on the allegation of improper use of GMS's "Trust Guard" seals, the claims are preempted as a matter of law.  The Copyright Act provides:

> [A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed **exclusively** by this title.

17 U.S.C. § 301(a) (emphases added).

The district courts of Utah have consistently applied the preemption doctrine to state law claims which assert violations of copyright interest.  *See, e.g.*, *Customs & Classics v. Bonneville Street Rods, LLC,* 2007 WL 1601483 (D. Utah June 4, 2007). State claims are preempted if:  "(1) the work is within the scope of the 'subject matter of copyright'  as specified in 17 U.S.C. §§ 102 and 103; and (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106."  *Gates Rubber Co. v. Bando Chemical Indus., Ltd.,* 9 F.3d 823, 847 (10th Cir. 1993); *see R.W. Beck, Inc. v. E3 Consulting, LLC*, 577 F.3d 1113, 1145-46 (10th Cir. 2009); *Ehat v. Tanner,* 780 F.2d 876, 878 (10th Cir. 1985).

Here, the Eighth Claim for negligence is predicated on the alleged damage suffered by GMS as a result of the purported infringement of its copyrighted Trust Guard seals.  [*See* 5/11/11 Compl. ¶ 100].  Because the negligence claim necessarily depends upon whether infringement exists and the attendant damages, the claim is well within "the exclusive rights within the general scope of copyright" and, therefore, preempted. 17 U.S.C § 301(a).[10]

Similarly, the Sixth Claim for unjust enrichment is preempted by the Copyright Act.  Federal courts addressing the issue have generally held that the "extra element" of a state law unjust enrichment claim that arises solely from a defendant's unauthorized use of a copyrighted work "does not qualitatively change the rights at issue, [*i.e.*,] the rights the plaintiff holds in the copyrighted work, and does not avoid preemption."  *Zito v. Steeplechase Films, Inc.,* 267 F.Supp.2d 1022, 1027 (N.D. Cal. 2003).[11]

---

[10] *See Marvullo v. Gruner + Jahr AG & Co.,* No. 98 Civ. 5000, 2001 WL 40772, at *7 (S.D.N.Y. Jan.17, 2001) (preempting a photographer's negligence claim as simply restating his copyright infringement claim); *Watermark Publishers v. High Tech. Sys.,* No. 95-3839-IEG, 1997 U.S. Dist. LEXIS 22512, at *15 (S.D. Cal. 1997) (preempting a negligence claim based on defendant's use of a copyrighted tourist map, explaining, "The only possible basis for a duty to protect another from copyright infringement -- if such a duty can exist -- is in copyright law; thus, the alleged existence of this duty is not an 'extra element.'").

[11] *See also, e.g.,* *R.W. Beck, Inc. v. E3 Consulting, LLC*, 577 F.3d 1113, 1147-48 (10th Cir. 2009) (state law unjust enrichment and unfair competition claims preempted);; *Briarpatch Ltd. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 306 (2nd Cir. 2004) ("While enrichment is not required for copyright infringement, we do not believe that it goes far enough to make the unjust enrichment claim qualitatively different from a copyright infringement."); *Chalfant v. Tubb,* 453 F.Supp.2d 1308, 1321 (N.D. Okla. 2006) (a claim for unjust enrichment based solely on the defendant's unfair economic gain from violating plaintiff's copyright would be preempted).

**V.    REGARDLESS OF PREEMPTION, MANY OF THE STATE LAW CLAIMS MUST BE DISMISSED BASED UPON GMS'S OWN ALLEGATIONS**

**A.    GMS'S THIRD CLAIM FOR RELIEF MUST BE DISMISSED AS TO NAMECHEAP BASED ON GMS'S ALLEGATIONS**

The Court must dismiss GMS's third Claim for Relief, based on "pharming" or "phishing" under the E-Commerce Integrity Act, because the specific allegations of the Complaint refute any such claim as against Namecheap.

To state a claim based upon "phishing," GMS must allege, among other things, that Namecheap has (a) made a communication under false pretenses and (b) used that "communication to induce, request, or solicit another person to provide identifying information or property."  Utah Code Ann. § 13-40-201(1).  Likewise, to state a claim based upon "pharming," GMS must allege, among other things, that Namecheap actually "create[d] or operate[d] a webpage" on which GMS's claim is based.  Utah Code Ann. § 13-40-201(2)(a).

GMS's Complaint contains the cursory, bald assertion that "Defendants' actions constitute violations of Utah Code §§ 13-40-201(1)-(2)."  [5/11/11 Compl. ¶ 64].  However, such a generalized allegation is insufficient to actually state a claim against Namecheap.[12]  Rather, GMS's Complaint contains specific factual allegations refuting these essential elements of a pharming or phishing claim.  GMS alleges that Namecheap is merely a domain registrar.  [5/11/11 Compl. ¶ 7].  GMS alleges that it was Goldstein, not Namecheap, that made and used the subject communications on

---

[12] *Twombly*, 550 U.S. at 557 n.5 (for allegations to rise to "enter the realm of plausible liability," they must cross the lines "between the conclusory and the factual," and "between the facially neutral and the factually suggestive.").

which GMS's claims are based.  [5/11/11 Compl. ¶¶ 29, 30].  Further, GMS alleges that

it was Goldstein, not Namecheap, that actually created or operated the website.

[5/11/11 Compl. ¶¶ 29, 30].  These specific factual allegations may state a claim against

Goldstein for phishing or pharming, however, they refute that GMS has any such claim

against Namecheap.  Because GMS's own allegations refute essential elements of the

claim, the Court should dismiss the Third Claim for Relief as against Namecheap.

### B.    THE COURT SHOULD DISMISS THE UNFAIR PRACTICES ACT CLAIM BECAUSE GMS DOES NOT ALLEGE ANY ANTICOMPETITIVE CONDUCT BY NAMECHEAP

GMS's Fourth Claim for Relief, based upon the Utah Unfair Practices Act

("UPA"), must be dismissed because GMS has not alleged any conduct by Namecheap

that is anticompetitive or which would otherwise violate the UPA.  To state a claim under

the UPA, GMS must "to plead or otherwise identify acts by [Namecheap] that violate the

Utah Unfair Practices Act's specific provisions, neither the conclusory allegation of a

violation nor the generalized assertion of interference with freedom of contract can

sustain" such a claim.  *MacArthur v. San Juan County*, 416 F. Supp. 2d 1098, 1181 (D.

Utah 2005).  GMS's Complaint falls far short of any such allegations.

First, GMS's allegations do not state any violation of the statute by Namecheap.

The UPA makes unlawful "[u]nfair methods of competition in commerce or trade."  Utah

Code Ann. § 13-5-2.5(1).[13]  Specifically, the legislation prohibits anticompetitive

---

[13] *See Trade Comm. v. Skaggs Drug Centers, Inc.*, 21 Utah 2d 431, 446 P.2d 958 (Utah 1968) (explaining the UPA's purpose is "to preserve a competitive climate by preventing large business concerns through the unrestrained use of size and resources alone, from overwhelming and destroying their smaller competitors" and that the UPA "simply has declared it unfair to accomplish [increased business] through giving away goods or services or selling them for less than cost.").

discriminatory pricing and advertising and contains a series of enumerated acts which are specifically declared to be "unlawful."  *See id.*  §§ 13-5-3, -8.  To state a claim, GMS must allege facts showing Namecheap engaged in conduct that constitutes such acts.[14] There is nothing in the Complaint that alleges Namecheap used any unfair method of competition, any discriminatory pricing, or engaged in any other anticompetitive activity made unlawful under the UPA.  Consequently, the Complaint states no valid claim under the UPA and the Fourth Claim for Relief must be dismissed against Namecheap.

Second, GMS's cursory allegation that "Defendants' actions" "offend public policy," "are immoral, unethical, oppressive, and/or unscrupulous, and/or they case substantial injury to customers" [5/11/11 Compl. ¶ 69] -- even if supported by specific factual allegations -- is not the type of conduct made unlawful under the UPA.  The UPA is intended to provide a claim only for injury caused by <u>a decrease in competition or a discrimination in price</u>.  *See Burt v. Woolsulate, Inc.*, 106 Utah 156, 146 P.2d 203, 205-06 (Utah 1944) (describing genesis of UPA as tool to prevent reduction in competition or creation of monopolies through, for example, price discrimination).  Indeed, GMS's allegations echo the Federal Trade Commission's Cigarette Rule, which permitted

---

[14] *See MacArthur v. San Juan County*, 416 F. Supp. 2d 1098, 1181 (D. Utah 2005) (a claim must be based on conduct "expressly defined by the Act as 'a violation of this act' or as 'unlawful.'  Neither the Act's general purpose 'to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition' nor the 'liberal construction' of its terms can extend civil liability -- or the Act's criminal sanctions -- beyond the 'unfair and discriminatory practices' expressly 'prohibited' by the Act itself.").

conduct to be "unfair" based upon application of a series of factors.[15]  The Utah

Supreme Court, however, has <u>rejected</u> application of the Cigarette Rule to the UPA.

*Garrard v. Gateway Financial Services, Inc.*, 207 P.3d 1227 (2009).  As the *Garrard*

court explained, the state statute "lack[s] an independent reference to unfair acts or

practices," and "there is no indication that the Utah Legislature intended the Unfair

Practices Act to reach any practices beyond anticompetitive behavior."  *Garrard v.*

*Gateway Financial Services, Inc.*, 207 P.3d 1227 (2009).  Unlike with federal law, the

UPA "contains no language prohibiting unfair or deceptive practices in commerce" and

"the Act unambiguously addresses unfair methods that impact fair competition."

*Garrard*, 207 P.3d at 1230.  Thus the state statute applies only to anticompetitive

behavior, not conduct that may "offend public policy, [is] immoral, unethical, oppressive,

and/or unscrupulous, and/or . . . cause[s] substantial injury to consumers," as Plaintiff

attempts to allege.  Hence, despite these allegations, there is no claim under the UPA.[16]

---

[15] The rule was originally adopted to regulate unfair or deceptive advertising or labeling
of cigarettes, to determine whether an act is unfair under the federal standards.  *FTC v.*
*Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n. 5.  By the *Sperry* interpretation, a
federal agency considers 3 factors in determining unfair practices: (1) whether the act
offends public policy as established by statute, common law, or otherwise; (2) whether
the act is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes
substantial injury to consumers or competitors.  *Id.*

[16] There is also no valid UPA claim because Namecheap has not engaged in
"commerce" within the limitation of the statute.  That is, section 13-5-5 states that the
"definition of 'commerce' as used in this bill shall be construed to mean **intrastate**
commerce in the state of Utah."  Utah Code Ann. § 13-5-5 (emphases added).  There
are no allegations in the Complaint that mention, let alone state, that Namecheap's
conduct was commerce within only the state of Utah.  Although Namecheap provides
domain registration and WhoIsGuard privacy services that may have been used in Utah,
such services certainly cannot be construed <u>as confined</u> within the state of Utah.
Instead, the nature of the commerce here is interstate.

**C.   GMS'S UNJUST ENRICHMENT CLAIM MUST BE DISMISSED BECAUSE THERE IS NO ALLEGATION IT CONFERRED ANY BENEFIT ON NAMECHEAP**

The Court should dismiss the Sixth Claim for Relief, for unjust enrichment, because GMS's own allegations refute essential elements of the claim.  The "elements of unjust enrichment are:  (1) a benefit conferred on the defendant by the plaintiff; (2) acceptance of the benefit by the defendant; and (3) circumstances which make it inequitable for the defendant to retain the benefit." *Cargill, Inc. v. Stafford*, 553 F.2d 1222, 1224 (10th Cir. 1977) (applying Colorado law); *see Dummar v. Lummis*, 543 F.3d 614, 623 (10th Cir. 2008) (stating same elements under Utah law); *Desert Miriah, Inc. v. B&L Auto, Inc.*, 12 P.3d 580, 582 (Utah 2000).

Under GMS's own allegations, Namecheap is merely a domain registrar that offers the WhoisGuard privacy service.  [5/11/11 Compl. ¶¶ 7, 10].  By these allegations, GMS alleges that Namecheap received no benefit from GMS, let alone a benefit conferred by GMS relative to the underlying alleged Trust Guard seals and mark. Indeed, GMS does not allege it was a subscriber of Namecheap's privacy service, GMS does not allege it gave anything to Namecheap, and GMS cannot legitimately do so. Because GMS does not allege it conferred any benefit on Namecheap, its claim for unjust enrichment fails as a matter of law and must be dismissed.

**D.   GMS'S CIVIL CONSPIRACY CLAIM MUST BE DISMISSED BECAUSE GMS HAS NOT ALLEGED ANY AGREEMENT BY NAMECHEAP RELATIVE TO THE PURPORTED INFRINGEMENT**

The Court should dismiss the Seventh Claim for Relief, for civil conspiracy, because GMS cannot allege essential elements of that claim.  "To prove the tort of civil conspiracy, a plaintiff must generally establish 'concert of action or other facts and

29

circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of a common design, intention, or purpose of the alleged conspirators.'" *Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1064 (Utah 2002) (citation omitted).[17]  "In a conspiracy that results in tort liability, the cause of action for which the co-conspirators are ultimately held liable is not the tort resulting in the harm, but for the conspiracy that led to the harm.  These are separate and distinct causes of action."  *Pohl, Inc. of Am. v. Webelhuth*, 201 P.3d 944, 955 (Utah 2008).

The Complaint in this case is devoid of any allegation to support that Namecheap engaged in any common design or intent, or even had a meeting of the minds, relative to the alleged infringement of GMS's purported copyrights or trademarks.  Indeed, the Complaint's allegations refute such facts.  That is, GMS's own allegation is that the intent or common design was to "mislead the public into believing that their websites were then verified by GMS."  [5/11/11 Compl. ¶ 88].  However, GMS does not allege Namecheap maintained any website, let alone any website that purports to have been verified by GMS, and GMS alleges instead that Namecheap is merely a registrar and not the publisher of any such content.  Accordingly, by GMS's own allegations, Namecheap was not involved with and had no such common design or intent that could support any civil conspiracy claim.  Because GMS does not allege these essential facts against Namecheap, the civil conspiracy claim should be dismissed.

---

[17] The following are the essential elements of a civil conspiracy claim: "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof."  *Alta Indus. v. Hurst*, 846 P.2d 1282, 1290 n.17 (Utah 1993) (citation omitted).

E.   NAMECHEAP CANNOT BE LIABLE ON THE NINTH CLAIM FOR RELIEF BECAUSE
     IT DOES NOT STATE A CAUSE OF ACTION AND IS A LEGAL THEORY REFUTED
     BY THE ALLEGED FACTS

The Court should dismiss the Ninth Claim for Relief labeled as "agent for

undisclosed principle [sic]" because it is not an independent cause of action, but rather

a legal theory for vicarious liability inapplicable and contrary to GMS's alleged facts.

First, the Ninth Claim should be dismissed because it is not a substantive cause

of action.  Relationships between principal and agent are theories to impose vicarious

liability upon one based upon the actions of another; they do not constitute independent

causes of action.  Legal theories are not separate causes of action and they are,

therefore, properly dismissed.  *Cf. Campbell v. Castlestone Homes, Inc.*, 2011 U.S. Dist

LEXIS 27266 (Case No. 2:09-CV-250 TS March 15, 2011) (dismissing cause of action

for punitive damages; may be pursued "'as a *remedy*, not a separate cause of action'").

Second, an undisclosed-principal theory has no application to the alleged facts of

this case.  It is a theory to hold an agent liable in contract, not tort.  That is, when an

agent enters a contract in his own name, without disclosing he is in fact acting on behalf

of a principal, the contract may be enforced against both the agent (here Namecheap)

and the principal (here Goldstein); whereas if an agent contracts on behalf of a

disclosed principal, the agent is not obligated under the contract.  *Carlie v. Morgan*, 922

P.2d 1, 6 (Utah 1996) ("'If a contract is made with a known agent acting within the scope

of his authority for a disclosed principal, the contract is that of the principal alone and

the agent cannot be held liable thereon . . . .') (quoting 3 Am. Jur. 2d Agency § 302

(1986)); *see generally* 3 Am. Jur. 2d Agency §§ 313-315 (explaining liability of agents in

undisclosed agency only within the context of contracts).[18]  Of course, the Complaint

contains not a single allegation of any contract entered into between Namecheap and

GMS, whether or not within the scope of any assumed agency for Goldstein.  Because

there is no contract at issue in this case, it is wholly irrelevant as to whether Namecheap

entered such a non-existent contract with or without disclosing it was acting on behalf of

Goldstein.  Consequently, GMS's theory labeled as "undisclosed principal" does not

state a claim against Namecheap and it is properly dismissed.

Third, the alleged agency relationship does not state a claim against

Namecheap.  As alleged at Paragraphs 29-30 of the Complaint, GMS admits that

Goldstein was the actual registrant of the offending website and that it was he who

placed the Trust Guard seals on the web pages appearing at the Domain.  Hence, if any

agency relationship exists (which Namecheap denies), GMS's own allegations establish

that Goldstein was the principal and Namecheap was the agent (at most).  As a matter

of law, Namecheap, as the agent, cannot be held vicariously liable for the torts of its

principal.  Rather, vicarious liability runs in the opposite direction.  *See Rookard v.

Mexicoach*, 680 F.2d 1257, 1261 (9th Cir.1982) ("[I]f Mexicoach was the agent of Del

Pacifico, it has no liability for the torts of its principal.... An agent, absent fault on his

part, cannot be vicariously liable for the wrongful acts of his principal"); *see also*

---

[18] Outside the context of contract, whether a principal is disclosed or not is immaterial to determine liability.  Rather, the agent is liable for his own conduct, and "[i]t is well established in the law that a principal is liable for the acts of his agent within the scope of the agent's authority, <u>irrespective of whether the principal is disclosed or undisclosed</u>."  *Peterson v. Coca-Cola United States*, 48 P.3d 941, 946 (Utah 2002) (emphasis added).

*Northstar Funding Group v. Federal Deposit Ins. Corp.* 2010 WL 2802438, 10 (D. Utah 2010); Restatement (Third) of Agency § 7.03 (2006)).

## CONCLUSION

For all the foregoing reasons, GMS' Complaint is irreparably defective. Namecheap's Rule 12(b)(6) Motion should be granted and all claims asserted against Namecheap should be dismissed with prejudice.

DATED this 10th day of June, 2011.

MAGLEBY & GREENWOOD, P.C.

_____
James E. Magleby
Eric K. Schnibbe
Jennifer Fraser Parrish

And

Eugene Rome
ROME & ASSOCIATES, A.P.C.

Attorneys for Defendant Namecheap, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that I am employed by the law firm of MAGLEBY & GREENWOOD,

P.C., 170 South Main Street, Suite 850, Salt Lake City, Utah 84101, and that pursuant

to Rule 5(b), Federal Rules of Civil Procedure, a true and correct copy of the foregoing

**MEMORANDUM IN SUPPORT OF NAMECHEAP'S MOTION TO DISMISS** was

delivered to the following this 10th day of June, 2011:

[   ]   Via U.S. Mail

[X]   Via CM/ECF System

[   ]   Via Electronic Mail (as indicated below)

Randall B. Bateman
  rbb@batemanip.com
Perry S. Clegg
  psc@batemanip.com
Sarah W. Matthews
  sm@batemanip.com
BATEMAN IP LAW GROUP, P.C.
8 East Broadway, Suite 550
Salt Lake City, Utah  84110

*Attorneys for Plaintiff*

Jo Washenko

34