Randall B. Bateman (USB 6482)
Perry S. Clegg (USB 7831)
C. Todd Kinard (USB 12575)
Sarah W. Matthews (USB 13295)
BATEMAN IP LAW GROUP, P.C.
8 East Broadway, Suite 550
P.O. Box 1319
Salt Lake City, Utah 84110
Tel: (801) 533-0320/Fax: (801) 533-0323
Email: mail@batemanip.com, rbb@batemanip.com, psc@batemanip.com, ctk@batemanip.com, sm@batemanip.com

Attorneys for Plaintiff,
Global Marketing Strategies, LLC

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| GLOBAL MARKETING STRATEGIES, LLC, a Utah limited liability company, | **MEMORANDUM IN OPPOSITION TO DEFENDANT NAMECHEAP'S MOTION TO DISMISS** |
| Plaintiff, | |
| vs. | |
| NAMECHEAP, INC., a Delaware corporation, d/b/a WHOISGUARD; DAN GOLDSTEIN; and DOES 1 through 5, | Case No. 1:11cv00065-DB |
| Defendants. | Judge Dee Benson |

Plaintiff Global Marketing Strategies, LLC ("GMS"), respectfully submits this

Memorandum in Opposition to Defendant Namecheap's Motion to Dismiss.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION…………………………………………………………………………...v

FACTUAL CONTENTIONS……………………………………………………………....vi

ARGUMENT…………………………………………………………………………...1

    A. GMS'S CLAIMS AGAINST NAMECHEAP MORE THAN
       MEET THE PLEADING STANDARD UNDER THE FEDERAL
       RULES AND CONTROLLING CASE LAW………………………………..1

    B. IT IS WELL ESTABLISHED THAT ACTUAL FIRST USE OF A MARK
       CREATES RIGHTS AND PRIORITY OVER OTHERS, NOT
       REGISTRATION OF THE MARK………………………………………..1

    C. GMS's CLAIM AGAINST NAMECHEAP FOR COPYRIGHT
       INFRINGEMENT IS SUFFICIENTLY PLED…………………………………2

    D. THE COPYRIGHT INFRINGEMENT CLAIM IS NOT BARRED BY THE
       DIGITAL MILLENNIUM COPYRIGHT ACT.....................................4

        1. *Namecheap interfered with GMS's ability to identify any owner of the
          Website, other than Namecheap, to allow GMS to protect its copyrighted
          works..………………………………………………………………5*

        2. *The safe harbors of the Digital Millennium Copyright Act only apply
          when a registrar is acting in its capacity as a registrar..…………………6*

        3. *Assuming arguendo that the DMCA safe harbors are available to
          Namecheap, it has not met the threshold requirements entitling it to the
          benefit of the safe harbors................................................8*

    E. GMS HAS PLED SUFFICIENT FACTS TO SHOW THAT IT IS ENTITLED
       TO RELIEF WITH RESPECT TO ITS LANHAM ACT AND UTAH UNFAIR
       COMPETITION ACT CLAIMS AGAINST NAMECHEAP………………………9

        1. *GMS has adequately pleaded a violation of the Lanham Act by
          Namecheap…………………………………………………………..10*

           a. GMS's Lanham Act claim is not barred by Namecheap's status
              as a domain name registrar…………………………………..10

           b. GMS has properly alleged use of its Mark by Namecheap………….12

           c. GMS's allegations allege ownership of the TRUST GUARD
              mark…………………………………………………………13

           d. GMS's Utah Unfair Competition Act Claim is sufficiently pled……14

F.  GMS's STATE LAW CLAIMS ARE NOT PREEMPTED BY THE
    COMMUNICATION DECENCY ACT……………………………………………..14

G.  THE COPYRIGHT ACT DOES NOT PREEMPT GMS's STATE
    LAW CLAIMS……………………………………………………………………17

H.  GMS's STATE LAW CLAIMS HAVE BEEN PROPERLY PLED AND
    SHOULD NOT BE DISMISSED…………………………………………………18

    1. *GMS has adequately pleaded a violation of the Utah E-Commerce
       Integrity Act*…………………………………………………………………...20

       a.   GMS's has stated a claim for "phishing" against Namecheap
            under the UEIA…………………………………………………..19

       b.   GMS's has stated a claim for "pharming" against Namecheap
            under the UEIA…………………………………………………..20

    2. *GMS has conferred a benefit on Namecheap and has thus alleged a
       valid claim for unjust enrichment against Namecheap*………………...…21

    3. *The civil conspiracy claim against Namecheap is supported by the
       allegations in the Amended Complaint*…………………………...…..22

    4. *Namecheap is at least vicariously liable for the acts committed by
       Goldstein*....................................................................................................23

CONCLUSION…………………………………………………………………………..24

ii

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### Cases

*Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.,* 249 F.3d 564 (6th Cir. 2001)………………………………………………………………………..2, 13

*Am. Plastic Equip., Inc. v. Toytrackerz, LLC*, Civ. No. 07-2253, 2008 WL 917507 (D. Kan. Mar. 31, 2008)………………………………………………………………………3

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)…………………………………………………2

*Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690 (S.D.N.Y. 2009)…….14, 15

*Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228 (10th Cir. 2006)……………………………10

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)……………………………………………..1, 2, 23

*Conley v. Gibson*, 355 U.S. 41 (1957)…………………………………………………1, 23

*Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248 (10th Cir. 1999) ………………………1

*Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288 (D.N.H. 2008)…………………15, 16

*Dubbs v. Head Start, Inc.,* 336 F.3d 1194 (10th Cir. 2003) ……………………………………1

*Dummar v. Lummis*, 543 F.3d 614 (10th Cir. 2008)…………………………………………..21

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340 (1991)…………………………4

*Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991) ………………………………………………1

*Hard Rock Café Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143 (7th Cir. 1992)……………………………………………………………………………13

*Harrison v. PPG Indus.*, 446 U.S. 578 (1980)………………………………………………15

*Inwood Labs. v. Ives Labs.*, 456 U.S. 844 (1982)……………………………………………...13

*Israel Pagan Estate v. Cannon*, 746 P. 2d 785 (Utah Ct. App. 1987) ………………………...22

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949 (C.D. Cal. 1997)……...11

*Marker Int'l v. deBruler*, 635 F. Supp. 986 (D. Utah 1986)……………………………………...10

*MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005)……………………………………...4

*Nature's Way Products, Inc. v. Nature-Pharma, Inc.*, 736 F. Supp. 245 (D. Utah 1990) …….10

*Palladium Music, Inc. v. Eatsleepmusic, Inc.*, 398 F.3d 1193 (10th Cir. 2005) ………………3

*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007)……………………………..8, 16

*R.W. Beck, Inc. v. E3 Consulting, LLC*, 577 F.3d 1133 (10th Cir. 2009)……………………...17

*Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1 (1st Cir. 2007)……………………15, 16

*Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092 (C.D. Cal. 2009)………….4, 6, 7, 11

*Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763 (1992)……………………………………..10

*Universal Communications Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007)..........14

*Utah Lighthouse Ministry v. F.A.I.R.*, 527 F.3d 1045 (10th Cir. 2008)………………………..10

*Vianix, LLC v. Nuance Comm's, Inc.*, Civ. No. 09-348, 2010 WL 2898289
(D. Del. Jul. 20, 2010)…………………………………………………………………………….3

*Voicenet Comms., Inc. v. Corbett*, No. 04-1318, 2006 U.S. Dist. LEXIS 61916, 2006 WL
2506318, (E.D. Pa. Aug. 30, 2006)……………………………………………………………….15

White v. Paramount Pictures Corp., 1997 U.S. App. LEXIS 3079
(Fed. Cir. Feb. 21, 1997) ………………………………………………………………………12

### Statutes

17 U.S.C. § 106…………………………………………………………………………...17

17 U.S.C. § 512(i)(1)(B)…………………………………………………………………...4, 5

17 U.S.C. § 512(i)(2)……………………………………………………………………….4, 5

17 U.S.C. § 512(c)(1)(C)…………………………………………………………………….8

17 U.S.C. § 512(c)(3)(B)(ii)…………………………………………………………………9

47 U.S.C. § 230(e)(1)……………………………………………………………………….15

47 U.S.C. § 230(e)(2)……………………………………………………………...14, 15, 16

47 U.S.C. § 230(e)(3)……………………………………………………………………….15

Utah Code Ann. § 13-40-201……………………………………………………………...19

Utah Code Ann. § 13-40-201(1)(a)-(b)…………………………………………………...20

Utah Code Ann. § 13-40-201(2)(a)………………………………………………………..20

### Other Authorities

McCarthy on Trademark and Unfair Competition………………………………………2, 13

H.R. Rep. 105-551………………………………………………………………………....8

S. Rep. No. 105-190……………………………………………………………………...5, 7

ICANN RAA 3.3……………………………………………………………………………6

ICANN RAA 3.7.7.3………………………………………………………………………..23

### Rules

Fed. R. Civ. P. 8(a)(2)……………………………………………………………………...1

Fed. R. Civ. P. 8(d)(2)……………………………………………………………………18

# I.  INTRODUCTION

Contrary to the assertions of Defendant Namecheap, Inc. ("Namecheap") in its Motion to Dismiss, GMS has more than met its burden under the required pleading standard.   GMS has alleged that it is the owner of intellectual property and that its rights have been infringed by use of its trademarks and copying of its copyrighted materials on the homerevenuestream.com website (the "Website").  GMS has also alleged that Namecheap, through its d.b.a. WhoIsGuard, was the registrant, and presumed legal owner, of the Website during at least two months in which Namecheap was on notice that GMS's intellectual property rights were being damaged by the infringing Website.  Only after GMS was forced to file the present action did Namecheap reveal that Defendant, Dan Goldstein ("Goldstein"), was involved with operation of the Website.

Furthermore, Namecheap fails to apply the governing standard for a Rule 12(b)(6) motion and instead seeks to escape the consequences of their action by presenting facts (often with no support) in a light most favorable to itself.  Namecheap points a finger to the activities of Goldstein and ignores the fact that it is equally responsible for damage done to GMS's intellectual property rights during the time GMS had no other recourse against Goldstein. Namecheap argues that immunity and safe harbors intended to protect registrars should apply to it in the present case. Namecheap's liability, however, stems from activities outside its capacity as a registrar, namely that it interfered with GMS's ability to protect its intellectual property rights.  All of these facts have been sufficiently plead by GMS in the Amended Complaint.

Because GMS has adequately pleaded its claims against Namecheap the motion to dismiss should be denied.

## II. FACTS RESPONSE TO DEFENDANT'S "FACTUAL ALLEGATIONS OF THE AMENDED COMPLAINT RELATING TO NAMECHEAP"

1.      GMS admits that it filed the present action on April 26, 2011, naming only Namecheap as a defendant and subsequently added Dan Goldstein as a party defendant. (*See* Complaint (Docket No. 2) and Amended Complaint (Docket No. 5)).

2.      GMS admits that it alleged that WhoisGuard (a d.b.a. of Namecheap) was the listed registrant of the homerevenuestreamsystem.com website (the "Website") and alleged on information and belief the alternate theories that Dan Goldstein was 1) the licensee of the homerevenuestreamsystem.com website, or 2) the actual registrant of the website.  (Amended Complaint, ¶¶28-29).  GMS did not allege that Namecheap did not have control over the domain name or website for which it is the listed registrant.

3.      GMS objects to the Namecheap's characterization that GMS recognized that Goldstein, rather than Namecheap, engaged in the actual conduct, as Namecheap was alleged to be the listed registrant and was thereby the purported owner of the website.   (*Id.* at ¶28). Moreover, as the listed owner of the website, Namecheap was repeatedly advised of the infringing material and failed to take down the website or remove the infringing material.  (*Id.* at ¶¶32-35).  Moreover, there is no evidence of record that Goldstein is not affiliated with Namecheap.

4.      GMS objects to the characterization that GMS "alleges that it is was Goldstein who was the actual registrant of the offending website and that it was Goldstein who placed the Trust Guard seals on the web pages appearing at the Domain", as the Complaint clearly identifies Namecheap as the listed registrant and, on information and belief, alleged alternatively that Dan

Goldstein was <u>either</u> the licensee <u>or</u> actual registrant of the domain name.  (*Id.* at ¶¶ 28-30).

5.       GMS admits that it sent a letter to WhoisGuard/Namecheap on February 25, 2011 and that the letter had a typographical error with respect to the domain name in the body of the letter.  However, the letter included an exhibit which showed the infringing webpage and gave the complete URL at which Namecheap could find the infringing material.  (Memorandum in Support of Namecheap's Motion to Dismiss, Docket No. 17, Exhibit 1, hereinafter "Namecheap's Memo in Support").  Namecheap, however, failed to provide any response to the cease and desist letter.  (Amended Complaint, ¶33).

6.       GMS admits that on March 21, 2011, it sent a second cease and desist letter to Namecheap and that the sentence including the certification under penalty of perjury that the information is accurate and was done on behalf of the owner of the intellectual property. However, such statement is contained in the February letter and Namecheap failed to respond to the letter.  (Namecheap's Memo in Support, Exhibit 1; Amended Complaint, ¶35).

7.       GMS also objects to Namecheap's argument posed as factual background asserting that the Complaint fails to inform the Court of material facts.  GMS admits that Markmonitor, Inc. was the owner of U.S. Trademark Registration No. 3633315 for "TRUST GUARD" and U.S. Trademark Registration No. 3412223 for "TRUSTGUARD."  GMS also admits that its trademark application was suspended pending a proceeding to cancel the Markmonitor trademark registrations on the basis that GMS was the first to use the mark in commerce and therefore had prior rights in the trademark.  (Namecheap's Memo in Support, Exhibit 7, ¶13).

8.     GMS admits that the cancelation proceedings against Markmonitor's trademarks were dismissed with prejudice.   Namecheap, however, omitted from its Memorandum that GMS's date of first use was prior to both the filing date of the Markmonitor registrations and the date of first use alleged by Markmonitor.  Namecheap also omitted from its Memorandum that the cancelation proceedings were dismissed with prejudice because Markmonitor conceded and moved to withdraw/abandon its trademarks.  (*See* <u>Exhibit A</u> attached hereto).

## III. ARGUMENT

**A.**     **GMS's Claims Against Namecheap More Than Meet the Pleading Standard Under the Federal Rules and Controlling Case Law.**

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).  Rule 8(a)(2) of the Fed. R. Civ. P. requires a claim for relief to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See also, Bell Atlantic v. Twombly*, 550 U.S. 544, 557 (2007).   The purpose of Rule 8(a)(2) is to ensure that a defendant has "fair notice of what the … claim is and the grounds upon which it rests". *Id.* (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  Significantly, "[a] court reviewing the sufficiency of a complaint presumes all of the plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991) (citations omitted).  "Granting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1251 (10th Cir. 1999) (reversing dismissal).

**B.**     **It Is Well Established That Actual First Use Of A Mark Creates Rights And Priority Over Others, Not Registration Of The Mark.**

The TRUST GUARD and TRUSTGUARD U.S. Trademark Registrations granted to Markmonitor do not establish its rights and priority over GMS.  "[I]t is not registration, but only actual use of a designation as a mark that creates rights and priority over others." 2 J. Thomas

1

McCarthy, McCarthy on Trademark and Unfair Competition, § 16:6, at 16-6 (4th ed. 2005);  *See also, Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.,* 249 F.3d 564 (6th Cir. 2001) (noting that "ownership rights flow only from prior use… [and that] [f]ederal registration of a trademark or service mark cannot create rights and priority over others who have previously used the mark in commerce...").

Namecheap attempts to dismiss GMS's trademark claims rely heavily on the fact that a third party, Markmoniter, Inc., obtained federal registrations on marks similar to GMS's TRUST GUARD mark (the "Mark").  Namecheap, however, fails to point out that it is actual first use of the mark, not a federal registration, which creates rights and priority over others.  Although GMS will bear the ultimate burden at trial of proving its rights in the Mark, it does not bear such a high burden of proof in overcoming a 12(b)(6) motion.  Markmonitor's federal registrations would be immaterial at this stage of the litigation even if they were still active.  However, both have been canceled, removing any argument whatsoever.  (*See* <u>Exhibit A</u> attached hereto).  GMS has adequately pleaded that it owns rights in the Mark and thus any basis for Namecheap's Motion to Dismiss on this grounds should be denied.

**C.     GMS's Claim Against Namecheap For Copyright Infringement is Sufficiently Pled.**

GMS provides sufficient facts to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  By so doing, GMS's copyright infringement claim meets the pleading and plausibility standards required to survive a motion to dismiss under Rule 12(b)(6). *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In order to be sufficiently pled under Rule 8, a claim for

copyright infringement must state: "(1) which specific original work is the subject of the copyright claims, (2) that plaintiff owns the copyright, (3) that the work in question has been registered in compliance with the statute, and (4) by what acts and during what time defendant has infringed the copyright." *Am. Plastic Equip., Inc. v. Toytrackerz, LLC*, Civ. No. 07-2253, 2008 WL 917507, *2 (D. Kan. Mar. 31, 2008); *see also Vianix, LLC v. Nuance Comm's, Inc.*, Civ. No. 09-348, 2010 WL 2898289, at *3 (D. Del. Jul. 20, 2010) (internal quotations omitted).

The Amended Complaint is replete with allegations about the specific original work that is the subject of GMS's copyright claims, *i.e.*, GMS's TRUST GUARD seals (the "Seals"). GMS alleged that it "registered its seals with the United State Copyright Office." (Amended Complaint, ¶37). The copyright registrations are also provided in an Exhibit to the Amended Complaint. (*See* Exhibit B thereto), demonstrating that the works have in fact been registered in compliance with the statute and owned by GMS. GMS also alleged that one or more of the Defendants, including Namecheap, copied infringing TRUST GUARD seals which were used on the Website. (*Id.*, ¶¶38 and 39). Furthermore, GMS alleged that Namecheap was the registrant and presumed owner of the Website, and was on notice for at least two months that GMS's copyrights were being infringed by the Website. (*Id.*, ¶¶41and 43).

At this stage the court must accept as true all the allegations in the complaint. GMS has presented certificates of registration for the Seals; thus, those copyrights are presumed valid. *See Palladium Music, Inc. v. Eatsleepmusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005) (presentation of a certificate of registration from the U.S. Copyright Office is typically prima facie evidence of a valid copyright). To prevail at trial on its claim of direct copyright infringement GMS must

show "(1) valid ownership of a valid copyright, and (2) unauthorized copying of constituent elements of the work that are original." *Id.* (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991)).  To prevail at trial on its claim of indirect infringement GMS must prove that Namecheap infringed "contributorily by intentionally inducing or encouraging direct infringement, [or] infringe[d] vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it."  *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).  Those are factual issues of proof to be determined at trial, not in the Amended Complaint.  GMS has adequately pleaded the elements required to assert a claim for direct and/or indirect copyright infringement against Namecheap.  Therefore, Namecheap's Motion to Dismiss GMS's copyright claim should be denied.

**D.    The Copyright Infringement Claim Is Not barred by the Digital Millennium Copyright Act.**

The limitations on liability provided by the DMCA are only available if the service provider "accommodates and does not interfere with standard technical measures…that are used by copyright owners to identify or protect copyrighted works.  17 U.S.C. §§512(i)(1)(B) and §512(i)(2).   Like the Anticybersquatting Consumer Protection Act ("ACPA"), the Digital Millennium Copyright Act ("DMCA") "was not intended to shield registrars from liability for actions outside their core function as registrars."  *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1105 (C.D. Cal. 2009).   Both the ACPA and the DMCA were enacted to encourage domain name registrars to work with trademark and copyright owners, respectively, to prevent infringement of their rights on the internet.  *See Id.*  Like the ACPA, the DMCA is meant

to provide certainty to both copyright owners and internet service providers with respect to copyright infringement online. *See* S. Rep. No. 105-190, at 1 (1998).

1.  *Namecheap interfered with GMS's ability to identify any owner of the Website, other than Namecheap, to allow GMS to protect its copyrighted works.*

The limitations on liability provided by the DMCA are only available if the service provider "accommodates and does not interfere with standard technical measures…that are used by copyright owners to identify or protect copyrighted works. 17 U.S.C. §§512(i)(1)(B) and §512(i)(2). The use of the Whois database to identify owners of websites that use infringing material is a standard technical measure used by copyright owners to protect copyrighted works. The Whois database listed WhoIsGuard as the registrant of the Website, a d.b.a. of Namecheap. (Amended Complaint, ¶28). The purpose of WhoIsGuard is to shield the name and contact information of the domain name owner from the public. WhoIsGuard actively prevents copyright owners from sending notification to any other owner of a domain name, instead notification must be sent to WhoIsGuard.

GMS sent a cease and desist letter via facsimile and certified mail using the contact information provided in the Whois database for WhoIsGuard. (*Id.*, ¶32). GMS also sent a cease and desist letter to Namecheap using the contact information provided on the WhoIsGuard website. (*Id.*, ¶34). Namecheap failed to respond to either of GMS's cease and desist letters until well after GMS was forced to file the present action. (*Id.*, ¶35). Namecheap interfered with GMS's ability to protect its copyrighted works for more than two months. (*Id.*, ¶43). Therefore, the limitations on liability provided by the DMCA are not available to Namecheap.

5

2.      *The safe harbors of the Digital Millennium Copyright Act only apply when a registrar is acting in its capacity as a registrar.*

Namecheap is not entitled to the safe harbor provisions of the DMCA because Namecheap was not merely acting as a registrar.  The court in *Solid Host*, found that to the extent a registrar was also the registrant of a domain name and that it was not working with intellectual property owners to prevent infringement of rights a blanket grant of immunity for its actions was not supported.  *Solid Host*, 652 F. Supp. 2d at 1105.  Ironically, the registrar/registrant in *Solid Host*  was none other than Namecheap.  *Id.*

The Amended Complaint explains that Namecheap provides a service, under the name of WhoIsGuard, wherein a person can request that WhoIsGuard be listed as the registrant of a domain name. (Amended Complaint, ¶¶ 10 and 11).  The Amended Complaint also explains that at the time GMS discovered the infringing Mark and Seals on the Website that WhoIsGuard was the listed registrant of the Website.  (*Id.* at ¶¶ 22-28).  Cease and desist letters were sent to Namecheap. (*Id.* at ¶¶32-34), including a copy of the infringing page with the complete URL for the website  (Namecheap's Memo in Support, Exhibit 1).  Namecheap failed to respond for two months to the cease and desist letters during which time WhoIsGuard remained listed as the registrant and purported owner of the Website.[1] ((Amended Complaint, ¶¶ 33 and 35).  Thus, GMS last resort was to instigate the present lawsuit to protect its intellectual property rights.

---

[1] Under the ICANN Registrar Accreditation Agreement ("RAA"), the "Registered Name Holder" of a domain name is the holder of a "Registered Name." The RAA's Section 3.3, which covers a registrar's duty to provide WHOIS service to the public, states that a registrar has a duty to provide name and postal address of a "Registered Name Holder" through the WHOIS service. Based on this language and as McGrady on Domain Names recognizes:

> "one can reasonably conclude from the RAA that the owner of a domain name is the party whose name and address is published in the public WHOIS in the Registered Name Holder (or "registrant") field."

6

The reasoning of *Solid Host*, *i.e.* that Namecheap's acts as the registrant of a domain name "support the imposition of liability on it, not a grant of immunity to it" under the ACPA, applies equally well under the DMCA. *See Solid Host,* 652 F. Supp. 2d at 1105 (C.D. Cal. 2009). Namecheap, via its WhoIsGuard service, was the registrant of the Website during at least a two month period in which GMS's copyrights were being infringed, which supports the imposition of liability, rather than a grant of immunity.

Furthermore, failure to cooperate with a copyright owner, like failure to cooperate with a trademark owner, supports the imposition of liability on a registrant, even if the registrant also happens to be a registrar. In *Solid Host*, the plaintiff filed suit within ten days of first contacting Namecheap, whereas in the present case Namecheap failed to work with GMS to protect its rights for two months while GMS's intellectual property rights were being harmed. The DMCA was intended to provide certainty to a copyright owner that it could protect against infringement of its rights. *See* S. Rep. No. 105-190, at 1 (1998). Namecheap completely failed to act. Therefore, Namecheap is not entitled to the immunity provided to internet service providers under the DMCA, the *quid pro quo* for working with a copyright owner to provide certainty that its rights are protected.

      3.      *Assuming arguendo that the DMCA safe harbors are available to Namecheap, it has not met the threshold requirements entitling it to the benefit of the safe harbors.*

---

McGrady on Domain Names § 1.06.

The DMCA safe harbor Namecheap seeks to invoke is conditioned on the internet service provider responding, upon notification, to "expeditiously … remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity."  17 U.S.C. §512(c)(1)(C).  GMS has alleged that it notified Namecheap of the infringing activity (Amended Complaint, ¶¶32-34) and that Namecheap failed to respond to GMS for at least two months. (*Id.* at ¶44).  Thus, GMS allegations make out a more than plausible claim that Namecheap failed to respond to GMS's notification expeditiously.  Because the application of the DMCA safe harbor is conditioned on Namecheap's expeditious response it is not entitled to the benefit of the safe harbor.

Namecheap instead argues that the GMS's notification do not "substantially comply" with the statutes requirements.  Whether GMS's notifications substantially comply, however, is a factual issue to be determined at trial.  Even though GMS must, and will, prove that the notifications do substantially comply, it does not carry such a burden to survive a 12(b)(6) motion.

Pursuant to the statute "communication substantially complies even if it contains technical errors such as misspellings…" *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1112 (9th Cir. 2007) (citing H.R. Rep. 105-551 (II), at 56 (1998)).  GMS's notices were at least in substantial compliance with the DMCA.  Namecheap argues that the cease and desist letter dated February 25, 2011 (the "February Letter"), does not substantially comply because the name of the Website was misspelled in the body of the February Letter.  While this is true, Namecheap

8

ignores the fact that a screen shot of the Website, showing the correct name, including the entire URL of the infringing page, was provided along with the February Letter.

Namecheap also argues that the cease and desist letter dated March 21, 2011 (the "March Letter") is deficient in providing notice under the DMCA because it "(1) fails to give a statement of the accuracy of the notice; and (2) does not state, under penalty of perjury, that GMS's counsel is authorized to act on behalf of the copyright holder."  (Namecheap's Memo in Support, at page 9).  Namecheap's arguments why the March Letters does not substantially comply are moot in light of §512(c)(3)(B)(ii).  Section §512(c)(3)(B)(ii) requires that a "service provider promptly attempt[] to contact the person making the notification or take[] other reasonable steps to assist in the receipt of notification that substantially complies".  If the service provider does not comply with the requirements of §512(c)(3)(B)(ii), then the missing requirements in the March Letter, which Namecheap argues makes the March Letter deficient, are not necessary to provide sufficient notice under the statute.  As Namecheap made no attempt to contact GMS, or take any other reasonable steps to assist in the receipt of notification that substantially complies, it cannot now argue that missing requirements make the March Letter ineffective as notice of the infringing material on the Website.

**E.     GMS Has Pled Sufficient Facts To Show That It Is Entitled To Relief With Respect To Its Lanham Act And Utah Unfair Competition Act Claims Against Namecheap.**

GMS pleaded standard Lanham Act and Utah Unfair Competition Act ("UUCA") claims. GMS has alleged facts that, if true, constitute violations of unfair competition law. Thus, it has adequately pled its claims. Namecheap's arguments to the contrary go to the merits of GMS's

9

claims, not to whether the claims have been adequately pled. Namecheap is making the wrong argument at the wrong time. The Court therefore should deny the motion to dismiss.

1.    *GMS has adequately pleaded a violation of the Lanham Act by Namecheap.*

"The Lanham Act is intended to protect the ability of consumers to distinguish among competing producers." *Utah Lighthouse Ministry v. F.A.I.R.*, 527 F.3d 1045, 1050 (10th Cir. 2008) (quoting *Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763, 774 (1992)) (internal quotation marks omitted).   "The essential purpose of section 43(a) of the Lanham Act is to provide a cause of action for any party injured by another party's commercial activities that are likely to cause confusion or deceive purchasers that the source of certain goods [or services] is a person or company other than their true source. *Nature's Way Products, Inc. v. Nature-Pharma, Inc.*, 736 F. Supp. 245, 250 (D. Utah 1990) (citing *Marker Int'l v. deBruler*, 635 F. Supp. 986, 996 (D. Utah 1986), *aff'd*, 844 F.2d 763 (10th Cir. 1988)) (internal quotation marks omitted. To evaluate likelihood of confusion, courts "look at (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting the mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks." *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1239 (10th Cir. 2006).

> a.    GMS's Lanham Act claim is not barred by Namecheap's status as a domain name registrar.

GMS alleged that use of the Mark on the Website was to "falsely represent to the public that the website was being monitored by GMS to induce potential customers to spend

10

money on the website." (Amended Complaint, ¶ 27). GMS also alleged that Namecheap, via WhoIsGuard, was the registrant of the Website and owner during the time when GMS's Mark was being infringed on the Website. (*Id.*, ¶ 28). These allegations are sufficient to support a plausible claim that Namecheap is liable under GMS's Lanham Act claim.

Namecheap argues that it cannot be held liable under the Lanham Act because it is a domain name registrar. GMS's Lanham Act claim is not based on Namecheap's role as a registrar, however, it is based on Namecheap's acts as the <u>registrant</u> of the Website. Namecheap was not acting as a registrar that only accepted the registration for the Website's domain name, as was the case in *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 959 (C.D. Cal. 1997). Namecheap also engaged in the additional commercial activity of providing its WhoIsGuard privacy protection service for the domain name of the Website, thus becoming the registrant and purported owner. This additional act by Namecheap is outside Namecheap's capacity as a registrar. *See Solid Host*, 652 F. Supp. 2d at 1103.

Because the registrant and owner of the domain name was listed as WhoIsGuard, *i.e.* Namecheap, GMS attempted to contact Namecheap to no avail. All the while, GMS's trademark rights were being damaged by use of the Mark on the Website which Namecheap apparently owned. As the court in *Solid Host* points out, the Lanham Act "contemplates that registrars will respond to trademark owners' complaints and help to resolve disputes between domain name registrants and trademark holders. *Id.* at 1005. Namecheap, however, did not respond to GMS's cease and desist letters until well after the present litigation commenced. Under these

11

circumstances, the Lanham Act supports the imposition of liability on Namecheap, not a grant of immunity for it.  *See e.g. Id.*

        b.  <u>GMS has properly alleged use of its Mark by Namecheap.</u>

        " '[U]se in commerce'…mean[s] *commercial use which is typical in a particular industry*. Additionally, [use in commerce] should be interpreted with flexibility so as to encompass genuine, but less traditional trademark uses[.]"  White v. Paramount Pictures Corp., 1997 U.S. App. LEXIS 3079, at *7 (Fed. Cir. Feb. 21, 1997) (emphasis in original) (citation omitted).  GMS alleges that use of its Mark identifies GMS's services, namely, analyzing websites "to verify that they have adequate safeguards to protect customer data, customer privacy, and that the business identified on [a] website is in fact the owner of the website." (Amended Complaint, ¶¶ 15-19 and 48-51).  GMS licenses commercial websites to use the Mark to ensure the public that the commercial websites are verified by GMS. (*Id.*)  GMS also alleges unauthorized use of the Mark on the Website by Defendants, including Namecheap, to associate its services (internet safety verified by GMS) with the Website. (*Id.* at ¶55).  In other words, GMS alleges that Namecheap was using the Mark in the same fashion as GMS itself uses the Mark.

        Namecheap cites *U-Haul Int'l, Inc. v. WhenU.com, Inc.*, for the proposition that a trademark is not used in connection with goods or services "when a defendant uses trademarks encountered on the Internet to trigger advertisements."  (Namecheap's Memo in Support, page 14).  The facts of the present case, however, are easily distinguishable from *U-Haul*.

12

GMS has not alleged that pop-up windows are the source of its trademark infringement allegation, but rather that the Mark is used on specific unauthorized website. The Mark is not in a separate window, but on the Website that uses the mark in an infringing way.  Moreover, while consumers searching for the UHaul website are bombarded by pop-ups, they know that those pop-ups are not a product endorsed by UHaul.  In this case, consumers search for the Website and find what they are looking for, however they also find the Mark on the Website, indicating to them that the security of the Website has been verified by GMS when in fact it has not.

GMS's allegations also state a claim for contributory trademark infringement of the Mark by Namecheap.  A defendant is liable for contributory trademark infringement if it is shown that it "intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the [defendant] is contributorily responsible for any harm done as a result of the deceit." *Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 854 (1982).  Furthermore, the "willful blindness" of a defendant is enough to support liability for contributory trademark infringement.  *Hard Rock Café Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992).  At best, Namecheap's conduct constituted willful blindness to the infringement of the Mark.  Moreover, Namecheap was the listed owner of the domain name and should be responsible for the content on its Website.

### c.   GMS's allegations allege ownership of the TRUST GUARD mark.

"[I]t is not registration, but only actual use of a designation as a mark that creates rights and priority over others." 2 J. Thomas McCarthy, McCarthy on Trademark and Unfair

Competition, § 16:6, at 16-6 (4th ed. 2005);  *See also, Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.,* 249 F.3d 564 (6th Cir. 2001) (noting that "ownership rights flow only from prior use… [and that] [f]ederal registration of a trademark or service mark cannot create rights and priority over others who have previously used the mark in commerce...").

GMS alleges that it "is well known for its services verifying commercial websites…[and that it] markets its services under the trademark TRUST GUARD."  (Amended Complaint, ¶¶ 48 and 49).  These allegations are sufficient to allege ownership of a trademark for purposes of surviving a motion to dismiss.   Namecheap inappropriately directs its arguments to the merits of GMS's claim to ownership of the Mark and ignores the proper pleading standard.

d.   <u>GMS's Utah Unfair Competition Act Claim is sufficiently pled.</u>

As explained above, GMS states a claim for which relief can be granted with respect to its Lanham Act claim.  Therefore, GMS has satisfied the third element of its Utah Unfair Competition Act claim, contrary to Namecheap's argument.  Therefore, the Court should not dismiss GMS's Utah Unfair Competition Act Claim.

**F.    GMS's State Law Claims Are Not Preempted By The Communication Decency Act.**

The Communication Decency Act ("CDA") expressly states that "[n]othing in this section shall be construed to limit or expand <u>any law</u> pertaining to intellectual property."  47 U.S.C. §230(e)(2) (emphasis added).  State law claims based on intellectual property clearly fall within this broad exception.  *See e.g., Universal Communications Systems, Inc. v. Lycos, Inc.,* 478 F.3d 413, 422-23 (1st Cir. 2007);  *Atl. Recording Corp. v. Project Playlist, Inc.,* 603 F. Supp. 2d 690, 704 (S.D.N.Y. 2009).  As each of GMS's state law claims pertain to its intellectual

14

property the CDA does not preempt those claims.

Namecheap does not support its position that §230(e)(2) only exempts federal intellectual property laws with case law dealing specifically with state intellectual property rights.  Although the Circuits are split as to the breadth of §230(e)(2)'s exception, the better reasoned opinions are provided by the First Circuit and Second Circuits.  *See, Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288 (D.N.H., 2008);  *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 704 (S.D.N.Y. 2009).

"Statutory interpretation begins with the language of the statute. Where . . . that language is clear and unambiguous, the inquiry is at an end." *Friendfinder Network*,  540 F. Supp. 2d at 299 (quoting *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 8 (1st Cir. 2007)).  As noted in *Friendfinder Network*:

> the language of § 230(e)(2) itself does not suggest a limitation to federal intellectual property law, but states simply that nothing in this section shall be construed to limit or expand any law relating to intellectual property.  As the Supreme Court has noted in another context, the modifier 'any' amounts to 'expansive language that offers no indication whatever that Congress intended a limiting construction.'

*Id.* (citing *Harrison v. PPG Indus.*, 446 U.S. 578, 589 (1980).

The court in *Friendfinder Network* also addresses the limiting provisions included in §§230(e)(1) and 230(e)(3) stating that there are:

> limiting provisions of § 230 which specifically identify federal or state law as such. See 47 U.S.C. §§ 230(e)(1)   ("Nothing in this section shall be construed to impair the enforcement of [named federal criminal statutes] or any other Federal criminal statute"), (e)(3) ("Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section") (emphases added). The content of these provisions indicates that, where Congress wished to distinguish between state and federal law in § 230, it knew how to do so. *See*

*Voicenet Comms., Inc. v. Corbett*, No. 04-1318, 2006 U.S. Dist. LEXIS 61916, 2006 WL 2506318, at *4 (E.D. Pa. Aug. 30, 2006).

In ruling that § 230(e)(1)'s removal of "any other Federal criminal statute" from the scope of the Act did not extend to state criminal law, the *Voicenet* court reasoned that "[i]f Congress had wanted all criminal statutes to trump the CDA, it could have written [§ 230(e)(1)] to cover "any criminal statute" just as it had written § 230(e)(2) to cover "any law pertaining to intellectual property." *Id.* Conversely, the use of "any" in § 230(e)(2), in contrast to the use of "federal" elsewhere in the CDA, suggests that Congress did not intend the terms to be read interchangeably. "It is well settled that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."

*Id.* at 300 (internal quotation marks altered).

Unlike the First and Second Circuits, the Ninth Circuit has construed §230(e)(2) without relying on the plain language of the statue. *Perfect 10*, 488 F.3d at 1118. Instead, the Ninth Circuit's rationale for construing §230(e)(2) narrowly is because of its concern that state intellectual property laws might have a deleterious effect on the development of the Internet. *Id.* As pointed out by the court in *Friendfinder Network*, however, "'[c]ourts are not free to disregard the plain language of a statute and, instead, conjure up legislative purposes and intent out of thin air' under the guise of statutory interpretation." 540 F. Supp. 2d at 300 (quoting *Ruiz*, 496 F.3d at 8.)[2]

Because the CDA does not provide Namecheap with immunity from GMS's state law claims they should not be dismissed.

---

[2] The *Friendfinder Network* court also noted that: "while Congress often acts to protect interstate commerce from the burden of nonuniform state laws, there is nothing in the language of § 230 effecting that protection here." 540 F. Supp. 2d at 300.

16

**G.    The Copyright Act Does Not Preempt GMS's State Law Claims.**

Each of GMS's state law claims are based on infringement of trademark rights.  (See

Amended Complaint, ¶¶ 48-57 (Second Claim); ¶¶62 and 63 (Third Claim); ¶71 (Fourth Claim);

¶79 (Fifth Claim); ¶¶83-85 (Sixth Claim); ¶88 (Seventh Claim); and ¶92 (Eighth Claim).  As the

Copyright Act does not preempt GMS's state law claims as they pertain to Namecheap's acts of

trademark infringement they should not be dismissed.

Furthermore, GMS's state law claims are not preempted by the Copyright Act as they

pertain to Namecheap's acts of copyright infringement because the rights granted under the state

law claims are not equivalent to the exclusive rights of federal copyright set out in 17 U.S.C.

§106.  The Tenth Circuit, in *R.W. Beck, Inc. v. E3 Consulting, LLC*, discussed what is required

for a state law claim to extend beyond the scope of copyright. 577 F.3d 1133, 1147 (10th Cir.

2009). "[W]hen a state law violation is predicated upon an act incorporating elements beyond

mere reproduction or the like, the rights involved are not equivalent and preemption will not

occur." *Id*.

Namecheap argues that because "[GMS's] negligence claim necessarily depends upon

whether [copyright] infringement exists…" it is preempted. (Namecheap's Memo in Support, at

page 24).  GMS's negligence claim, however, is based on the duty of care Namecheap owed

GMS to cooperate in protecting its rights from infringing activity on the Website. (Amended

Complaint, ¶¶93-97).[3]  The duty Namecheap owed to GMS is not equivalent to any of the rights

---

[3] The DMCA was intended to provide certainty to a copyright owner that it could protect against infringement of its
rights. In return, the DMCA places a duty on internet service providers, such as registrars, to cooperate with
copyright on in the protection of their rights.

conferred by the Copyright Act.   Namecheap would ask the Court, on the one hand, to view it as merely a passive registrar having no involvement with the infringing material on the Website and, thus, the copyright laws should not apply to them in the present case.  Then, on the other hand, Namecheap asks the Court to apply the copyright laws to preempt GMS's state law negligence claim.  Namecheap cannot use the Copyright Act as both a shield and a sword.  If, as Namecheap argues, that GMS's copyright claims are only properly alleged as to Defendant Goldstein, then GMS's negligence claim does not at all depend on Namecheap's infringement of its copyright.  Therefore, GMS's negligence claim against Namecheap is not preempted.  Likewise, GMS's remaining state law claims are also not preempted.

**H.      GMS's State Law Claims Have Been Properly Pled And Should Not Be Dismissed.**

The Amended Complaint has sufficient factual allegations to support its state law claims against Namecheap.  Namecheap does not apply the proper standard for analyzing allegations in a complaint for purposes of a 12(b)(6) motion, namely, that the facts are taken in a light most favorable to the plaintiff.   For example, Namecheap repeatedly points to the allegation acknowledging Namecheap's role as a registrar.  (Amended Complaint, ¶7).  However, GMS claims are directed to Namecheap's actions outside its capacity as a registrar, namely that it was Namecheap, via WhoIsGuard, who was the registrant of the Website and owner during the time when GMS's Mark and Seals were being infringed on the Website.  (*Id.* at ¶ 28).

Furthermore, Namecheap would have the court look only to GMS's allegations against Defendant Goldstein and ignore that the Federal Rules of Civil Procedure allow a party to plead in the alternative.  Rule 8(d)(2).  The Amended Complaint states that that Defendants, including

18

Namecheap, violated GMS's rights under applicable state laws. (*See e.g.* Amended Complaint, ¶¶62-65, 69-72, 78-79, 84-85, and 88.)  GMS allegations are sufficient to allege claims against Namecheap and/or Goldstein despite the Amended Complaint having allegations, made on information and belief, that Defendant Goldstein is the licensee or registrant of the Website and placed the infringing materials on the Website.  Namecheap has provided no evidence that Goldstein was not affiliated with Namecheap, and/or that they were not responsible for the alleged misconduct.  Even if Namecheap had provided such evidence, that evidence would go to the merits of GMS's claims, not to whether the claims have been adequately pled.

      1.     *GMS has adequately pleaded a violation of the Utah E-Commerce Integrity Act.*

GMS's factual allegations state a claim for relief as to Namecheap under the Utah E-Commerce Integrity Act ("UEIA").  The scienter requirement under Utah Code §13-40-201, requires that a party allege sufficient facts to show that a person had "intent to defraud or injure an individual, or [had] knowledge that [it] is facilitating a fraud or injury to be perpetrated by another." (emphasis added).  GMS alleges that use of the Mark on the Website was to "falsely represent to the public that the website was being monitored by GMS to induce potential customers to spend money on the website."  (Amended Complaint, ¶ 27).  GMS also alleges that Namecheap, via WhoIsGuard, was the registrant of the Website and owner during the time when GMS's Mark was being infringed on the Website.  (*Id.* at ¶ 28).  These allegations are at least sufficient to support the claim that Namecheap had knowledge of the fraud and injury being caused by the Website.

a.   GMS's has stated a claim for "phishing" against Namecheap under the UEIA.

A properly pled UEIA claim further requires allegations of acts committed by a person.  *Id*.  A "phishing" claim requires that a "person makes a communication under false pretenses purporting to be by or on behalf of a legitimate business, without the authority or approval of the legitimate business; and…the person uses the communication to induce, request, or solicit another person to provide identifying information or property."  Utah Code §13-40-201(1)(a)-(b).  GMS has alleged that the Mark and the Seals were used on the Website without the authorization of GMS. (Amended Complaint, ¶22).  GMS further alleges that Namecheap's purpose in using the Mark and Seals on the website was to falsely represent to the public that the website was being monitored by GMS. (*Id*. at ¶27).  GMS also alleges that the Mark and Seals are used on the Website to induce persons to provide identifying information and/or property to Namecheap, including names, credit card information and money. (*Id*. at ¶63).  This was done with the intent to defraud the public. (*Id*. at ¶27).  The alleged fact, thus, make out a claim for "phishing" with respect to Namecheap.

b.   GMS's has stated a claim for "pharming" against Namecheap under the UEIA.

A "pharming" claim requires that a person "creates or operates a webpage that represents itself as belonging to or being associated with a legitimate business, without the authority or approval of the legitimate business, if that webpage may induce any user of the Internet to provide identifying information or property".  Utah Code §13-40-201(2)(a).  GMS has alleged that Namecheap created the Website with content that infringes the Mark and Seals to falsely represent that the Website is associated with GMS. (Amended Complaint, ¶¶25-27).

20

GMS also alleges that the Mark and Seals are used on the Website to induce persons to provide identifying information and/or property to Namecheap, including names, credit card information and money. (*Id.* at ¶63).  Therefore, the Amended Complaint properly alleges a cause of action for "pharming" against Namecheap and the claim should not be dismissed.

2.    *GMS has conferred a benefit on Namecheap and has thus alleged a valid claim for unjust enrichment against Namecheap.*

GMS has alleged that it conferred a benefit on Namecheap, *i.e.* unauthorized use of the Mark and Seals on the Website, and that Namecheap appreciated the benefit of using the Mark and Seals on the Website.   The elements of unjust enrichment are "a benefit conferred on one person by another. …, the conferee must appreciate or have knowledge of the benefit… [and] there must be the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *Dummar v. Lummis*, 543 F.3d 614, 623 (10th Cir. 2008).

GMS has alleged that it expended considerable time and resources to develop and promote the Mark and Seals. (Amended Complaint, ¶83).   GMS further alleged the Mark and Seals provide assurances to consumers that their information is safe and that they are dealing with a real company, and so the Mark and Seals increase the conversion rate or purchases on websites displaying the seals due to the higher trust level of consumers.  (*Id.* at ¶18).  GMS also alleges that unauthorized, and unpaid for, use of the Mark and Seals by Namecheap was for the purpose of inducing consumers to purchase products from the Website, implying that Defendants

appreciated the benefit of having the Mark and Seals displayed on the Website. (*Id.* at ¶25). Therefore, GMS claim for unjust enrichment against Namecheap should not be dismissed.

       3.     *The civil conspiracy claim against Namecheap is supported by the allegations in the Amended Complaint.*

GMS allegations support the elements of a conspiracy claim against Namecheap which are "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof." *Israel Pagan Estate v. Cannon*, 746 P. 2d 785, 790 (Utah Ct. App. 1987) (citations omitted).  GMS has alleged that Namecheap allows another person to register a domain name using WhoIsGuard's contact information. (Amended Complaint, ¶11).  Namecheap is aware that individuals who use WhoIsGuard as the listed registrant of a domain name often do so when infringing intellectual property rights of third parties to avoid detection and slow enforcement efforts. (*Id.* at ¶12).  The object of listing WhoIsGuard as the registrant of the Website in the present case was to slow the efforts of GMS to enforce its intellectual property rights. GMS also alleges that Namecheap knew of the infringing activity[4] and acted in concert[5] with, on information and belief, Defendant Goldstein to infringe GMS's trademark and copyrights and to mislead the public in believing that the Website was verified secure by GMS. (*Id.* at ¶12).  These facts properly set forth a claim for civil conspiracy against Namecheap.

---

[4] GMS sent a cease and desist letter via facsimile and certified mail using the contact information provided in the Whois database for WhoIsGuard.  (Amended Complaint, ¶32).  GMS also sent a cease and desist letter to Namecheap using the contact information provided on the WhoIsGuard website.  (*Id.*, ¶34).  Thus, Namecheap had knowledge that the Website was infringing GMS's intellectual property rights.

[5] "Concert" is defined as "agreement of two or more individuals in a design or plan; combined action; accord or harmony" Dictionary.com, http://dictionary.reference.com/browse/concert.

Despite being the listed registrant and presumed owner of the Website, Namecheap argues that it was not involved in publishing the infringing material. (Namecheap's Memo in Support, page 30). This argument, however, goes to the merits of GMS's claim, not whether GMS has pled a claim for civil conspiracy. Futhermore, Namecheap's arguments miss the point that the object of the conspiracy was to slow the efforts of GMS to enforce its intellectual property rights. Namecheap has put forth no evidence as to why it was reasonable to take two months to respond to GMS's cease and desist letters.

4.      *Namecheap is at least vicariously liable for the acts committed by Goldstein.*

Namecheap is vicariously liable for the act of registrant's who use WhoIsGuard to register domain names. Section 3.7.7.3 of the Registrar Accreditation Agreement states that:

> Any Registered Name Holder [registrant] that intends to license use of a domain name to a third party is nonetheless the Registered Name Holder of record and is responsible for providing its own full contact information and for providing and updating accurate technical and administrative contact information adequate to facilitate timely resolution of any problems that arise in connection with the Registered Name. A Registered Name Holder licensing use of a Registered Name according to this provision shall accept liability for harm caused by wrongful use of the Registered Name, unless it promptly discloses the current contact information provided by the licensee and the identity of the licensee to a party providing the Registered Name Holder reasonable evidence of actionable harm.

Namecheap was the registrant of the Website for at least two months that GMS's Marks and Seals were being damaged by the infringing material displayed on the Website. ( *Id.*, ¶¶41and 43). Namecheap did not promptly disclose the contact information for Defendant Goldstein and only disclosed the information after the present lawsuit was filed. (Amended Complaint, ¶35.) Therefore, Namecheap must accept liability for harm caused by the wrongful

23

use of the Mark and Seals.

GMS's Ninth Claim for Relief is sufficient to give Namecheap "fair notice of what the …

claim is and the grounds upon which it rests" and should not be dismissed. *See Bell Atlantic v.*

*Twombly*, 550 U.S. at 557 (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).


**IV. CONCLUSION**

GMS respectfully request that Namecheap's Motion to Dismiss be denied because GMS

have sufficiently pleaded their claims in the Amended Complaint.


DATED this 26th day of July, 2011.


BATEMAN IP LAW GROUP

/s/C. Todd Kinard

Randall B. Bateman
Perry S. Clegg
C. Todd Kinard
Sarah W. Matthews

*Attorneys for Plaintiff*
Global Marketing Strategies, LLC

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that a true and correct copy of the foregoing

**MEMORANDUM IN OPPOSITION TO DEFENDANT NAMECHEAP'S MOTION TO**

**DISMISS** and this **CERTIFICATE OF SERVICE** were served on opposing counsel via

CM/ECF this 26th day of July, 2011, as follows:

>   **James E. Magleby**
>   magleby@mgpclaw.com
>
>   **Jennifer F. Parrish**
>   parrish@mgpclaw.com
>
>   **Eric K. Schnibbe**
>   schnibbe@mgpclaw.com
>
>   **Eugene Rome**
>   erome@romeandassociates.com


>                               /s/C. Todd Kinard

25