James E. Magleby (7247)
 magleby@mgpclaw.com
Eric K. Schnibbe (8463)
 schnibbe@mgpclaw.com
Jennifer Fraser Parrish (11207)
 parrish@mgpclaw.com
**MAGLEBY & GREENWOOD, P.C.**
170 South Main Street, Suite 850
Salt Lake City, Utah 84101
Telephone: 801.359.9000
Facsimile: 801.359.9011

Attorneys for Defendant Namecheap, Inc.

Eugene Rome (*pro hac vice*)
 erome@romeandassociates.com
**ROME & ASSOCIATES, A.P.C.**
2029 Century Park East, Suite 1040
Los Angeles, California 90067
Telephone: 310.282.0690
Facsimile:  310.282.0691

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| **GLOBAL MARKETING STRATEGIES, LLC, a Utah limited liability company,**<br><br>    **Plaintiff,**<br><br>**vs.**<br><br>**NAMECHEAP, INC., a Delaware corporation/ d/b/a WHOISGUARD; DAN GOLDSTEIN; and DOES 1 through 5,**<br><br>    **Defendants.** | **REPLY MEMORANDUM IN SUPPORT OF NAMECHEAP'S MOTION TO DISMISS**<br><br><br><br>**Case No. 1:11-CV-00065-DB**<br><br>**Judge Dee Benson** |

Defendant Namecheap, Inc. ("Defendant" or "Namecheap"), through counsel of record, hereby submits this Reply Memorandum in Support of Namecheap's Motion to Dismiss.[1]

---

[1]  Unless otherwise noted, abbreviated terms are as defined in the Memorandum in Support of Namecheap's Motion to Dismiss, filed June 10, 2011 (Docket No. 17) (referred to herein as "Supporting Memo" or "Supp. Memo").  Plaintiff's Memorandum in Opposition to Defendant Namecheap's Motion to Dismiss, filed July 26, 2011 (Docket No. 28), is referred to herein as "Opposition Memo" or "Opp. Memo."

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ vii

ARGUMENT ................................................................................................................ 1

I.   GMS'S ATTEMPT TO RECHARACTERIZE THE ALLEGATIONS IN ITS
     AMENDED COMPLAINT DEFY THE REALITY OF INTERNET DOMAIN
     NAME REGISTRATIONS AND NAMECHEAP'S "WHOISGUARD"
     SERVICE ............................................................................................................ 1

     A.   The Reality of Domain Name Registrars and the Internet ......................... 1

     B.   Namecheap's Manner of Processing Registrations Anonymously is
          Lawful and Important ................................................................................ 4

II.  THE COURT SHOULD REJECT PLAINTIFF'S ATTEMPT TO DEFEAT
     DISMISSAL BY MISAPPLYING THE GOVERNING RULE 12(b)(6)
     STANDARD ........................................................................................................ 8

III. GMS HAS PROVIDED NO VALID ARGUMENT SUPPORTED BY
     ACTUALLY ALLEGED FACTS TO SHOW THE DMCA SAFE HARBORS
     DO NOT APPLY TO NAMECHEAP ................................................................. 14

     A.   Namecheap's WhoisGuard Service and the Delay in Responding to
          GMS's Letters Do Not Eliminate the DMCA Safe Harbors ...................... 14

     B.   The Court Should Reject GMS's Argument to Disregard the DMCA
          Based on GMS's Characterization of the DMCA's Purposes .................. 18

     C.   GMS's Arguments That its Defective Letters Were Sufficient Notice
          to Remove the DMCA Safe Harbors are Without Merit ........................... 20

IV.  GMS PROVIDES NO VALID ARGUMENT TO SAVE ITS LANHAM ACT
     AND STATE LAW UNFAIR COMPETITION CLAIMS FROM DISMISSAL ........ 24

V.   THE COURT SHOULD REJECT GMS'S ARGUMENTS ATTEMPTING TO
     MINIMIZE THE NINTH CIRCUIT'S *HOLDING* THAT THE EXCEPTION
     TO IMMUNITY UNDER THE CDA APPLIES ONLY TO FEDERAL
     INTELLECTUAL PROPERTY CLAIMS ............................................................. 28

VI.    GMS'S CANNOT RELY ON THE RAA TO SAVE ITS "AGENT FOR
       UNDISCLOSED PRINCIPLE [SIC]" THEORY ..................................................... 33

CONCLUSION ........................................................................................................... 34

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.*, 755 F. Supp. 2d 1151 (D. Utah 2010) ............. 27

*American Girl, LLC v. Nameview, Inc.*, 381 F. Supp. 2d 876 (E.D. Wis. 2005) .............. 1

*Ashcroft v. Iqbal*, ____ U.S. ____, 129 S. Ct. 1937 (2009).................... viii, 8, 10, 13, 21, 26

*Atlantic Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690
 (S.D.N.Y 2009) ................................................................................................. 30, 31

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007).......vii, 8, 9, 10, 13

*City of Grantsville v. Redevelopment Agency of Tooele City*, 233 P.3d 461
 (Utah 2010) ............................................................................................................. 34

*Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288 (D.N.H. 2008) ................. 29, 30

*GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610 (E.D. Va. 2003) ........ 4

*Gucci Am, Inc. v. Hall & Assocs.*, 135 F. Supp. 2d 409 (S.D.N.Y. 2001)...................... 29

*In re Anonymous Online Speakers*, 2011 U.S. App. LEXIS 487
 (9th Cir., Jan. 7, 2011) ............................................................................................. 6

*In re Anonymous Online Speakers*, 611 F.3d 653 (9th Cir. 2010) ................................. 6

*In re Ford*, 574 F.3d 1279 (10th Cir. 2009) ................................................................... 31

*Jarecki v. G.D. Searle & Co.*, 367 U.S. 303 (1961) ...................................................... 31

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980 (9th Cir. 1999) ..... 26, 27

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ............................................... 5

*P&G Co. v. Haugen*, 317 F.3d 1121 (10th Cir. 2003) .................................................... 25

*Panavision Int'l L.P. v. Toeppen*, 945 F. Supp. 1296 (C.D. Cal. 1996).......................... 34

*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007) ..... 14, 17, 23, 28, 29

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 2004 U.S. Dist Lexis 15895, *17, No. C 04-0371-JW (N.D. Calif. Aug. 5, 2004) ............................................................... 26, 29, 30

*Sandals Resorts Intl. Ltd. v Google, Inc.*, 86 A.2d 32 (N.Y. App. Div. 2011) .................. 6

*Savannah College of Art and Design, Inc. v. Houeix*, 369 F. Supp. 2d 929 (S.D. Ohio 2004) ..................................................................................................... 2

*Smith v. Network Solutions, Inc.,* 135 F. Supp. 2d 1159 (N.D. Ala. 2001) ...................... 1

*SolidHost, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092 (C.D. Cal. 2009) ................................................................... 19, 20, 27, 28, 34

*Specht v. Google, Inc.*, 660 F. Supp. 2d 858 (N.D. Ill. 2009).......................................... 25

*Talley v. California*, 362 U.S. 60 (1960).......................................................................... 5

*Tiffany Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010) .................................................... 26

*Toomer v. City Cab*, 443 F.3d 1191 (10th Cir. 2006) ...................................................... 18

*U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723 (E.D. Va. 2003)................. 24

*UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099 (C.D. Cal. 2009) ........................................................................................................ 17

*United States v. Killbride*, 507 F. Supp. 2d 1051 (D. Ariz. 2007) .................................... 3

*Universal Communications Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007) ........ 29

*Utah Lighthouse Ministry v. Foundation for Apologetic Information & Research*, 527 F.3d 1045 (10th Cir. 2008) ........................................................................................ 24

**Statutes**

15 U.S.C. § 1115(a) ....................................................................................................... 23

15 U.S.C. § 1125(a)(1) ................................................................................................... 24

17 U.S.C. § 512(c)(3) ................................................................................................ 18, 22

17 U.S.C. § 512(h) ......................................................................................................... 18

17 U.S.C. § 512(n) ......................................................................................................... 21

47 U.S.C. § 230(e) .................................................................................................... 29, 31

**Other Authorities**

Sen. Rep. No. 105-190, at 52 (1998) ............................................................... 15

**Rules**

Fed. R. Civ. P. 8(a)(2) ................................................................................ 9

Fed. R. Civ. P. 11(b) ................................................................................. 13

Fed. R. Civ. P. 12(6) .................................................................................. v

# INTRODUCTION

The Court should grant Namecheap's Motion to Dismiss because GMS has offered no valid argument to show it actually states a claim against Namecheap on which relief may be granted.  Fed. R. Civ. P. 12(6).

First, there are numerous arguments raised in support of the Motion to Dismiss that GMS wholly ignores, essentially conceding that dismissal is appropriate on those grounds.  Among others, GMS does not dispute that Namecheap qualifies as an ISP under the Digital Millennium Copyright Act ("DMCA") and that the first DMCA safe harbor requires dismissal of its copyright infringement claim against Namecheap.  GMS also does not demonstrate any way that Namecheap made any commercial use of GMS's alleged trademarks in connection with any of Namecheap's goods or services and, therefore, GMS's unfair competition claims against Namecheap must be dismissed.

Second, where GMS does argue to save its Complaint as against Namecheap, those arguments are contrary to GMS's actual allegations and the applicable law.

GMS attempts to fundamentally recharacterize the actual allegations in its Complaint that recognized Namecheap was the registrar of the domain name and its WhoisGuard service merely affected the manner in which the domain was registered. GMS alleged it was Defendant Goldstein, not Namecheap, that controlled the content that later appeared on the website that was published by Goldstein at the domain. Rather than accepting its Complaint as alleged, GMS attempts to argue it has stated

that Namecheap was the registrant and owner of the website and, therefore, GMS's various federal and state law claims should not be dismissed.

GMS's arguments are untenable.  First, they ignore the real-world context of domain name registrations and the anonymous registration service provided by Namecheap.  Second, GMS's arguments do not comply with *Twombly* and *Iqbal* -- GMS has made only conclusory assertions with regard to Namecheap operating the subject website, largely found within the threadbare recitations of the elements of causes of action.  There are no specific facts alleged as to Namecheap's ownership or control of the website that could be taken as true, or that would support an actual plausible claim under the requirements of *Twombly* and *Iqbal*.  Consequently, regardless of GMS's arguments now, the multitude of claims based upon the erroneous characterization of the alleged facts fail and must be dismissed.

In addition, GMS's arguments that the DMCA safe harbors should not bar its copyright claim are without merit.  GMS asserts that Namecheap interfered with "standard technical measures" and, therefore, Namecheap cannot rely upon the safe harbors at all.  However, the Whois database is not remotely close to the "standard technical measures" Congress intended, which are a narrow category of mutually agreed upon tools.  Further, GMS erroneously argues that the Court should simply disregard application of the DMCA because, GMS argues, it would not further the purposes of the safe harbors for the different and irrelevant statute, the Anticybersquatting Consumer Protection Act ("ACPA").  Finally, despite GMS's arguments, the February Letter was not "substantial compliance" for a DMCA take down

notice because it affirmatively stated infringing content appeared where it did not actually appear, and the March Letter was defective because it was not under penalty of perjury.

The Court should also reject GMS's arguments relative to its Lanham Act and state unfair competition claims based upon alleged use of GMS's marks.  GMS essentially recognizes that these claims fail by arguing that it has a claim against Namecheap for contributory infringement.  However, GMS's Complaint is devoid of any claim for contributory infringement and does not allege facts showing that Namecheap intentionally induced Goldstein (or anyone else) to infringe a trademark, that Namecheap supplied any product or service to Goldstein while it knew of alleged infringement, or that Namecheap had any ability to monitor and control the content of the website that Goldstein published at the subject domain.  Accordingly, there is no claim for contributory infringement and GMS's unfair competition claims must be dismissed.

GMS's arguments that attempt to widen the exception to immunity under the Communications Decency Act ("CDA") to save its state law claims are without merit.  As the Ninth Circuit has held, the exception to immunity for intellectual property law applies only to federal, not state, intellectual property law.  Contrary to GMS's arguments, the First Circuit decision stating to the contrary is pure dicta with no analysis whatsoever and there is, therefore, no "circuit split" on the issue.  Moreover, the two lower court cases on which GMS relies are not persuasive.  Both cases were unduly reliant upon

and deferential to the First Circuit's dicta and both cases relied upon a textual analysis, but failed to fully address the entire text of the statutory exception.

Finally, GMS cannot rely upon the ICANN Registrar Accreditation Agreement ("RAA") to save its "Agent for Undisclosed Principle [sic]" claim.  GMS has made no allegations in the Complaint with regard to the RAA and has stated no claim for relief based upon the RAA.  Moreover, the RAA expressly provides that it was not intended to benefit any person other than ICANN and a signing registrar, and GMS has absolutely no rights arising from the RAA.

Accordingly, none of the arguments offered by GMS can save the Complaint from dismissal as against Namecheap.  The Court should grant Namecheap's Motion to Dismiss.

x

## ARGUMENT

### I. GMS'S ATTEMPT TO RECHARACTERIZE THE ALLEGATIONS IN ITS AMENDED COMPLAINT DEFY THE REALITY OF INTERNET DOMAIN NAME REGISTRATIONS AND NAMECHEAP'S "WHOISGUARD" SERVICE

As a fundamental, overarching flaw in GMS's opposition to the Motion to Dismiss, GMS attempts to recharacterize its allegations from the facts actually alleged to ones that do not square with the reality of how internet domain name registrations are conducted and websites are created.[2]  The Court must review the allegations in the Complaint in the context of this reality.  *See infra*, Argument Part II.

#### A. THE REALITY OF DOMAIN NAME REGISTRARS AND THE INTERNET

The location of individual sites on the internet is denoted by an internet protocol ("IP") address composed of a string of four groups of digits separated by periods.  Each site has a unique numeric internet address, based upon the computer used to host the information to be published on the website.  *Smith v. Network Solutions, Inc.,* 135 F. Supp. 2d 1159, 1160 (N.D. Ala. 2001).  For ease of access, the numeric addresses typically correspond to more easily remembered alphanumeric "domain names" (such as <google.com>).  Internet users can enter the domain name into their web browser to access content hosted on the computer for the specific website designated by the domain name.  A domain name is composed of two parts, separated by a period.  The portion to the right of the period, i.e., the "com" in <google.com>, is known as the top level domain ("TLD").  *Id.* at 1160-61; *American Girl, LLC v. Nameview, Inc.*, 381 F. Supp. 2d 876, 879 (E.D. Wis. 2005).  The portion to the left of the period, a series of a

_____

[2] [*See, e.g.*, Opp. Memo, Argument Part D.2 (arguing DMCA safe harbors should not apply because Namecheap should be viewed as a registrant, rather than registrar].

numbers and letters chosen by the operator of a website -- the "google" in google.com -- is known as the second level domain ("SLD").  *Smith*, 135 F. Supp. 2d at 1160-61.[3]

One wishing to use a specific domain name must register the name with one of numerous competing companies known as "registrars."  In 1993, pursuant to a contract with the National Science Foundation, Network Solutions, Inc. ("NSI") became the sole registrar for domain names in the most commonly used "top-level domains" ("TLD's") (".com," ".net," " .org," and ".edu").  *Id.* at 1161.  In 1998, the federal government adopted a policy favoring competitive domain name registration.

> In furtherance of this policy, a private, non-profit corporation, the Internet Corporation for Assigned Names and Numbers ("ICANN"), was formed to assume responsibilities for managing the allocation of Internet Protocol numbers and the domain name system.  Also as part of the transition to a competitive system, NSI's domain name registration service was divided into two separate units:  a registrar and a registry.

*Id.*  The registry maintains a centralized, publicly accessible database of information concerning all domain names in a TLD, known as the Whois (or WHOIS) database; this database is compiled from information submitted by registrars.  *Id.*  While there is only a single registry for each TLD, there are numerous competing registrars.  *Id.*  Registrars control the IP addresses associated with particular domain names, but do not generally

---

[3] Although a domain name is often associated with a webpage, the computers tied to a domain may actually publish no content on the world wide web.  For example, domain names are often registered for use in connection with e-mail even though the registrant may not use the domain name to also publish a website.

Also, a website cannot be registered.  Rather a domain name may be registered and a website may *subsequently be created and hosted <u>at the registered domain</u>*.  A domain, in and of itself, may be active or inactive, without any content appearing at the domain.  *See, e.g. Savannah College of Art and Design, Inc. v. Houeix*, 369 F. Supp. 2d 929, 935 (S.D. Ohio 2004) (observing that after registration of the domain, a party who registered the domain began using the domain name to host a web site).

control the content published on a host computer for a website tied to a registered

domain name.[4]  Customers seeking to register specific domain names interact with

registrars; the registrars submit information regarding domain names to the registry,

which includes the information in the public Whois database.  *Id.* at 1162.

Generally, an individual seeking to use a domain name submits an online

application to a registrar.  *Smith*, 135 F. Supp. 2d at 1161-62.  "[I]f someone submits an

application for a particular domain name that already exists in the Registry WHOIS

database by virtue of a prior registration, that name cannot be registered again, and the

applicant is advised that the sought domain name is unavailable. . . . If there is no

existing registration for a given [second-level domain] SLD name within a given TLD,

[however,] that domain name is considered available and generally may be registered

on a first-come, first served basis."  *Id.* at 1162.

A "registrant" is the individual or entity who submits an application to a "registrar"

to obtain a domain name and who thereafter controls the content published in

connection with that domain name.[5]  Notwithstanding GMS's attempts to recharacterize

---

[4] There are numerous domain name registrars, which operate in a competitive industry. In addition to "Namecheap.com," other commonly known registrars, and Namecheap's competitors, include "GoDaddy.com" and "Register.com."  A listing of ICANN-accredited TLD registrars is available at the following URL: http://www.icann.org/en/registrars/accredited-list.html.

[5] *See United States v. Killbride*, 507 F. Supp. 2d 1051 (D. Ariz. 2007) (stating "the obvious definition of 'registrant' [is] "[o]ne who registers' and 'who thereby gains a particular entitlement'" which "clearly refers to one who registers a domain name with a registrar and thereby gains the right to use the name in email and on the Internet.") (quoting Oxford English Dictionary (2d ed. 1989) (second alteration in original); *see also* http://www.icann.org/en/resources/ ("A registrar is a company that facilitates the registration of domain names."); ICANN RAA § 1.10 ("The word 'registrar,' when

its allegations to push Namecheap into a registrant, the actual specific allegations are that Namecheap did not submit the application for the subject domain name -- Goldstein did -- Namecheap cannot be and was not a registrant here.  Rather, as stated in the Complaint "Defendant Namecheap is **_a registrar_** of domain names used on the Internet."  [Compl. ¶ 7 (emphasis added)].

**B.    NAMECHEAP'S MANNER OF PROCESSING REGISTRATIONS ANONYMOUSLY IS LAWFUL AND IMPORTANT**

The Court should reject GMS's attempt to characterize Namecheap's WhoisGuard service as something nefarious, by which GMS encourages the Court to interpret the DMCA safe harbors narrowly, because GMS's arguments are contrary to the real nature of that service.[6]  First, when a registrant opts to use the WhoisGuard service, it in no way changes the fact that Namecheap is still the registrar and not somehow transformed into a registrant itself.  As the Complaint states, "Namecheap provides a service **to domain name owners** who register their domain names with Namecheap called 'WhoisGuard.'"  [Compl. ¶ 10 (emphasis added)].  Rather, such a selection by the registrant merely determines the _manner_ in which Namecheap carries out its actions _as a registrar_ by listing WhoisGuard contact information in the registry that is searched through the Whois protocol.  Just as with any other registrar offering

---

appearing without an initial capital letter, refers to a person or entity that contracts with Registered Name Holders and with a Registry Operator and collects registration data about the Registered Name Holders and submits registration information for entry in the Registry Database."); _see, e.g._, _GlobalSantaFe Corp. v. Globalsantafe.com_, 250 F. Supp. 2d 610, 623 (E.D. Va. 2003) (observing different roles in connection with issue of jurisdiction in the United States).

[6] [_See_ Opp. Memo, Argument, Part D.2].

anonymous domain name registration, the name placed into the registry -- whether that be "WhoisGuard," "John Doe," or "Private" -- does not alter that Namecheap's conduct remains limited to "collect[ing] registration data about the Registered Name Holders and submit[ting] registration information for entry in the Registry Database," ICANN RAA § 1.10, and Namecheap is not seeking to itself own the domain name or use it in email or on the internet.

Second, the anonymous registration of domain names is unquestionably legal and its importance to free speech and privacy cannot be overstated.  As the U.S. Supreme Court has explained, "'[a]nonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind.'"  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341 (1995) (quoting *Talley v. California*, 362 U.S. 60, 64 (1960)).  Anonymous speech fosters the creation of works of art that might otherwise be dissuaded due to "fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible."  *Id.* at 341-42.  Moreover, "the interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry."  *Id.* at 342.  Indeed, "'persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all,'" and anonymity "provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do not like its proponent."  *Id.* (quoting *Talley*, 362 U.S. at 64).  "Although the Internet is the latest platform for anonymous speech, online speech stands on the

same footing as other speech." *In re Anonymous Online Speakers*, 611 F.3d 653, 657

(9th Cir. 2010).[7]  Indeed, the internet is uniquely situated to provide a means to foster

free speech because it has lower barriers to entry than other forms of media.[8]

    The geopolitical events occurring over the past year further punctuate the

importance that the internet plays in securing democracy and it is decidedly the public

policy of the United States to promote that access and protect online privacy.  The

ability to communicate over the internet, including through anonymous means, played a

vital role this year in ushering in new democracies as part of the "Arab Spring."  As

stated on behalf of the State Department:

> By now, every government understands the power of ordinary citizens
> to harness the Internet and social media to organize and express themselves.
> Some have embraced these new technologies as a way to connect with and
> serve their citizens.  Others are redoubling their attempts to control them.
> . . . .
> But these crackdowns also indicate a basic lack of understanding that free
> speech – whether it's supportive speech or subversive speech – is harder
> than ever to suppress in the Digital Age.  And the young people who have
> taken to the streets across the Arab world this year understand that it isn't
> pornography or pirating that is being suppressed.  It's people.  It's their
> demands for dignity and a say in the political and economic future . . . ..

Michael H. Posner, Internet Freedom & Human Rights:  The Obama Administration's

Perspective, Remarks to the New America Foundation "Future Tense" Conference

---

[7] *Accord In re Anonymous Online Speakers*, 2011 U.S. App. LEXIS 487, at *5 (9th Cir., Jan. 7, 2011) (withdrawing and replacing 611 F.3d 653, but containing same quotation).

[8] *Sandals Resorts Intl. Ltd. v Google, Inc.*, 86 A.2d 32, 44 (N.Y. App. Div. 2011) (noting "'the low barrier to speaking online allows anyone with an Internet connection to publish his thoughts, free from the editorial constraints that serve as gatekeepers for most traditional media of disseminating information.'") (citation omitted).

(July 13, 2011) (available http://www.state.gov/g/drl/rls/rm/2011/168475.htm)
(Exhibit "1").

In addition to promoting free speech, Namecheap's WhoisGuard service has other plainly legitimate purposes, including permitting domain name registrants to avoid SPAM and protecting privacy against information harvesting.  Congress has recognized the importance of e-mail; that the convenience and efficiency of e-mail "are threatened by the extremely rapid growth in the volume of unsolicited commercial electronic mail"; that SPAM "may result in costs to recipients who cannot refuse to accept such mail and who incur costs for the storage of such mail, or for the time spent accessing, reviewing, and discarding such mail, or for both"; and that SPAM "contains material that many recipients may consider vulgar or pornographic in nature."  15 U.S.C. § 7701(a)(1) to (5).  Moreover, many SPAM senders "use computer programs to gather large numbers of electronic mail addresses on an automated basis from Internet websites or online services where users must post their addresses in order to make full use of the website or service."  *Id.* § 7701(a)(10).  Accordingly, it is public policy that "recipients of commercial electronic mail have a right to decline to receive additional commercial electronic mail from the same source."  15 U.S.C. § 7701(b)(3).  Because the WhoisGuard service protects e-mail addresses of domain name registrants from this automated data-mining to generate SPAM and impose its substantial costs and burdens upon registrants, as recognized by Congress, the service is unquestionably legitimate and provides no valid reason, as GMS argues, to narrowly interpret any safe harbor.

## II.   THE COURT SHOULD REJECT PLAINTIFF'S ATTEMPT TO DEFEAT DISMISSAL BY MISAPPLYING THE GOVERNING RULE 12(b)(6) STANDARD

The Court should reject GMS's arguments that seek to maintain its Complaint notwithstanding the governing Rule 12(b)(6) standard.  In this regard, GMS admits the governing standard is set forth in *Twombly*[9] and *Iqbal*,[10] [*see* Opp. Memo at 1-2 (citing cases)], but then proceeds to rely entirely upon pre-*Twombly* cases regarding the standard [*see* Opp. Memo at 1] and argues the Complaint's allegations are sufficient as to Namecheap although they fall far short of the actual standard.

As described in *Iqbal*, the Court determines this Motion through a "two-pronged approach."  *Iqbal*, 129 S. Ct. at 1950.  First, the Court determines whether allegations in the complaint must be accepted as true.  *Id.* at 1949-50.[11]  In this regard, Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 1949.  Allegations will not be taken as true when "[a] pleading . . . offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,'" *id.* (quoting *Twombly*, 550 U.S. at 555), or when "a complaint . . . tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

---

[9] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007).

[10] *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937 (2009).

[11] *See also  id.* at 1951 ("We begin our analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth.")

Second, the Court determines whether the "sufficient factual matter, accepted as true," actually "state[s] a claim to relief that is plausible on its face." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for <u>more than a sheer possibility</u> that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 556, 557) (emphasis added). Determining whether a complaint states a "plausible" claim for relief, will "be a <u>context-specific task</u> that requires the reviewing court to draw on its judicial experience and common sense," *id.* at 1950 (citation omitted) (emphasis added), and "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

GMS's Opposition Memo wholly disregards both prongs of this governing standard. First, GMS argues the Motion should be denied based upon the Complaint's naked assertions, legal conclusions, formulaic and threadbare recitations of elements, and unsupported conclusory elements. Further, even when GMS's allegations against Namecheap go beyond the conclusory, they do not show facts supporting a "plausible" claim within the context of domain registrars and the internet as described above. *See supra*, Argument Part I. GMS's arguments that it has alleged sufficient facts by misapplying the applicable standard permeate its Opposition Memo.[12]

---

[12] GMS makes these flawed assertions in an attempt to sustain its First Claim for Relief (copyright infringement), [Opp. Memo, Argument, Part D (regarding DMCA); Second and Fifth Claims for Relief, (Lanham Act and Utah unfair competition claims) [Opp.

As an initial matter, a large portion of supposedly alleged facts that GMS now argues supports its claims against Namecheap are, in actuality, bald and cursory assertions of conduct by "Defendants" that are taken from the "[t]hreadbare recitals of the elements of a cause of action."  *Id.* at 1949.  For example, GMS asserts it properly alleged a copyright infringement claim because GMS "alleged that one or more of the Defendants, including Namecheap, copied" seals "used on the Website," but cites to Paragraphs 38 and 39 of the Complaint, which is merely the recitation of elements of a copyright infringement cause of action.  [*See* Opp. Memo at 3; Compl. ¶¶ 38-39].  GMS asserts it has alleged a proper unfair competition claim against Namecheap because the Complaint "alleges unauthorized use of the Mark on the Website by Defendants, including Namecheap," citing to Paragraph 55 that, again, is merely the recitation of elements of an unfair competition cause of action.  [*See* Opp. Memo at 12; Compl. ¶ 55].  And GMS asserts that its state law claims are properly pled because the Complaint "states that that [sic] Defendants, including Namecheap, violated GMS's rights under applicable state laws," citing to Paragraphs 63-65, 69-72, 78-79, 84-85, and 88 that, again, are merely cursory recitations of elements in the Third through Seventh Claims for Relief.  [*See* Opp. Memo at 18-19; Compl. ¶¶ 63-65, 69-72, 78-79, 84-85, 88].  None of these allegations meet the requirements of *Twombly* and *Iqbal* and they cannot be accepted as true by this Court in ruling upon this Motion to Dismiss.

---

Memo, Argument, Part E.1.a-b]; Third Claim for Relief (state claim for pharming or phishing) [Opp. Memo, Argument, Part H.1.a-b]; Sixth Claim for Relief (unjust enrichment) [Opp. Memo, Argument, Part H.2]; Seventh Claim for Relief (civil conspiracy) [Opp. Memo, Argument, Part H.3]; and Ninth Claim for Relief (agent for undisclosed principal) [Opp. Memo, Argument, Part H.4].

Further, GMS relies upon its inclusion of the word "or" to argue that it has alleged "the alternate[13] theories that Dan Goldstein was 1) the licensee of the [subject] website or 2) the actual registrant of the website," [Opp. Memo at vi, ¶ 2], which GMS then bootstraps into an allegation that Namecheap was "the registrant of the Website and owner" during the time of the claimed infringement to support virtually all GMS's purported claims.  [Opp. Memo at 10, 18].  However, even assuming there was such a license, the existence of that license means it would be Goldstein, rather than Namecheap, actually controlling the content appearing on the website because without such control there would be no purpose for Goldstein's license.  Further, GMS alleges no facts that would permit the inferential leap to an allegation of Namecheap's ownership or control of the website appearing at the domain -- GMS provides no facts as to the nature of that license, the terms of that license, or when the license was entered.  Accordingly, even if GMS actually alleged control by Namecheap based upon this license -- which it did not -- such a cursory allegation could not be accepted as true.  Indeed, it is disingenuous for GMS to contend now that Namecheap actually owned or controlled the website appearing at the domain,[14] and such an allegation would not be

---

[13] Notably, the Complaint does not even contain the words "alternative" or "alternate," let alone expressly give notice that GMS was basing its claims upon alternative sets of fact.
[14] GMS's own February Letter and March Letter (of which this Court has taken judicial notice) acknowledge that GMS has always known that a person other than Namecheap was the actual registrant, because they demanded disclosure of the registrant's identity:

> To resolve this matter amicably, we must demand that you provide us with the identity and information regarding the registrant. Additionally, you must remove the infringing material from the websites immediately.

"plausible" in light of the context of domain name registrations where it is the registrants, not registrars, that control content appearing on a website.[15]

Likewise, there are no facts alleged to support the conclusory assertion of some affiliation between Namecheap and Goldstein that in any way pertains to the actually claimed wrongful conduct.  Rather, the only specific facts alleged are (a) that Namecheap acted as a registrar by processing Goldstein's domain name application in a manner that included WhoisGuard contact information, (b) that "Dan Goldstein [not Namecheap] placed the infringing TRUST GUARD seals on the website" [Compl. ¶ 30]; (c) that Namecheap did not "promptly" respond to the February Letter that expressly stated offending content appeared at a website with a <u>different domain name</u>, and (d) that Namecheap did not "promptly" respond to the March Letter that did not state under oath that it was made with authority of the mark owner at a time when the public record reflected Markmonitor, rather than GMS, actually owned the subject mark.[16]  Those specific allegations are not enough for the Court to accept as true that there was any

[February Letter at 1, Ex. 1 to Supp. Memo (emphasis added); *accord* March Letter at 1, l, Ex. 2 to Supp. Memo].

[15] As a further example, the domain name <uscourts.gov> was registered through the General Services Administration.  https://www.dotgov.gov/portal/web/dotgov/welcome. Nonetheless, the website appearing at that domain "is maintained by the Administrative Office of the U.S. Courts on behalf of the Federal Judiciary" and it is the Federal Judiciary that controls content appearing on the website, not the GSA. http://www.uscourts.gov/Home.aspx.

[16] *See* 7/28/11 Order (Docket No. 29) (granting Namecheap's Motion for the Court to Take Judicial Notice of Adjudicative Facts, including filings with USPTO showing that, at the time of the alleged infringement and February Letter and March Letter, the marks "TRUST GUARD" and "TRUSTGUARD" were registered to Markmonitor, Inc.).

such license, that Namecheap owned the website that appeared at the domain, or that Namecheap controlled the content of that website.  Moreover, even if the Court accepted those alleged conclusions as true, they show nothing more than the mere possibility of misconduct by Namecheap.  Rather, within the context of anonymous domain name registrations (including the WhoisGuard service) and the internet explained above, GMS's allegations unquestionably fail to state a "plausible" claim consistent with the requirements of *Twombly* and *Iqbal*, because they do not show why Namecheap would do anything more than act as a simple domain name registrar relative to Goldstein -- why is Goldstein so special?[17]

Indeed, GMS's failure to plead any specific facts showing misconduct by Namecheap due to actual control or involvement with the website that eventually appeared at the domain is underscored by GMS's reliance now upon the absence of its own express negating allegations.  That is, GMS asserts "GMS did not allege that Namecheap did not have control."  [Opp. Memo at vi ¶ 2 (emphasis added)].  However, it is the actual content of the Complaint, not what may have been left out, that matters and the lack of an allegation negating control does not change that GMS's Complaint fails to allege specific facts showing that control.  Likewise, GMS's argument now that its Complaint as to Namecheap should survive unless Namecheap offers evidence to

---

[17] GMS likely did not allege facts showing Namecheap's use, ownership, or control of the subject website appearing at the registered domain name because it had no factual basis for doing so and no such basis exists.  *See* Fed. R. Civ. P. 11(b).

prove negatives is without merit.[18]  This is a Motion to Dismiss and if GMS's Complaint

is deficient it should be dismissed without Namecheap to disproving nonexistent facts.

## III.   GMS HAS PROVIDED NO VALID ARGUMENT SUPPORTED BY ACTUALLY ALLEGED FACTS TO SHOW THE DMCA SAFE HARBORS DO NOT APPLY TO NAMECHEAP

The Court should reject GMS's arguments that the DMCA safe harbors do not

apply to Namecheap.  GMS's arguments are contrary to law, the context of domain

name registrars offering anonymous registration, and the drafters' legislative intent.

### A.   NAMECHEAP'S WHOISGUARD SERVICE AND THE DELAY IN RESPONDING TO GMS'S LETTERS DO NOT ELIMINATE THE DMCA SAFE HARBORS

The Court should reject GMS's argument that DMCA immunity cannot apply

when a registrar offers private registration or does not respond to defective DMCA

notices because they constitute interference with "standard technical measures."  [*See*

Opp. Memo, Argument, Part D.1].  GMS's argument misconstrues section 512(i).

First, GMS's argument is without merit because the Whois database is not

"standard technical measures" as contemplated by Section 512(i).  Rather, "'[s]tandard

technical measures' refers to a <u>narrow</u> group of technology-based <u>solutions</u> to online

copyright infringement."  *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir.

2007) (emphasis added).  Section 512 specifically defines the "standard technical

measures," with which an ISP must not interfere, as follows:

> (2) Definition. As used in this subsection, the term "standard technical
> measures" means technical measures that are used by copyright owners to

---

[18] [*See, e.g.*, Opp. Memo at vi, ¶ 3 ("[T]here is no evidence of record that Goldstein is not affiliated"); *id.* at 19 (stating "Namecheap has provided no evidence that Goldstein was not affiliated with Namecheap"); *id.* at 23 ("Namecheap has put forth no evidence as to why it was reasonable to take two months to respond to GMS's" letters)].

identify or protect copyrighted works and--
> (A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;
> (B) are available to any person on reasonable and nondiscriminatory terms; and
> (C) <u>do not impose substantial costs on service providers or substantial burdens on their systems or networks</u>.

17 U.S.C. § 512(i) (emphasis added).  Congress adopted this subsection with the vision that ad hoc groups or industry committees would be formed between copyright owners and service providers, where they would affirmatively agree that certain searching and protection technologies could constitute "standard technical measures":

> [W]e have included subsection [(i)(1)(B)], which is intended to encourage appropriate technological solutions to protect copyrighted works.  The Committee strongly urges all of the affected parties expeditiously to commence voluntary, interindustry discussions to agree upon and implement the best technological solutions available to achieve these goals.
>
> [The Subsection] is explicitly limited to "standard technical measures" that have been developed pursuant to a broad consensus of both copyright owners and service providers in an open, fair, voluntary, multi-industry standards process.  <u>The Committee anticipates that these provisions could be developed both in recognized open standards bodies or in ad hoc groups,</u> as long as the process used is open, fair, voluntary, and multi-industry and the measures developed otherwise conform to the requirements of the definition of standard technical measures set forth in paragraph [(i)(2)].  A number of recognized open standards bodies have substantial experience with Internet issues.  The Committee also notes that an ad-hoc approach has been successful in developing standards in other contexts, such as the process that has developed copy protection technology for use in connection with DVD.

Sen. Rep. No. 105-190, at 52 (1998) (emphasis added) (Attached as Exhibit "2").  The types of technologies that are arguably "standard technical measures" include such things as digital fingerprints, which allow user-uploaded content (such as music or video) to be filtered through "algorithmic comparisons against works within [a] referent

database" provided by copyright owners and anti-copying encryption.  *See* Lauren G.

Gallo, The (Im)possibility of "Standard Technical Measures" for UGC Websites, 34

Colum. J.L. & Arts 283, 285 (2011).  Assuming future improvements to lessen burdens

upon computer systems and more widespread adoption, another such technology may

be digital watermarking, which "involves embedding cryptographic information derived

from frames of digital video [or audio] into the video itself."  *Id.* at 285 n.16.

      Accordingly, it is not anything and everything related to "technology" that would

come with in purview of section 512(i).  Rather it is only the narrow categories of

specific and generally-accepted technologies, agreed to by content providers and by

ISPs for searching and protecting copyright materials that are within the ambit of the

standard measures that an ISP cannot interfere with to maintain DMCA immunity.

Despite this statutory definition, GMS's Complaint contains no allegations that

demonstrate that "use of the Whois database" is a "standard technical measure" as

actually contemplated by the statute.  [*See* Compl.].  Likewise, GMS's assertion in its

Opposition Memo in this regard is not supported by citation to even a single authority.

[*See* Opp. Memo at 5].[19]  GMS has also not explained, or alleged, how a cease and

desist letter even qualifies as a technological measure, let alone one that has been

developed and agreed to by a broad consensus in the industry.

---

[19] Indeed, even if the Whois database qualified as such a technology, GMS has not
alleged any conduct by Namecheap that would interfere with the operation of that
database.  Rather the WhoisGuard service does not prevent the database to function,
but only determines what contact information will be retrieved through the properly
functioning database.

Second, GMS's argument completely ignores that a "standard technical measure" cannot be one that would impose substantial costs on ISPs or burdens upon their systems.  17 U.S.C. § 512(i)(2)(C).  As thoroughly described above, a service for anonymous registration of domain names serves important and legitimate interests. The wholesale removal of DMCA protections from any registrar offering anonymous registration would impose substantial litigation costs upon those registrars -- even when they have no knowledge that a website appearing at a domain is being used to infringe.

Likewise, GMS's argument regarding a delayed response to the February Letter and March Letter would impose undue and burdensome costs upon registrars.  If the rule was as GMS suggests, then every registrar that received a letter complaining of content on a website using any domain that did not exist would require the registrar to spend time searching for other potential domains that the letter writer might have intended rather than what the writer actually stated.  This is directly contrary to DMCA's purposes, which "place the burden of policing copyright infringement--identifying the potentially infringing material and adequately documenting infringement--squarely on the owners of the copyright.  We decline to shift a substantial burden from the copyright owner to the provider."  *Perfect 10, Inc.*, 488 F.3d at 1113 (emphasis added).[20]

Finally, the Court should reject GMS's arguments because they would render

---

[20] *Accord UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1108 (C.D. Cal. 2009) ("requiring [ISP] to perform . . . searches would conflict with principle articulated in *CCBill*" as to burden on copyright owners); *see also UMG Recordings*, 665 F. Supp. 2d at 1108 ("'[A] service provider need not monitor its service or affirmatively seek facts indicating infringing activity . . . in order to claim this limitation on liability. However, if the service provider becomes aware of a 'red flag' from which infringing activity is apparent, it will lose the limitation of liability if it takes no action.'") (quoting H.R. Rep. 105-551(II), at 53, 57).

specific portions of the DMCA superfluous.  *Toomer v. City Cab*, 443 F.3d 1191, 1194

(10th Cir. 2006) (stating "[w]hen construing a statute, we should give effect, if possible,

to every clause and word").  That is, if not responding to a <u>defective</u> DMCA take-down

notice constituted interference with "standard technical measures" with a complete loss

of DMCA immunity, this would render the specific requirements for those notices in 17

U.S.C. § 512(c)(3) a dead letter.  Further, offering anonymous domain name registration

through the WhoisGuard service provides no basis for Namecheap to be removed

wholesale from the protections of the DMCA.  GMS makes no argument disputing that

Namecheap qualifies as an ISP under the DMCA, and the DMCA specifically

recognizes that users publishing infringing content may do so anonymously by

expressly providing a mechanism to obtain disclosure of an anonymous infringer's

identity, a statutory provision that would be rendered meaningless if there was no

DMCA immunity relative to anonymous infringers in the first place.  *See* 17 U.S.C. §

512(h) (providing means for "clerk of any United States district court to issue a

subpoena to a service provider for identification of an alleged infringer").[21]

## B. THE COURT SHOULD REJECT GMS'S ARGUMENT TO DISREGARD THE DMCA BASED ON GMS'S CHARACTERIZATION OF THE DMCA'S PURPOSES

There is no merit to GMS's argument that, even if DMCA immunity applies under

the terms of the DMCA, the Court should disregard it based upon GMS's

characterizations of its purpose.  [Opp. Memo, Argument, Part D.2].

---

[21] Indeed, GMS's failure to pursue this remedy during the alleged two months when Namecheap did not respond to GMS's defective notices, belies any assertion that GMS actually suffered any harm during that time.

First, regardless of whether the WhoisGuard service furthers DMCA purposes, if the Court determines immunity applies under the plain terms of the statute, then GMS's copyright claim is barred.  GMS's characterizations of the DMCA's purposes -- which are wrong[22] -- do not change that this Court applies the law as it is written.  As outlined in Namecheap's Supporting Memo, there is no question that the first or third DMCA safe harbor applies because Namecheap is an ISP and the claimed copyright content was either (1) a transitory digital network communication, 17 U.S.C. § 512(a), or (2) information residing on systems or networks at the direction of users, 17 U.S.C. § 512(c).  [Supp. Memo, Argument, Part II].

Second, contrary to GMS's arguments, *SolidHost v. Namecheap*, provides no support for the proposition that this Court should disregard application of DMCA immunity that would otherwise apply merely if the Court finds that its purposes would not be served.  In *SolidHost*, the district court addressed safe harbors under the ACPA, which the court stated "apply only in specific circumstances."  652 F. Supp. 2d 1092, 1103 (C.D. Cal. 2009); *see id.* at 1105 (stating "ACPA provides safe harbors for registrars in <u>limited</u> circumstances") (emphasis added).  To state the obvious, the ACPA

---

[22] For example, GMS states "The DMCA was intended to provide <u>certainty to a copyright owner that it could protect against infringement of its rights</u>," citing to Sen. Rep. No. 105-190, at 1[sic] (1998).  [Opp. Memo at 7 (emphasis added)].  In actuality, the cited provision states the purpose is to give certainty also to <u>ISPs</u>, and the certainty is with regard to <u>liability</u>, not copyright owners' protection:  "Title II will provide certainty for copyright owners <u>and Internet service providers</u> with respect to copyright infringement <u>liability</u> online."  Sen. Rep. No. 105-190 at 2 (emphasis added).  Notably, if the Court were to disregard the DMCA safe harbors as GMS requests, it would significantly undercut that liability certainty.
Namecheap correctly described the purposes of the DMCA in its Supporting Memorandum, Argument, Part II.

is not the DMCA, GMS does not allege any "cybersquatting" claim, and another court's interpretation of limited immunity under an irrelevant statute is wholly inapposite here. Indeed, GMS cites <u>not a single authority</u> for the proposition that the *SolidHost* court's reasoning under the ACPA "applies equally well under the DMCA." [Opp. Memo at 7].[23]

Moreover, in *SolidHost*, the alleged facts were starkly different from those alleged here by GMS. That court ruled another court's interpretation of the ACPA safe harbor was that "a registrar is not liable under § 1125(d) *when it acts a registrar,* i.e., <u>when it accepts registrations for domain names from customers</u>." *Id.* at 1104 (second emphasis added). The specifically alleged facts, taken as true for purpose of the motion to dismiss, was that another defendant, eNom -- not Namecheap -- acted as registrar of the subject domain name and the court recognized the result may be different "if [Namecheap] acted as the registrar for <solidhost.com>." *Id.* at 1105-06. Even if this was a cybersquatting case, the result would be different because GMS's allegations are that Namecheap <u>was the registrar</u> of the subject domain name. [Compl. ¶ 7].

### C.   GMS'S ARGUMENTS THAT ITS DEFECTIVE LETTERS WERE SUFFICIENT NOTICE TO REMOVE THE DMCA SAFE HARBORS ARE WITHOUT MERIT

The Court should reject GMS's attempt to evade Namecheap's immunity under the DMCA based upon the defective February Letter and March Letter.

First and foremost, GMS's arguments as to its February Letter and March Letter cannot prevent immunity under other DMCA safe harbors. That is, in Namecheap's

---

[23] GMS fails to disclose that the *SolidHost* court went on to rule that the plaintiff in that case could not state a claim against Namecheap for cybersquatting because "[n]othing in the complaint suggests that by affording Doe the benefits of anonymous registration, NameCheap sought to benefit in any way from the goodwill associated with Solid Host's mark." *SolidHost,* 652 F. Supp. 2d at 1110.

Supporting Memorandum, Namecheap specifically argued that it could not be liable pursuant to the first of four DMCA safe harbors, for transitory digital network communications, under Section 512(a).  [*See* Supp. Memo at 4-5 (explaining four types of safe harbors); *id.* at 7 ("[T]he claimed infringed copyright content, the Trust Guard seals, fall into the first DMCA safe harbor – a transitory digital network communication – one that originated with Goldstein and passed through Namecheap . . . .")].  Further, the four DMCA safe harbors are separate and provide <u>independent</u> bases of immunity:

> Subsections (a), (b), (c), and (d) describe <u>separate and distinct functions</u> for purposes of applying this section.  Whether a service provider qualifies for the limitation on liability in any one of those subsections shall be based solely on the criteria in that subsection, <u>and shall not affect a determination of whether that service provider qualifies for the limitations on liability under any other such subsection</u>.

17 U.S.C. § 512(n) (emphasis added).  The take down notice provision applies only to the third safe harbor, not the first safe harbor, which itself contains no take down notice provision.  *Compare* 17 U.S.C. § 512(a) (no take down notice provision relative to transitory digital network communications), with *id.* § 512(a)(3) (stating requirements for take down notices relative to information residing on systems at direction of users).  Hence, the February Letter and March Letter are irrelevant to the first safe harbor.

Indeed, despite Namecheap specifically invoking the first DMCA safe harbor as an independent ground for dismissing the copyright infringement claim, GMS provides <u>no argument</u> disputing the applicability of this safe harbor, aside from its generalized arguments about allegations that do not comply with *Iqbal* and erred view of the purpose of the DMCA.  In so doing, GMS essentially admits that dismissal of the claim is appropriate pursuant to Section 512(a).

Second, as outlined in Namecheap's Supporting Memorandum, the February Letter and March Letter did <u>not</u> substantially comply with the requirements for notice pursuant to the third DMCA safe harbor. [Supp. Memo, Argument, Part I.A]. GMS's arguments to the contrary are incorrect. Regarding the February Letter, the letter plainly identified an incorrect domain name, not registered through Namecheap, as the location containing the allegedly infringing content and, thereby, failed to provide "information reasonably sufficient to permit the service provider to locate the material." 17 U.S.C. § 512(c)(iii). Further, GMS's failure to substantially comply with this requirement, created no obligation for Namecheap to contact GMS for further information. *Id.* § 512(c)(3)(B)(ii) (providing ISP's contact obligation only applies when notice "substantially complies with clauses (ii), (iii), and (iv)").

This was not a mere "misspelling" or the type of minor technical error that would constitute substantial compliance as contemplated by Congress, because it would not be immediately noticeable to the letter's reader based on other obvious content:

> The Committee intends that the substantial compliance standard in subsections (c)(2) and (c)(3) be applied <u>so that technical errors</u> (such as misspelling a name, supplying an outdated area code <u>if the phone number is accompanied by an accurate address</u>, or supplying an outdated name <u>if accompanied by an e-mail address that remains valid</u> for the successor of the prior designated agent or agent of a copyright owner) <u>do not disqualify service providers</u> and copyright owners from the protections afforded under subsection (c).

Sen. Rep. 105-190, at 47 (emphasis added). Likewise, the fact that a single page buried in a pile of enclosures to the letter contained a single URL at the top, does not provide information reasonably sufficient for Namecheap to have located the material. Under GMS's arguments, even though GMS affirmatively identified an incorrect domain,

Namecheap would be required sift through the February Letter and its enclosures with a fine-toothed comb and search to cross-reference any internet reference against Namecheap's own records -- precisely the burden on an ISP that was not intended by Congress.  *Perfect 10, Inc.*, 488 F.3d at 1113.

Likewise, the March Letter, by failing to state anything under penalty of perjury also cannot constitute substantial compliance with Section 512(c)(3)'s requirements:

> The DMCA requires a complainant to declare, under penalty of perjury, that he is authorized to represent the copyright holder, and that he has a good-faith belief that the use is infringing.  This requirement is not superfluous. Accusations of alleged infringement have drastic consequences:  A user could have content removed, or may have his access terminated entirely.  If the content infringes, justice has been done.  But if it does not, speech protected under the First Amendment could be removed.  We therefore do not require a service provider to start potentially invasive proceedings if the complainant is unwilling to state under penalty of perjury that he is an authorized representative of the copyright owner, and that he has a good-faith belief that the material is unlicensed.

*Perfect 10, Inc.*, 488 F.3d at 1112; *see id.* at 1112 n.4 ("Without the predicate certification under penalty of perjury, Fisher would have had no reason to go looking for the photographs.").  This is especially true when the public record at the time showed that trademarks referred to in that letter were owned by Markmonitor, Inc., not GMS.[24]

---

[24] Even if GMS claimed some right to the marks based upon prior use in commerce, the USPTO filings demonstrate at the time of the March Letter the "TRUSTGUARD" and "TRUST GUARD" marks were registered to Markmonitor, Inc. and that registration is prima facie evidence of Markmonitor, Inc.'s ownership of the marks and exclusive right to use the marks.  *See* 15 U.S.C. § 1115(a).

IV.   **GMS PROVIDES NO VALID ARGUMENT TO SAVE ITS LANHAM ACT AND STATE LAW UNFAIR COMPETITION CLAIMS FROM DISMISSAL**

The Court should reject GMS's arguments that attempt to save its Lanham Act and dependent Utah Unfair Competition Act ("UCA") claims from dismissal.[25]  GMS's arguments defy the actual content of the Complaint,[26] ignore the wholesale failure to allege any commercial use by Namecheap, and attempt to create a contributory infringement claim that was neither pled nor supported by the law.

First, GMS wholly ignores that to state a valid unfair competition claim against Namecheap, it must allege facts showing that Namecheap "used the plaintiff's mark 'in connection with any goods or services,'" which is "commonly described as the commercial use requirement."  *Utah Lighthouse Ministry v. Foundation for Apologetic Information & Research*, 527 F.3d 1045, 1052 (10th Cir. 2008) (citing 15 U.S.C. § 1125(a)(1)).  Although GMS engages a contorted attempt to distinguish the case *U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723 (E.D. Va. 2003), GMS never explains how its allegations actually state that Namecheap, rather than Goldstein, used the mark with any of Namecheap's services.  Again, the Complaint alleges Namecheap is a registrar, conducting business under the "Namecheap" name, and there is no allegation the mark "TRUST GUARD" was used in any manner connected with

---

[25] [*See* Compl., Second and Fifth Claims for Relief].

[26] GMS's asserts it has stated these unfair competition claims against Namecheap, as opposed to just Goldstein, by alleging that Namecheap was the actual registrant, owner, and controller of the content on the infringing website that appeared at the domain. [Opp. Memo at 10-12].  As addressed above, GMS has not actually alleged such facts in a manner that they could (a) be taken as true or (b) state a plausible claim under *Iqbal*.  [*See supra*, Argument, Part II].

Namecheap's registration services.  Likewise, there is no allegation, or basis for one, that Namecheap used "TRUST GUARD" to market its anonymous domain registrations through the WhoisGuard service.  Consequently, the Lanham Act Claim and Utah UCA claims fail as a matter of law against Namecheap and must be dismissed.[27]

Second, GMS's arguments relative to contributory trademark infringement are completely without merit.  As an initial matter, the Complaint does not actually state any claim for contributory infringement under the Lanham Act -- the Complaint does not even contain the word "contributory" -- and for that reason alone, GMS has not stated such a claim and its arguments provide no reason to deny the Motion to Dismiss.[28]

Moreover, GMS's allegations demonstrate it cannot state a valid claim against Namecheap for contributory infringement.  Secondary liability for infringement arises when a defendant "'intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement.'"  *P&G Co. v. Haugen*, 317 F.3d 1121, 1128 (10th Cir. 2003) (quoting *Inwood Labs. Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 853-54 (1982) ).

---

[27] Interestingly, GMS seems to misconstrue Namecheap's position in this regard by stating that "Namecheap argues that it cannot be held liable under the Lanham Act because it is a domain name registrar."  [Opp. Memo at 11].  Certainly Namecheap is immune generally "for the registration or maintenance of a domain name for another absent a showing of bad faith intent to profit from such registration or maintenance of the domain name."  15 U.S.C. § 1114(2)(D)(iii).  However, the point here is not that Namecheap enjoys blanket immunity from GMS's claim as a "registrar"; the point is that Namecheap's conduct, including offering its WhoisGuard service, did not constitute the use by Namecheap of any GMS mark in connection with the sale of Namecheap's goods or services, as is required for an unfair competition claim.

[28] *See Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 865 (N.D. Ill. 2009) ("With regards to the contributory and vicarious infringement, the FAC fails to mention either of these legal claims, much less plead each with supporting facts.  Plaintiffs, therefore, have not satisfied the burden of pleading these claims under Rule 8.").

Regarding the first prong, there are no specific facts alleged in the Complaint that in any way show Namecheap intentionally induced Goldstein to place the mark "TRUST GUARD" on the website that Goldstein created at the domain. Rather, Namecheap merely provided registrar services and processed Goldstein's domain name application in connection with the WhoisGuard service that substituted contact information in the Whois database. The domain name itself is not alleged to be an infringement upon GMS's mark and there is no specific allegation that can be accepted as true under *Iqbal* that would demonstrate Namecheap had any control over the website or did anything to cause Goldstein to publish a website at the domain that used the mark. *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 2004 U.S. Dist Lexis 15895, *17, No. C 04-0371-JW (N.D. Calif. Aug. 5, 2004) ("Although the complaint contains the allegation that Defendants 'are knowingly inducing' the alleged infringing conduct, there are no facts presented in the complaint that support such an allegation.").

Regarding the second prong, this case is "squarely on the 'service' side of the product/service distinction suggested by *Inwood Lab* and its offspring." *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999). Accordingly, GMS cannot state such a claim against Namecheap unless the facts alleged show "[d]irect control and monitoring of the instrumentality used" by Goldstein. *Id.* Indeed, in the online context, "[f]or contributory trademark infringement liability to lie, a service provider must have more than a general knowledge or reason to know that its service is being used to [infringe]. Some <u>contemporary</u> knowledge of which particular listings are infringing or will infringe in the future is necessary." *Tiffany Inc. v. eBay, Inc.*, 600 F.3d

93, 107 (2d Cir. 2010) (emphasis added).  The Complaint contains no facts to show that Namecheap directly controlled or monitored the content of the website that Goldstein placed on the domain.  In reality, domain name registrars, including those providing anonymous registration services, do not constantly monitor the internet and content of websites using the domains and any requirement to do so would place an unimaginable burden upon them.[29]  Indeed, in context of domain name registrations, because the registration of the name necessarily comes <u>before</u> any website is published at the domain and the alleged infringement here is not the domain name itself, Namecheap did not have reason to know of any infringement at the time it provided services to Goldstein.  Further, even assuming that the February Letter (referencing a different domain name) provided reason to know of the infringement,[30] the Complaint does not allege Namecheap <u>thereafter</u> provided any further services to Goldstein.[31]

This case is not remotely close to the control shown in the analogized context of Namecheap being the "'cyber-landlord' of the internet" that might subject it to liability for contributory infringement.  *SolidHost, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092,

---

[29] *See Lockheed Martin Corp.*, 194 F.3d at 985 (citation omitted) ("While the landlord of a flea market might reasonably be expected to monitor the merchandise sold on his premises, [a registrar] cannot reasonably be expected to monitor the Internet.").

[30] Such a proposition is itself untenable inasmuch as the public record, <u>at that time</u>, provided prima facie evidence that Markmonitor, Inc. and not GMS actually owned the subject mark.  Moreover, knowledge could not be imparted by the March Letter because GMS alleges it was never actually delivered to Namecheap.  [Compl. ¶ 34 ("The second cease and desist letter was returned as undeliverable."].

[31] *1-800 Contacts, Inc. v. Lens.com, Inc.*, 755 F. Supp. 2d 1151, 1184 (D. Utah 2010) ("'[T]he doctrine of contributory trademark infringement should not be used to require defendants to refuse to provide a product or service to those who merely might infringe the trademark.'") (citation omitted).

27

1115 (C.D. Cal. 2009).  In *SolidHost*, for example, a claim was stated for contributory infringement where (1) the infringement consisted of using the domain name itself, not the content appearing at the domain, *id.* at 1097; (2) a hacker had stolen the domain name and moved it to the control of Namecheap, *id.*; (3) and Namecheap, though preferring to remain neutral, had the unquestioned ability to return the domain name back to the plaintiff, which would cause "Doe's illegal activity [to] have ceased."  *Id.* at 1115.  Here, in distinction, Namecheap had no control over the content of the website using the registered domain.  Nothing done by Namecheap could have stopped the infringement, because Goldstein could simply have moved the domain to another service provider.  Even if Namecheap would have immediately disclosed Goldstein's identity, as requested by GMS in the February Letter, that disclosure would not have changed the content of the website or stopped the alleged infringement.  Consequently, this is not the case where Namecheap had control over the infringement and GMS cannot hold Namecheap secondarily liable for Goldstein's alleged misconduct.

**V.    THE COURT SHOULD REJECT GMS'S ARGUMENTS ATTEMPTING TO MINIMIZE THE NINTH CIRCUIT'S *HOLDING* THAT THE EXCEPTION TO IMMUNITY UNDER THE CDA APPLIES ONLY TO FEDERAL INTELLECTUAL PROPERTY CLAIMS**

GMS argues that the exception to Namecheap's immunity under the Communications Decency Act is broader than applied in *Perfect 10, Inc.*, 488 F.3d at 1118-19 ("In the absence of a definition from Congress, **we construe the term "intellectual property" to mean "federal intellectual property**.") (emphasis added). Those arguments are in error.

First, GMS incorrectly states that "the Circuits are split as to the breadth of [47 U.S.C.] §230(e)(2)'s exception." [Opp. Memo at 15]. This is plainly untrue. The only <u>circuit court of appeals</u> to consider directly the issue of whether the term "intellectual property" in section 230(e)(2) means "federal intellectual property" or "federal and state intellectual property" is the Ninth Circuit in *Perfect 10*, and the *Perfect 10* court squarely held that it means only "federal intellectual property." The only other <u>circuit</u> court even cited by GMS is *Universal Communications Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007) ("*Lycos*"). However, that court did not in any way analyze the meaning of "intellectual property," and merely assumed, without any analysis whatsoever, that it would also include state intellectual property claims.[32] As the Ninth Circuit and a lower court in the First Circuit have recognized, the statement by the *Lycos* court is pure dicta because the breadth of section 230(e)(2) was not decided and was not necessary to its decision.[33] Because there is no other circuit court decision squarely

---

[32] The *Lycos* court's <u>entire</u> discussion relevant to the issue was limited to the following:
> UCS's remaining claim against Lycos was brought under Florida trademark law, alleging dilution of the "UCSY" trade name under Fla. Stat. § 495.151. Claims based on intellectual property laws are not subject to Section 230 immunity. *See* 47 U.S.C. § 230(e)(2) ("Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property."); *see also Gucci Am., Inc. v. Hall & Assocs.*, 135 F. Supp. 2d 409, 413 (S.D.N.Y. 2001) (finding that the "plain language of Section 230(e)(2) precludes [the defendant's] claim of immunity" from a claim for trademark infringement).

478 F.3d at 422-23.

[33] *See Perfect 10*, 488 F.3d at 1119 n.5 ("The First Circuit was able to sidestep the question of what counted as intellectual property on Fist Amendment Grounds."); *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 298-99 (D.N.H. 2008) ("Because the court of appeals would have upheld the dismissal of the plaintiff's state-law claim regardless of its interpretation of 47 U.S.C. § 230(e)(2), its statement in that regard arguably fits the usual definition of dicta . . . .").

dealing with this issue, it is simply not true that there is currently a circuit split.  This Court should follow the more authoritative application by the Ninth Circuit in *Perfect 10*.

Second, the two lower court decisions cited by GMS and ruling differently than *Perfect 10* have flawed analyses that should not be persuasive to this Court.[34]

In *Doe*, the court's analysis was fueled by its view that it should weigh heavily and defer to the result articulated in dicta in *Lycos*, which result, in turn, affected the remainder of its reasoning to construe the CDA's immunity as excepting state intellectual property claims.  As that court stated:

> Nevertheless, just as the First Circuit accords considerable deference to dicta in Supreme Court opinions, this court "accords substantial deference to the considered dicta of the court of appeals."  This court will follow First Circuit dicta over the contrary holding of another appeals court, then, <u>absent a particularly compelling reason to do otherwise</u>.

*Doe*, 540 F. Supp. 2d at 299 (emphasis added).  Accordingly, unless the *Doe* court found a "particularly compelling reason" to reach a different result, it was admittedly and erroneously predisposed to follow the dicta of the First Circuit in *Lycos*.  The *Atlantic Recording* case, in turn, relies heavily upon *Doe* and its analysis is, therefore, similarly impacted by the predisposition to follow this dicta.  603 F. Supp. 2d at 703.

Further, the *Doe* court attempted to engage in a textual analysis of section 230(e), by comparing part (1) and part (2) and concluding that reference in part (1) to "federal" criminal laws, not also found in part (2), meant part (2) was intended to

---

[34] The only cases, besides *Lycos*, cited by GMS are *Atlantic Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690 (S.D.N.Y 2009) and *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288 (D.N.H. 2008).  [Opp. Memo at 14-16].  Inasmuch as these are <u>district court</u> decisions, GMS's assertion that they reflect the law governing the entire "First and Second Circuits," [Opp. Memo at 16], is entirely without merit.

apply to both state and federal intellectual property laws.  *Doe*, 540 F. Supp. 2d at 300.

That analysis is flawed because it omits the overall construction of section 230(e) and

even terms within parts (1) and (2).  Likewise, although the *Atlantic Recording* court

attempted a broader textual analysis, it did not properly consider that the overall

statutory scheme is more consistent with interpreting the undefined term "law pertaining

to intellectual property" as referring to federal intellectual property laws.[35]  Properly

considering the entire text of section 230(e) supports the Ninth Circuit's holding that also

furthers the explicit Congressional intent written into the statute in section 230(a) & (b).

     Section 23(e) provides, in its entirety:

> (e) Effect on other laws.
> (1) No effect on criminal law.  Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this Act, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, United States Code, or any other Federal criminal statute.
> (2) No effect on intellectual property law.  Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.
> (3) State law.  Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section.  No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.
> (4) No effect on communications privacy law.  Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

47 U.S.C. § 230(e).  Part (1) begins by generally referring to "[n]o effect on criminal law"

-- without reference to "federal" -- but then continues to state the exception as to specific

---

[35] *See In re Ford*, 574 F.3d 1279, 1289 (10th Cir. 2009) ("'The maxim noscitur a sociis, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.'") (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)).

federal statutory provisions.  Likewise, part (2) begins by general referring to "intellectual property law" -- again, without reference to "federal" -- but then states an exception for intellectual property laws.  The similarity in format between parts (1) and (2) demonstrates the intent was to provide a general description of the law each part addresses, and then describe the specific aspects of <u>federal</u> law excepted.[36]

Further, considering the inclusion of parts (3) and (4), reinforces that part (2) refers only to federal intellectual property laws.  That is, part (3) contains a specific description as to the impact the CDA has upon state laws, a provision that would be rendered partially superfluous if part (2) had already addressed state law -- i.e., state intellectual property laws.  Moreover, had Congress intended that part (2) would refer to state intellectual property laws, then part (3) would have included the word "other," to reflect that part (2) had already described some state law, and would state instead: "Nothing in this section shall be construed to prevent any State from enforcing any **[other]** State law that is consistent with this section."  The omission of the word "other" in part (3) indicates that parts (1) and (2) had not yet included reference to state laws.

Finally, the inclusion of part (4), further demonstrates that part (2) refers only to federal intellectual property law.  That is, part (4) governs the general category of "privacy law" but then lists the specific exception as applying to "the Electronic Communications Privacy Act of 1986" "or <u>any similar State law</u>."  (Emphasis added.) Hence, part (4) demonstrates that where Congress intends to include an exception for

---

[36] It is further unlikely that Congress, a federal body, specifically had in mind the full panoply of various intellectual property laws enacted by all the respective states throughout the country.

state laws that are similar to the federal ones it was addressing, it will do so explicitly. Unlike part (4), part (2) does <u>not</u> provide that the exception applies "to intellectual property **[or any similar State law]**." Accordingly, part (4) supports that the intellectual property laws excepted by part (2) are only federal, not state, intellectual property laws.

Because the better interpretation of section 230(e) is the Ninth Circuit's that furthers the statutory purposes and excepts only federal intellectual property claims from immunity, the Court should grant the Motion to Dismiss as to state law claims.

## VI. GMS'S CANNOT RELY ON THE RAA TO SAVE ITS "AGENT FOR UNDISCLOSED PRINCIPLE [SIC]" THEORY

GMS opposes dismissal of its Ninth Claim for Relief, labeled as "Agent for Undisclosed Principle [sic]," but ignores the multiple, valid arguments Namecheap explained that require its dismissal. [*See* Opp. Memo at 23-24; Supp. Memo at 31-33]. Instead, GMS attempts to save the "claim" with arguments based upon the ICANN RAA, arguing merely that Namecheap is vicariously liable for Goldstein pursuant to Section 3.7.7.3 of the RAA. [*See* Opp. Memo at 23-24]. That argument is without merit.

First, regardless of any definition in the RAA, the RAA cannot change the reality that GMS was the registrar for the subject domain because it processed Goldstein's domain name application and did not make any such application for its own use.

Second, GMS has not alleged anything in its Complaint about the RAA, has not asserted any breach of contract claim against Namecheap, and GMS has absolutely no rights under the RAA. Section 5.10 of the RAA provides: "<u>No Third-Party Beneficiaries</u>. This Agreement shall not be construed to create any obligation by either ICANN <u>or Registrar to any non-party to this Agreement</u>, including any Registered Name Holder."

33

[Emphases added].[37]  Simply put, GMS cannot use the RAA to state a claim against Namecheap and, regardless of the RAA, its claims fail as a matter of law. [38]

## CONCLUSION

For all the foregoing reasons and as stated in Namecheap's initial supporting memorandum, GMS' Complaint is irreparably defective.  Namecheap's Rule 12(b)(6) Motion should be granted and all claims asserted against Namecheap should be dismissed with prejudice.

---

[37] GMS's reliance on the ICANN RAA with regard to the DMCA, and its attempt to recharacterize Namecheap as the domain "registrant," fails for the same reason.  [*See* Opp. Mem at 6 & n.1].  As described above, the RAA cannot change the reality that Namecheap received and processed the domain name at issue here and did not control or publish the content that ultimately appeared on the website at that domain.  *See infra*, Argument, Part I.  Providing a service affecting the manner of registration does not alter that it is the domain owner, not Namecheap, that is making the registration application and, by definition, is the "registrant" -- regardless of what contact information ultimately appears in the Whois database.  [*See* Compl. ¶ 10 recognizing WhoisGuard is a service provided "to domain name owners")].

[38] *See SolidHost*, 652 F. Supp. 2d at 1118-19 (dismissing breach of contract claim based on RAA because RAA provided it "shall not be construed to create any obligation by either ICANN or Registrar to any non-party to this Agreement, including any Registered Name Holder"); *see also Panavision Int'l L.P. v. Toeppen*, 945 F. Supp. 1296, 1305 (C.D. Cal. 1996) (granting summary judgment despite assertion that "representations and warranties that NSI requires of domain name applicants are made for the benefit of intellectual property owners such as Panavision" and "a jury could not reasonably infer that the Toeppen–NSI contract was intended to benefit intellectual property owners"); *City of Grantsville v. Redevelopment Agency of Tooele City*, 233 P.3d 461, 466 (Utah 2010) ("[O]nly those who are a party to a contract have a legally protectable interest in that contract.").

DATED this 2nd day of September, 2011.

MAGLEBY & GREENWOOD, P.C.

James E. Magleby
Eric K. Schnibbe
Jennifer Fraser Parrish

and

Eugene Rome
ROME & ASSOCIATES, A.P.C.

Attorneys for Defendant Namecheap, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that I am employed by the law firm of MAGLEBY & GREENWOOD,

P.C., 170 South Main Street, Suite 850, Salt Lake City, Utah 84101, and that pursuant

to Rule 5(b), Federal Rules of Civil Procedure, a true and correct copy of the foregoing

**REPLY MEMORANDUM IN SUPPORT OF NAMECHEAP'S MOTION TO DISMISS**

was delivered to the following this 2nd day of September, 2011:

[  ]    Via U.S. Mail

[X]    Via CM/ECF System

[  ]    Via Electronic Mail (as indicated below)

    Randall B. Bateman
     rbb@batemanip.com
    Perry S. Clegg
     psc@batemanip.com
    C. Todd Kinard
     ctk@batemanip.com
    Sarah W. Matthews
     sm@batemanip.com
    BATEMAN IP LAW GROUP, P.C.
    8 East Broadway, Suite 550
    Salt Lake City, Utah  84110

    *Attorneys for Plaintiff*

_____